## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| The OFFICIAL STANFORD INVESTORS COMMITTEE; and PHILLIP A. WILKINSON, and HORACIO MENDEZ, individually and on behalf of a class of all others similarly situated | § § § § § § § | |
| VS. | § § | CIVIL ACTION NO. _____ |
| BREAZEALE, SACHSE & WILSON, LLP; CLAUDE REYNAUD, ADAMS & REESE, LLP, J.D. PERRY; REBECCA HAMRIC, MICHAEL CONTORNO, and LOUIS FOURNET | § § § § § § § § § | |
| Defendants. | § | |

_____

## PLAINTIFFS' ORIGINAL COMPLAINT - CLASS ACTION
_____

NOW COME PLAINTIFFS, **The OFFICIAL STANFORD INVESTORS COMMITTEE; and PHILLIP A. WILKINSON and HORACIO MENDEZ, individually and on behalf of a class of all others similarly situated**, (collectively hereinafter "Class Plaintiffs"), and file this their Original Complaint - Class Action against Defendants, **BREAZEALE, SACHSE & WILSON, LLP, CLAUDE REYNAUD, ADAMS & REESE, LLP, J.D. PERRY, REBECCA HAMRIC, MICHAEL CONTORNO and LOUIS FOURNET** (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

### I.        PARTIES

1.      Plaintiff Official Stanford Investors Committee was formed by this Court on August 10, 2010.  *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order").  As stated in the terms of the Committee Order, the Committee, through this Complaint, is cooperating with the Receiver in the identification and prosecution of actions and proceedings against the Defendants for the benefit of the Receivership Estate and the Stanford Investors.  *See id.* at ¶ 8; *see also id.* at ¶ 7 (authorizing the Receiver and the Committee to bring litigation jointly). The Committee is the assignee of certain claims owned by The Receiver, as alleged herein.

2.      Plaintiff, PHILLIP A. WILKINSON, is a citizen of the United States of America currently residing in Harris County, Texas.

3.      Plaintiff, HORACIO MENDEZ, is a citizen of the United States of America currently residing in Travis County, Texas.

4.      Additionally, this case seeks certification of a class of all investors who, as of February 17, 2009, had purchased and still held Certificates of Deposit ("CD") and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. ("SIBL") through IRA accounts at Stanford Trust Company ("STC").

5.       Defendant, Defendant, Breazeale, Sachse & Wilson, LLP ("BSW") is a Louisiana limited liability partnership and with its principal place of business in Baton Rouge, Louisiana. BSW may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.  BSW may be served by serving its Partner, Claude Reynaud, One American Place, 301 Main Street, Twenty-Third Floor, Baton Rouge, LA 70821-3197.

6.      Defendant, Claude F. Reynaud, Jr. ("Reynaud") is a lawyer/individual residing in Baton Rouge, Louisiana and employed at Breazeale, Sachse & Wilson, LLP.   Reynaud may be

served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.   Reynaud may be served at Breazeale, Sachse & Wilson, LLP, One American Place, 301 Main Street, Twenty-Third Floor, Baton Rouge, Louisiana 70825.

7.      Defendant, Adams and Reese, LLP ("A&R") is a Louisiana limited liability partnership doing business in the State of Texas to be served through a Partner, A. Christopher Derden, One Houston Center, 1221 McKinney, Suite 4400, Houston, Texas 77010.

8.      Defendant, J.D. Perry ("Perry") is an individual residing in Texas.

9.      Defendant, Rebecca Hamric ("Hamric") is an individual residing in Texas.

10.     Defendant, Michael Contorno ("Contorno") is an individual residing in Texas.

11.     Defendant, Louis Fournet ("Fournet") is an individual residing in Louisiana. Fournet may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

## II.      PERSONAL JURISDICTION

12.     This Court has personal jurisdiction over the non resident Defendants under the Texas Long Arm Statute.  Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction.  Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas.   Since at least 1998 the Defendants served in various capacities as employees, officers, and directors (Perry, Hamric, Fournet, Reynaud) and/or lawyers (Reynaud, BSW, A&R) for an important segment of the Stanford Financial group headquartered in Houston, Texas, and in that

capacity engaged in extensive, indeed sometimes daily, contacts with Stanford Financial personnel based in Houston, Texas, including the General Counsel of Stanford Financial, related to the provision of the various services they provided to the Texas-based Stanford Financial group of companies.  In conjunction with the provision of their professional services to Stanford Financial, Defendants engaged in contacts with the State of Texas that assisted and perpetuated the Stanford Ponzi scheme described herein.  Based on their general and specific contacts with the State of Texas, Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

13.     Furthermore this Court has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

### III.      SUBJECT MATTER JURISDICTION & VENUE

14.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).   Further, as the Court that appointed the Receiver and the Committee, this Court has jurisdiction over any claim brought by the Receiver (or the Committee as assignee) to execute Receivership duties. Further, within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Receiver filed the original SEC Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

15.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C.

§1332(d)(2)(A) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of states different from Defendants.

## IV.   FACTUAL BACKGROUND

### A.   The Stanford Financial Empire

**16.**   From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia, Texas built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself, that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company ("SGC");  Antiguan based offshore bank Stanford International Bank Ltd. ("SIBL"); Stanford Trust Company (Louisiana)("STC"), Stanford Trust Company (Antigua), and the representative offices of Stanford Trust Company (Antigua) that operated in Miami, Houston and San Antonio under the d/b/a "Stanford Fiduciary Investor Services" ("SFIS"), all of which entities were ultimately controlled and managed from the United States, principally Houston, Texas.

**17.**   Begun initially as an offshore banking operation in the mid-1980s called Guardian International Bank, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer and investment adviser services worldwide from its SGC headquarters base in Houston, Texas.  Stanford Financial gave all the appearances of a highly successful operation, with lavish offices in some of the world's premier

cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal

fortune estimated at $2.2 billion.

18.     The entire Stanford Financial operation was fueled by one primary product:

Certificates of Deposit ("CDs") issued by the Antiguan offshore bank wholly owned and controlled

by Stanford himself – SIBL.  Clients who were introduced to the Stanford Financial group, whether

in Houston, Miami, Caracas or Mexico City, quickly learned that the main financial product being

peddled by the group was the SIBL CD.  The SIBL CDs were sold worldwide by a web of different

Stanford Financial promoter companies, including SGC, STC and SFIS, whose sole function was to

promote the sale of the SIBL CDs.  By 2009, SIBL had sold over $7.2 billion in CDs.

B.      **Stanford's U.S. Operations**

19.     For the first decade of his CD sales operations, 1985-1995, Stanford and his offshore

bank (whether Guardian or SIBL) targeted an exclusively Latin American clientele.  But by the mid-

1990s, Stanford had begun to establish a foothold in the United States.  In 1995 Stanford established

SGC and registered it as a broker/dealer and investment adviser in February, 1996.   Headed by

Louisiana brokers Jay Comeaux and Alvaro Trullenque, SGC established offices initially in Houston

and Baton Rouge, and began to grow.  Stanford began the practice of "head hunting" for U.S.

brokers, bankers, and other financial advisers, paying enormous signing bonuses to the brokers,

bankers and other financial advisers to leave their jobs at other firms and transfer their book of

clients over to SGC.  Fueled by this influx of veteran bankers, brokers and investment advisers, SGC

grew from 6 branch offices in the United States to more than 25 offices across the United States (but

principally concentrated in the Southern United States) between 2004 and 2007.

20.     Recognizing the huge potential for marketing his offshore CDs to Latin Americans

via the "gateway" city of Miami, in 1998 Stanford established SFIS, a representative office of SIBL

in Miami and, with the help of the Miami law firm Greenberg Traurig and partner Carlos Loumiet, disguised it as the representative office of Stanford Trust Company (Antigua) in order to evade U.S. banking regulations.  From that date forward until it was shut down in 2009, the Miami office of SFIS generated over $1 billion in SIBL CD sales for Stanford, primarily sales to investors from South American countries such as Venezuela, Ecuador, Colombia and Peru.  Based on the Miami success of SFIS, Stanford thereafter set up SFIS offices in Houston and then San Antonio, Texas, designed to cater to Mexican investors visiting those cities.

21.     Stanford then decided he wanted to sell the SIBL CDs to the IRA accounts of U.S. investors. He therefore established STC in Baton Rouge Louisiana in 1998 to serve as the trustee/custodian for IRA accounts owned by investors referred to STC by SGC.  Once set up with STC, the SGC brokers and investment advisers then convinced the IRA investors to invest some or, in many cases, *all* of their IRA account into the SIBL CDs.

22.     For all of these promoter companies --- whether SGC, SFIS or STC -- the primary product marketed and sold, and which sustained the operations and paid the employees' salaries and bonuses, was the SIBL CD.  All of these companies were 100% owned by Stanford, and all of these companies were interconnected via various intercompany marketing and referral fee agreements whereby SIBL paid percentage commissions or referral fees to the promoter companies for promoting the CDs.   In fact, it was no secret that throughout its history, SGC depended entirely for its survival on the constant influx of referral fees paid by SIBL to SGC for the promotion and sale of the SIBL CDs.

23.     Houston, Texas was the administrative nerve center and principal base for all of the operations of Stanford Financial, including SIBL, SGC, SFIS and STC.  STC was wholly owned and controlled by Houston-based SGC, and, with the exception of Defendant Claude Reynaud, virtually

every member of the STC Board of Directors at any time was an employee of SGC. SGC directed

the operations of STC and provided all administrative functions from Houston. STC's annual budget

and financial forecasts were prepared by SGC in Houston, and even reimbursement of expenses for

STC employees was handled out of Houston.

24.     All of the sales and marketing practices for the entire Stanford Financial group

(including SIBL), as well as general operational and administrative functions, were managed under

the overall direction, supervision, and control of the Houston offices of Stanford Financial. SIBL

itself never had a sales force or marketing or promotional arm in Antigua – rather it depended

entirely on all of the separate promoter or "feeder" companies like SGC, SFIS and STC to sell its

CDs. The head of the global sales operation for the marketing and sale of the SIBL CDs was located

in Houston, Texas.

25.     All of the Stanford Financial/SIBL sales practices, directives, techniques, strategies

and reward programs were developed and crafted in Houston and disseminated to the various

Stanford Financial branch offices around the world, including STC and SFIS. All of the sales force

training manuals, promotional literature and materials for SIBL, including the Spanish-language

promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed

from Stanford's Houston headquarters to the other Stanford Financial sales offices around the world

to be utilized by the local sales force in each country.

26.     In addition, mandatory sales training for the Stanford Financial sales force for SIBL

was conducted principally in Houston (known to the foreign financial advisers as the "Houston

experience") by Stanford Financial personnel headed by Oreste Tonarelli. In those mandatory

training sessions, sometimes twice a year, the Stanford Financial financial advisers ("FAS") were

trained to sell the Stanford Financial image. The Stanford Financial "script" for why SIBL was a

safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled and drilled again into their heads.   Therefore all of the sales, marketing and promotional activities for Stanford Financial and SIBL occurred in Texas.

27.     The Stanford Financial/SIBL sales and promotional materials created in Texas and distributed uniformly throughout the world intentionally blurred the lines between Antigua-based SIBL and the other U.S.-based Stanford Financial entities, including SGC, STC and SFIS, and intentionally created the false impression that, e.g., SIBL and SGC were one and the same and therefore that SIBL enjoyed the same regulation and protections as a U.S.-regulated company, including regulation by the SEC and coverage by SIPC.  As the Receiver has reported previously, "Stanford's financial advisors used the apparent legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate sales of SIBL CDs worldwide."[1]  Little did the investors like the Class Plaintiffs know that Allen Stanford, Jim Davis and others were engaged in a long running conspiracy to ensure that Stanford Financial, including SGC, SIBL, STC & SFIS, evaded SEC and other U.S. federal regulations, and regulation from any other governmental agency, foreign or domestic, at all costs, in order to keep prying eyes away from the SIBL portfolio.  In the end, keeping the SIBL asset portfolio a secret so that no one knew where the money from the CD sales was going, became the most important facet of Stanford's global Ponzi scheme.

## C.     Defendants' Participation in Stanford Trust Company Louisiana's Fraud

28.     Stanford established Stanford Trust Company in Baton Rouge, Louisiana by acquiring an existing Louisiana trust company, the Southern Trust Company.   SGC agreed to purchase all of the stock of the Southern Trust Company, which Stanford wanted to rename the "Stanford Trust Company" (STC).  Jay Comeaux and Alvaro Trullenque spearheaded this effort, and named J.D.

---

1  "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.

Perry as the President of STC.   The initial directors of STC were Jay Comeaux, J.D. Perry, Jay Zager, Jason Green, and Allen Stanford's right hand, General Counsel, and eventual Chief of Staff, Yolanda Suarez.

29.     Stanford had to seek approval for the acquisition of the Southern Trust Company from the Louisiana Office of Financial Institutions ("OFI").  As part of that process, OFI Chief Examiner Sidney Seymour sent a letter to Stanford's lead external counsel, Miami's Greenberg Traurig, on April 13, 1998 asking for more detailed information about SGC and SGC's affiliated companies. As part of that request for additional information about SGC, the OFI's Seymour told Greenberg Traurig that OFI wanted to know more about the extent of Stanford's involvement with Guardian International Bank in Montserrat ("Guardian"), which Seymour noted had been the subject of an OCC Banking Circular in 1989 regarding unauthorized banking activities in the United States. Said circular had been issued because of investigations by banking regulators in Texas, Florida and California concerning whether Guardian International Bank was operating illegal bank offices in those states.

30.     As a result, Stanford's General Counsel Yolanda Suarez decided that Stanford needed "connected" counsel in Louisiana, and so in early May 1998 Suarez hired Defendant Claude Reynaud and his Baton Rouge law firm Breazeale Sachse & Wilson ("BSW") to interface directly with the OFI and help gain OFI approval of the acquisition and get STC operational.   Reynaud and BSW became aware  as of May or early June 1998 that Allen Stanford was the sole shareholder of SGC as well as his offshore Antiguan bank SIBL, and that therefore SIBL was a sister company of SGC, the proposed parent company of STC.

31.     On June 5, 1998 Reynaud and BSW responded to the OFI's request for additional information by providing documentation to the OFI related to Guardian's surrender of its banking

license in Montserrat, and an investigation by the Texas Department of Banking of Guardian's operation of an unregistered representation office in Texas. Thus, from the very beginning of his relationship with Stanford, Reynaud was aware of Stanford's previous run-ins with the law based on his *modus operandi* of attempting to run unlicensed and illegal "sales offices" for his offshore banks in the United States. Reynaud and his law firm BSW nonetheless thereafter set out to help Stanford set up and run yet another sales office for his offshore bank, SIBL, in the State of Louisiana disguised as a "trust company".

32.     On June 23, 1998, the Louisiana OFI gave conditional approval for SGC to acquire STC. The STC acquisition was closed by lawyers from BSW on July 13, 1998. By late September 1998, all of the conditions imposed by OFI for STC to begin operations had been fulfilled.

33.     Once STC was up and running, Stanford began to implement his business plan – to use STC as an additional source of funding for SIBL CDs. His plan was to promote STC as an IRA custodian and trustee and get STC to acquire SIBL CDs for its' clients IRA accounts. Stanford began to implement this plan slowly, but by the time STC was shut down in 2009, most, if not all, SGC customers that had been referred to STC had their IRA accounts invested in the SIBL CDs. As of February 2009, STC had custody of over **$300 million** worth of SIBL CDs held in IRA accounts owned by SGC-referred customers.

34.     As a first order of business, Stanford put in place the legal mechanism that would govern the business relationship between SGC and STC. Through a Referral Agreement dated September 14, 1999 and signed by Jay Comeaux for SGC and J.D. Perry for STC, SGC agreed to refer to STC those clients "who have an interest in the types of investment products that are available" through STC. Importantly, STC retained the right to "determine the suitability of the client for the purchase of any security or other investment product". Thus STC retained a degree of

discretion over the investments chosen by the trusts it was to administer.   In return for the referral of clients, STC agreed to pay SGC referral fees equal to 50% of whatever fees STC earned from the referred client.   A separate agreement allowed STC to receive referral fees directly from SIBL when IRA account clients invested in the SIBL CDs.    Thus all three related companies, STC, SGC and SIBL, would share in the fees earned from the sale of the SIBL CDs to the IRA accounts held by STC.

35.     In early 2000, Reynaud became a member of the Board of the Directors of STC, and served in such capacity continuously until STC was put into receivership in February 2009.   In that position, Mr. Reynaud was involved in all major decisions made by STC about its business operations over the years, as well as decisions concerning STC's business model, including the decision to purchase SIBL CDs for STC's clients' IRA accounts, and was also aware of the rapid, pervasive and disproportionate growth of the SIBL CDs relative to other assets held in the IRA accounts, particularly from 2006-2008.   In short, Reynaud became aware over the years he served as a member of the Board of Directors of STC that the sole purpose of STC was to sell SIBL CDs to IRA accounts held in trust at STC.

36.     Next, Stanford started looking at the legalities of how to get the IRA accounts invested in the SIBL CDs.    Stanford initially had his in-house lawyers examine the issue.   In September 2000, Stanford in-house counsel Michael Contorno prepared a Memo to Jason Green, Oreste Tonarelli and Stanford Financial General Counsel Mauricio Alvarado that attempted to answer the question of whether CDs issued by an offshore bank were acceptable, qualified investments to be held in IRA accounts under US tax law.   While Contorno concluded in the Memo that there were no tax-based restrictions on selling offshore CDs to IRA accounts, he went on to suggest that before including the SIBL CDs in the IRA product offered by STC, it would be

necessary to obtain an independent legal opinion from Louisiana counsel to determine if there were any legal impediments under Louisiana law, given the related party nature of such transactions between STC, SGC and SIBL.

37.     On September 15, 2000 Stanford General Counsel Alvarado retained the Louisiana law firm Jones Walker to provide such a legal opinion.   On September 19, 2000, Jones Walker partner Ted Martin issued his legal opinion in which he opined that IRS regulations would not prevent SIBL from selling the CDs to IRA accounts in custody at STC, notwithstanding that Allen Stanford was the ultimate owner of both entities.   However Martin questioned whether such a transaction would run afoul of the Louisiana Trust Code prohibition on self-dealing.   He concluded his opinion by also pointing out that any recommendation by STC as to investment decisions would also have to be prudent, and that "[i]*n view of the close relationship between [STC and SIBL], if something goes wrong STC will have a very high burden of proving that it was not imprudent*".

38.     Based on the portions of the Jones Walker opinion that were favorable to selling the CDs, but ignoring the unfavorable portion, on September 21, 2000, Alvarado wrote to Jason Green and Oreste Tonarelli that  he was "happy to confirm" that SIBL CDs could be utilized as qualified investments in IRA accounts at STC, as long as the clients were advised that STC received fees from SIBL.

39.     The Stanford executives thereafter had some concerns about the propriety of STC receiving fees directly from SIBL for the sale of the CDs to the IRA accounts held by STC.   They therefore requested that Ted Martin of Jones Walker provide another analysis concerning the fees to be earned by STC.   Jones Walker issued a separate opinion letter on October 27, 2000 in which Ted Martin opined that nothing about the fee structure changed his advice rendered on September 19, 2000 and that he did not think the fee arrangements among the different Stanford companies needed

to be disclosed to the investors.

**40.**     Based on these legal opinions from Jones Walker, Stanford in-house counsel Michael Contorno thereafter advised the business group at STC that it was entirely permissible for an IRA account at STC to contain _only_ SIBL CDs.   Contorno opined, via Memo dated October 30, 2000 and addressed to Jason Green and J.D. Perry, that "[u]nless the recommendation of such an investment can be shown to be imprudent, there is no reason why an IRA need contain any other investment" [beyond SIBL CDs].

**41.**     SGC thereafter began to sell, and STC, as trustee, began to acquire on behalf of its clients, SIBL CDs for the clients' IRA accounts held at STC.   But just a year later, during a routine audit of STC in early August 2001, the Louisiana OFI raised concerns about this business and questioned several of Jones Walker's opinions, and suggested that a Private Letter Ruling from the IRS was needed on whether (1) STC was a fiduciary;  (2) SIBL was an affiliate of STC; and (3) whether the SIBL CDs were the same as CDs issued by a US Bank.   Alvarado wrote to Ted Martin on August 6, 2001 requesting that he respond to the issues raised by the OFI, since "STC did indeed rely on your analysis and offered SIBL CDs to STC's IRA clients".   Alvarado closed the letter by stating that a Private Letter Ruling would not be desirable.

**42.**     Martin responded to Alvarado's letter on August 13, 2001 by opining, in effect, that it was irrelevant whether SIBL and STC were related parties.   Alvarado forwarded that opinion to Perry, Green and (now Chief of Staff) Yolanda Suarez and recommended that Ted Martin respond directly to the OFI, since "Jones Walker is the largest law firm in Louisiana".   On August 15, 2001, Suarez called Perry and told him to instruct Jones Walker to deal with the OFI in order to try and avoid the OFI including the CD program in its official audit.    Martin sent a letter to the OFI dated August 16, 2001 providing his legal opinion that, while STC was a fiduciary to the IRA accounts,

there was nothing wrong with STC (as trustee) acquiring SIBL CDs for its clients' IRA accounts as long as the clients were aware of the relationship between STC and SIBL. He followed up with a second letter to the OFI dated September 26, 2001 in which he opined that there was nothing wrong with STC receiving referral fees directly from SIBL for acquiring the CDs while serving as trustee, because STC was not a fiduciary (contradicting his earlier opinion finding that STC was a fiduciary) because STC exercised no discretion with respect to what assets to purchase for the IRA accounts.

43.     On October 8, 2001, the OFI issued its examination report for its 2001 audit of STC, a copy of which went to all STC Board members, including Reynaud. As part of performing the audit, the OFI met with the STC Board (with Reynaud attending by telephone) on August 28, 2001, during which meeting "various aspects of the SIBL investment arrangement" were discussed. In its written report, the OFI disagreed with Jones Walker's assertions that STC was not functioning as a fiduciary on the IRA accounts. The OFI also raised concerns about conflicts of interest and self dealing and the overall prudence of STC investing in the SIBL CDs, since they were not insured or otherwise collateralized. The OFI noted that at that time in 2001, some $4 million in customer IRA funds had been invested in the SIBL CDs, and that in its interviews with STC President Perry, Perry had informed OFI staff that only clients "interested in more riskier international instruments are introduced to the [SIBL] CDs", which utterly contradicted the entire marketing campaign for the SIBL CDs as being low risk and safe investments. The OFI concluded the exam report by recommending that the STC Board reevaluate the CD program and "ensure that the risk being assumed by recommending and facilitating the purchase of these CDs is justified".

44.     Not happy with the danger to its new IRA-CD business, Stanford decided to retain more compliant legal counsel to help ward off the OFI. Therefore, Stanford turned to the Louisiana law firm Adams & Reese ("A&R"), who Stanford had used on previous occasions, including in a

1997-1998 attempt to set up a trust representative office in Texas to sell SIBL CDs.  Alvarado sent a letter to A&R partner Bob Schmidt outlining the issues of (1) whether STC, as trustee of IRA accounts, could use client IRA funds to invest in SIBL CDs, and (2) could STC receive fees for doing so.  A&R's Schmidt began working on his legal opinion, which thereafter went through various permutations before it was finalized in November 2001 and sent to the OFI.  In early drafts of the opinion, Schmidt seemed to have problems with the legalities of the structure, including whether or not STC and SGC would be deemed to be joint fiduciaries to the IRA accounts, thereby making the CD sales "prohibited transactions".  But after the draft went through the hands of Stanford personnel like Alvarado, Perry and Green, all doubts Schmidt had expressed vanished, and his final opinion found no problems with the structure.  Ignoring the facts known to him, including that SGC was a registered investment adviser and would be advising its clients to invest up to 100% of their retirement savings held in IRA accounts at related party STC into uninsured CDs issued by an offshore bank that was also an affiliate of SGC and STC, and that STC and SGC would share fees for doing so, Schmidt gave the "green light" to the entire structure and essentially "blessed" STC's business model.  A&R's legal opinion was then used by STC to convince the OFI to allow STC to continue with its business model and plan of operation.  As a direct result, STC thereafter served as trustee supervising its clients' purchases of unregistered, offshore Ponzi scheme securities in their IRA accounts going forward for the next seven years until the amounts invested in SIBL CDs held in the IRA accounts totaled $300 million.  The OFI essentially left STC alone from 2001 through 2007, during which time it exploded with growth in the sale of SIBL CDs.

45.     From 2001 through 2008, SGC brokers and investment advisers continuously convinced clients to transfer their IRA investments to STC to be held in trust there, and simultaneously recommended to the clients that they invest their IRA funds in the SIBL CDs.  In

many cases STC's clients, on the advice of their SGC investment advisers, invested 100% of their IRA accounts, their entire life's savings, in the SIBL CDs. Throughout these years, J.D. Perry and Reynaud, as officers and directors of STC, were overseeing and supervising the operations of STC and authorized STC to make these investments in the SIBL CDs on behalf of clients and to do so at the behest of SGC in order to earn fees from the sales.

46.     During this time period A&R continued to provide legal services to STC and SGC to assist Stanford to get hold of investors' retirement plans, including 401k plans, for investment in the SIBL CDs. In February 2007, as part of an analysis of whether STC could act as custodian for ERISA plans and whether such plans could purchase the SIBL CDs, A&R lawyers - including Schmidt and fellow A&R partner Jim Austin - received and reviewed offering materials and disclosures for the SIBL CDs, and became aware that the CDs were not insured, and had not been registered as securities in the United States and were not otherwise subject to regulation in the United States.

47.     J.D. Perry resigned from STC at the end of 2006. Louis Fournet was named President of STC in April 2007. Fournet joined STC from Hancock Bank, where he previously was the Senior Vice President and Trust Administration Manager.

48.     In September 2007, the OFI initiated its 2007 audit of STC. As part of that examination, OFI once again questioned STC's investments of its clients' IRA funds in the SIBL CDs. The OFI became alarmed because by this time in the early Fall of 2007, STC held custody of some $263 million in IRA accounts, the vast majority (72%) of which had been invested in the SIBL CDs. From a review of STC IRA account files, the OFI also discovered that the files contained no financial information or back up data supporting the appropriateness of investments in the SIBL CDs, in violation of STC's own internal policies. The OFI was also alarmed to discover that STC

was still receiving referral fees from the sales of the SIBL CDs to the IRA accounts, albeit indirectly through SGC, and that said fees accounted for the vast majority of STC's income.

49.    STC immediately turned to A&R to get a new legal opinion on the issue of whether or not STC and/or SGC were permitted to receive fees from the sale of the SIBL CDs.   With full knowledge that the opinion was designed to placate the OFI, Schmidt issued his new legal opinion on October 8, 2007, in which he opined, yet again, that (i) the acquisition of SIBL CDs by the IRA accounts was not prohibited and (ii) receipt of fees was not prohibited.   STC forwarded this new A&R legal opinion on to the OFI, and took the position that STC was allowed to share fees with SGC for the sale of the SIBL CDs.

50.    After follow up meetings with the STC Board, on January 30, 2008 the OFI sent a letter to STC President Louis Fournet asking for information to "verify the validity" of the SIBL CDs, including a summary of STC's analysis/efforts with respect to validating the CDs and the asset mix of SIBL, and also requesting authorization to contact SIBL's auditor, CAS Hewlett, to confirm SIBL's investments.

51.    But instead of getting a response from STC, on February 14, 2008 the OFI received a response from Bernie Young, the Director of Compliance for SGC in Houston.   SGC refused to produce any documents that would satisfy OFI's request to "go behind the curtain" to peek at SIBL's portfolio, citing (inapplicable) Antiguan privacy laws.   Young also informed the OFI that SGC could not put OFI in contact with CAS Hewlett because SGC "does not have a contractual relationship" with the auditor, but that he would "facilitate an introduction" to SIBL's management so that SIBL's management could decide whether or not to provide the requested information.   Upon information and belief, all members of the STC Board, including Reynaud, knew of and approved this communication between Young and the OFI.

52.     On February 22, 2008, Reynaud sent a letter on BSW letterhead to Fournet and fellow STC Board member Zack Parrish to report on two tasks he had been assigned by the Board with respect to the OFI:  (1) to get some intelligence on OFI Commissioner John Ducrest, who was in charge of the 2007 audit of STC and (2) to figure out a way to "approach" Ducrest.  Reynaud reported that, as a regulator, Ducrest was "lifer", and had a reputation of being very professional and no-nonsense.   Reynaud then went on to state, in a surprising moment of candor, that

> "[a]ll of this would likely be good news if we were wanting good government professional appointees running our State, and I do for reasons obviously independent of this situation.  It is, however, not necessarily good news from a political standpoint, because, unlike past commissioners, we have no political history with him.  In addition, Mr. Ducrest's history as a fraud examiner probably makes him look at the offshore business of Stanford International Bank with an initial bit of curiosity, if not concern."

53.     What happened next is nothing short of shocking.   In order to provide some "cover" to the OFI, STC and SGC determined that they would get SIBL's Antiguan regulator, the FSRC, to send a letter to the OFI attesting to the validity of SIBL.   So on April 8, 2008, Stanford in-house counsel, Defendant Rebecca Hamric, herself prepared a letter purportedly "from" the Antiguan FSRC to the Louisiana OFI for FSRC director Leroy King to sign and place on FSRC letterhead and send to the OFI.  Hamric prepared all of the text of the fake FSRC letter, including the statement that "we found the bank to be in compliance with all regulatory guidelines and all applicable rules and regulations".  She even inserted a space at the top of the page to indicate that the letter needed to go on Leroy King's letterhead.   Hamric e-mailed that document to SIBL's President Juan Rodriguez-Tolentino to pass along to King.

54.     That exact letter prepared by Hamric for Leroy King's signature was then duly signed by King the very next day, April 9, 2008, and faxed back to SGC by Rodriguez-Tolentino, upon which it was forwarded to the OFI.   Hamric did the same thing with a similarly fake letter from

auditor CAS Hewlitt --- basically ghost writing it to say what she and other STC and SGC employees wanted it to say, and then forwarding it to CAS Hewlett for signature and then delivering it to the OFI.

55.     On July 21, 2008 the OFI issued its official audit report based on its 2007 examination of STC. The OFI noted that a "great majority" of STC's growth and income had come from the "proliferation" of sales of the SIBL CDs in IRA accounts.   The OFI also noted that the investment advisors on those STC accounts were all employed by SGC.  The OFI emphasized that it was "concerned with the lack of diversification and apparent risk associated with this growing concentration", and expressed concern that the growth in the SIBL CD concentration "without proper due diligence and ongoing reviews of SIBL is exposing STC to an undue level of risk."   Because of that concern, the OFI instructed STC that it was "no longer willing" to allow STC to continue to accept SIBL CDs as investments in its clients' IRA accounts without an independent valuation of the CDs.  The OFI therefore recommended that STC immediately obtain an independent valuation of the SIBL CDs brokered through SGC, and to also obtain an independent validation of the methodology being used by SGC to determine whether the customers truly qualified as "accredited investors" under Reg. D of the securities laws.

56.     Stanford turned to A&R again to help with the OFI.  As had become Stanford's modus operandi everywhere it operated, Stanford wanted someone "connected" who could "grease the skids" with the OFI. On July 29, 2008, SGC compliance executive Lena Stinson informed General Counsel Alvarado that she had spoken with A&R partner Jim Austin, who had indicated that he had personally known OFI Commissioner John Ducrest since they were 5 years old, and that Austin was "well known" at OFI.

57.     At an August 5, 2008 meeting of the STC Board, attended by Stanford Financial

General Counsel Mauricio Alvarado and SGC compliance executive Lena Stinson, the Board discussed the OFI report, and began discussing how to handle the CD valuation.   Alvarado voiced objection to the OFI's perceived attempt to exert jurisdiction over SIBL, but other Board members pointed out that the OFI had jurisdiction because the CDs were being held in Louisiana IRAs.   As to the issue of whether STC could receive fees from the sale of the SIBL CDs, Alvarado indicated that STC had legal opinions from A&R regarding the legality of taking fees, and that STC should just ignore the OFI on the fee issue.

58.     The STC Board met again on August 11, 2008 to continue discussions about the OFI examination and to approve the retention of A&R's Jim Austin to respond to the OFI.   STC hired Jim Austin, and STC and SGC executives immediately supplied him with copies of SIBL financial statements audited by CAS Hewlett, along with copies of the OFI examination reports and the previous A&R legal opinions concerning the legality of the trust operations and earning of fees.   On August 28, 2008 STC advised Austin that the total amount of SIBL CDs held in the more than 1,200 IRA accounts at STC as of that date was $337,270,133.31.

59.     STC officially stopped selling the SIBL CDs to its IRA accounts on August 15, 2008. Louis Fournet resigned as President of STC shortly thereafter in late August or early September 2008.

60.     With little to no revenues due to the cessation of the SIBL CD business, SGC and STC decided to transfer the SIBL CD - IRA business to another custodian, so that SIBL could continue to sell the CDs to the IRA accounts while they were held by an unrelated party.   SGC negotiated an arrangement with International Bank and Trust ("IB&T") to transfer 1,264 IRA accounts holding SIBL CDs to said company.  Indeed, many unfortunate investors who invested with Stanford after January 2009 had their IRA accounts transferred to IB&T and invested in the SIBL

CDs.   But Stanford Financial collapsed and was taken over by the SEC before the transfer of the existing IRA accounts could be accomplished.

### D.   The Stanford Ponzi Scheme

61.   The reality of the Stanford Financial empire was that it was nothing but a massive, worldwide Ponzi scheme.  The master manipulator and salesman, Allen Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level. Stanford became a true international financial pirate, absolutely intent on operating an outlaw investment company from his Caribbean safe haven completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Mexico or elsewhere.  Indeed Stanford Financial violated the laws of virtually every country it operated in, including the United States, Mexico, Venezuela and Antigua.   Stanford's repeated commission of regulatory fraud in various countries enabled and fostered the growth of SIBL's CD sales.

62.   The gist of the fraud was simple:  (1) sell the offshore SIBL CDs through a flashy marketing campaign designed to trick investors into believing that they were purchasing safe, secure (even insured) and liquid CDs that were regulated in the United States because SGC was a U.S. licensed broker/dealer, while at the same time (2) maintain a "Wizard of Oz" style veil of secrecy over the SIBL asset portfolio and what Stanford was doing with the money (which ended up being whatever Allen Stanford wanted).   Thus Stanford went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's portfolio.

63.   SIBL was insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end.  Stanford induced investors to buy CDs by offering  above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment

strategy, financial strength, the safety and nature of its investments and other facts important to investors. SIBL's earnings and assets were insufficient to meet its CD payment obligations, so the only way Stanford could keep the scheme going was by using the proceeds from the CD sales to pay redemptions, interest and operating expenses. SIBL's assets were inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, Stanford and his minions would simply determine what level of fictitious revenue SIBL "needed" to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses. They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative) of a fictitious investment allocation.

64.     Stanford opened up his first offshore bank, Guardian International Bank ("Guardian"), in 1985 on the tiny (12,000 residents) Caribbean island of Montserrat. Guardian served as the starting point roadmap for the eventual creation of the Stanford Financial empire. Stanford established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to wealthy Latin American clients.[2] Stanford brought in his old college roommate James Davis to help run operations. Guardian offered CDs with rates typically 2-3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

65.     By 1989 the banking system in Montserrat came under investigation by British and U.S. authorities. Guardian itself came under scrutiny for possible drug money laundering, and so Stanford began looking for other locations for his bank. In December 1990 Stanford re-incorporated Guardian Bank in Antigua and transferred all of the assets of the Montserrat licensed Guardian bank

---

2       *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"

to the new Antiguan licensed Guardian bank.  By May 1991 Stanford's banking license was officially revoked by the Montserrat Government (although Stanford later in 1994 would sue the Government of Montserrat to have that order rescinded).   So Stanford simply picked up and moved his banking operations to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of the Antiguan bank from Guardian to Stanford International Bank ("SIBL") in 1994.

66.     Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship with the local government.  In return for political cover, Stanford eventually became a major source of funding for the entire island, eventually loaning hundreds of millions of SIBL investors' dollars to the Antiguan government over the years.  Stanford even bought the Antiguan newspaper, the Antiguan Sun.  By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues – and certain of the loans were secured by Antigua's tax revenues and medical fund.  In that same year, SIBL had grown to over $3 billion in deposits.

67.     So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1998-1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws.  Stanford and his agents were then named to the banking regulatory commission (the precursor to the FSRC), that was created and charged with supervising Antigua's banks.  Stanford then used the new commission to wrest control of Antigua's offshore banking industry, even stooping to the level of sending representatives to physically take bank records from the previous Antiguan banking regulators.

68.     Antigua's corruption and lax banking regulations is borne out  by the Plea Agreement entered by Stanford CFO Jim Davis ("Davis Plea"), as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"),

Stanford's good friend and the former head of Antigua's FSRC (the "Indictment").  The Davis Plea

and Indictment allege that for years King, while acting as the CEO of the Antiguan FSRC, accepted

bribes from Stanford and/or his associates in return for ensuring that the FSRC "looked the other

way" and did not properly perform its regulatory functions or supervise SIBL.  King even entered

into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever

be bound to Allen Stanford.  As part of the blood brother relationship and bribery, King became

Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning

the SEC's investigations of Stanford Financial and SIBL from 2005 all the way until 2009.  All of

this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by

evading and obstructing regulation of SIBL's activities at every turn and in every country.

69.     Stanford Financial began to grow exponentially beginning in 2000.  In November

1998, SIBL filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIBL CDs

to U.S. "accredited investors" in the United States without registering them as securities (of course,

Stanford continued to rampantly sell CDs to Latin Americans from its offices in Texas and Miami

regardless of whether they were "accredited" or not).   That initial Reg. D filing listed CD offerings

totaling $50 million.  SIBL filed an amended Reg. D in November 2001 increasing the CD offering

amount to $150 million.    SIBL filed two additional amendments in 2004 (March and then

November) increasing the size of the offering to $200 million and then to $1 billion, clearly

evidencing the mass sales of SIBL CDs taking place in the United States.   Finally, in November

2007 SIBL filed yet another Reg. D amendment to increase the size of the offering to $2 billion.

During those years, SIBL sold CDs under the Reg. D offering to well in excess of 1,000 investors.

70.     In November 2004, as part of Stanford's in-house legal team's analysis of Reg. D,

Stanford lawyer Rebecca Hamric prepared a Memo to General Counsel Mauricio Alvarado in which

she set forth the legal analysis supporting SIBL's decision to amend its Reg. D filing to increase the offering amount to $1 billion.   She stated in the Memo that she had cold-called the SEC and talked to an SEC lawyer about how often an issuer could amend a Reg. D filing, and described how the SEC lawyer had mentioned that many hedge funds use section 506 because the sales "go on for years".   She pointed out that, "*although the SIBL CD is not marketed as a hedge fund, the filing issues are similar, and we should be able to address our own issues similarly*".   She went on to recommend that SIBL increase its offering limit to $1 billion.

71.     During this same time period, Stanford Financial employees in Houston reported that Stanford had printed and distributed to FAs for marketing purposes some 30,000 SIBL offering brochures in 2003.   In March, 2006, Stanford Financial personnel reported that the various U.S. sales offices had collectively distributed 4,424 SIBL CD "accredited investor" packets to investors under the Reg. D offering.

72.     From 2004 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut.   Stanford Financial began an intensive television advertising campaign in the United States in 2005 designed to promote the sale of the CDs.   The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".   In order to market and sell the SIBL CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial FAs, including those in Latin America, to "push" the SIBL CDs on investors like Plaintiffs.   SIBL paid disproportionately large commissions to SGC for the sale of CDs; SGC received a 3% commission upon the sale of the CDs, of which 1% was paid to the SGC broker that made the sale, and the FAs were also eligible to receive as much as a 1 % trailing commission throughout the term of the CD.   Stanford Financial used this generous commission structure to recruit established

financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.   Of course, commission and bonus structures like that used by SIBL are not typical, largely because they cannot be sustained economically-i.e., the investments do not make enough to cover the stated CD rates of return, commissions and referral fees along with other applicable operating expenses.

73.     The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company from Houston, Texas.   In essence, Stanford Financial, acting through its international network of companies and FAs, lured money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together to make investments in various illiquid and high risk assets worldwide, including loans to Allen Stanford and massive investments in Antiguan real estate.   None of the investors' money was segregated and all investor money was commingled and then sprinkled as equity investments throughout the various companies that comprised Stanford Financial.   As such, in reality Stanford Financial was operating as an outlaw mutual or hedge fund, not registered under the Investment Company Act, and selling its internal product securities to Plaintiffs and others from Houston, Texas in violation of the Investment Company Act.   Section 47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.  15 U.S.C.§ 80a-46.

74.     Stanford Financial was never registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class, who were

consistently and uniformly told verbally and via the Stanford Financial promotional materials that, e.g. the Stanford Financial group based in Houston, Texas was compliant, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage.  Plaintiffs and other investors were never told the material fact that the acts of Stanford Financial and its unregistered investment company were *void as a matter of law* under Section 47 of the Investment Company Act.

75.    As part of the fraud committed on Plaintiffs and the Class, Stanford Financial also uniformly touted the high liquidity of SIBL's investment portfolio.  For example, in its marketing materials distributed to Plaintiffs and the Class from at least 1995 through 2009, which materials were reviewed by Defendants, Stanford Financial emphasized the importance of the liquidity of the SIBL CD, stating, under the heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors."  None of that was true. Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients…"  To ensure investors would buy the CDs, Stanford Financial, through its FAs, assured the investor clients that SIBL's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly 80% of SIBL's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.8 billion; (2) private equity investments in non-public companies; and (3) investments in Stanford Financial companies with real estate holdings, including extensive real estate holdings in Antigua and elsewhere in the Caribbean.

76.    Contrary to Stanford Financial's representations (both verbal and via the promotional

materials) to Plaintiffs and the Class regarding the liquidity of its portfolio from 1995 through 2009, significant portions of SIBL's portfolio were misappropriated by SIBL's sole shareholder, Allen Stanford, and used by him to invest heavily in Caribbean real estate development ventures. In fact, by 2008, Stanford Financial was essentially a real estate development fund, a crucial fact that was never disclosed to Plaintiffs or the Class.

77.     At year-end 2008, the largest segments of SIBL's portfolio consisted of the "loans" to Mr. Stanford and over-valued real estate, primarily in the Caribbean. By February 2009, Mr. Stanford had misappropriated at least $1.8 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua. The rest of the money from investors was spent by Stanford on creating and perpetuating the Stanford Financial image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige. None of this was disclosed to Plaintiffs or the Class.

78.     As alleged in the Davis Plea and in the criminal Indictment of Allen Stanford and the others, Stanford and his CFO Jim Davis fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements. Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. Information in SIBL's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the

bank investments.  SIBL's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements.

79.     By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIBL CDs to Plaintiffs and the Class by touting: (i) the bank's safety and security, including that invested funds were insured; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that  exceeded those offered by commercial banks in the United States.  It was at the end of 2008, in the midst of the worldwide financial meltdown, that Stanford Financial began to stumble.

80.     As alleged by the SEC and the United States Justice Department, in order to cover up a hole in SIBL's balance sheet that would cause it to fall below minimum capital requirements, in 2008 Stanford and Davis concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of Antiguan property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB.

81.     In October, 2008 Stanford Financial began suffering liquidity problems caused by a "run" on SIBL that prevented SIBL from complying with client requests for transfers of funds. SIBL's CD transaction records indicate that approximately $2 billion in CDs was paid to investors for principal and interest from January 1, 2008 through February 17, 2009.  This had a huge impact on the ability of the FAs at Stanford Financial to keep clients pacified.  Nevertheless the Stanford Financial FAs were ordered to continue to sell the CDs and bring in new money.

82.     In the wake of the Madoff scandal in January 2009, as Defendants were helping SGC re-route clients funds to SIBL through a different trust company, Venezuelan financial analyst Alex

Dalmady performed an analysis of SIBL's returns over the years, taken from SIBL's Annual Reports (the same ones Defendants reviewed every year), as a favor for a friend, and then published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings. Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck". The cat was out of the bag.

83.    The Madoff fiasco intensified the SEC's 3 year long investigation of Stanford. In advance of a deposition before the SEC, Stanford Financial officials met with outside counsel in Miami on February 4, 2009. Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen Stanford an e-mail, copying David Nanes as well, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together*).

84.    On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a Complaint against SGC and SIBL, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions". The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed as Receiver, Ralph Janvey to liquidate the Stanford Financial group of companies.

85.    The SEC, through its Second Amended Complaint, alleges a fraud of shocking magnitude. The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIBL into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private harem of women and their children; a fleet of jets; yachts; and mansions in several different countries, as well as funding all

of the massive Caribbean real estate projects Stanford had dreamed up but never disclosed to the investors.  On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering.  Former Stanford Financial CFO Jim Davis has since pled guilty to, *inter alia*, securities fraud.

## V.       COMMITTEE'S CLAIMS

### A.    Basis for Claims

86.    This Court has found that the Stanford fraud was a Ponzi scheme.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

87.    In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme.  *See Janvey v. Alguire*, No. 10-10617, 2010 WL 5095506, at *1, *17 (5th Cir. Dec. 15, 2010) (upholding this Court's Order).  In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> *                  *                  *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> *                  *                  *
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi

> scheme existed . . . .
>
> \*      \*      \*
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . . .
> The record supports the fact that Stanford, when it entered
> receivership, was grossly undercapitalized.

*Id.* at \*9-13.

88.　　CD Proceeds from the Ponzi scheme described above were transferred at various times by or at the direction of the Stanford Entities to Defendants.  Defendants did not provide reasonably equivalent value for the transfers of CD Proceeds and cannot establish that they are good-faith transferees.

89.　　The Receiver has identified payments of CD Proceeds totaling at least millions of dollars from the Stanford Entities to Defendants from January 2006 through February 16, 2009.  See Schedule of payments, attached hereto as Exhibit "A".

90.　　The transfers of CD Proceeds to A&R from the Stanford Entities consisted of at least the following: $111,247.68 in legal fees between April 17, 2007 and December 4, 2008.

91.　　The transfers of CD Proceeds to BSW from the Stanford Entities consisted of at least the following: $283,270.59 in legal fees between December 13, 2006 and February 6, 2009, which includes a flat payment of $250,000 on May 27, 2008 for unknown work.

92.　　The transfers of CD Proceeds to Reynaud from the Stanford Entities consisted of at least the following: $38,000 in STC director's fees at $1,000 a month between at least January 19, 2006 and February 12, 2009.

93.　　The transfers of CD Proceeds to Contorno from the Stanford Entities consisted of at least the following: $652,756.45 salary and bonuses between August 15, 2006 and September 4, 2008, and including $165,000 in severance payments transferred to Contorno in September 2008.

94.     The transfers of CD Proceeds to J.D. Perry from the Stanford Entities consisted of at least the following: $117,794.84 in salary and bonuses between at least March 17, 206 and October 13, 2006, and including $100,000 in severance payments transferred to Perry on October 13, 2006.

95.     The transfers of CD Proceeds to Hamric from the Stanford Entities consisted of at least the following: $470,604.23 in salary and bonuses between at least April 6, 2006 and March 13, 2009.

96.     The transfers of CD Proceeds to Fournet from the Stanford Entities consisted of at least the following: $374,740.53 in salary and bonuses between May 15, 2007 and September 17, 2008, and including $125,000 in severance payments transferred to Fournet on September 15, 2008.

97.     The Receiver's investigation is continuing, and should more payments of CD Proceeds to any of the Defendants be discovered, the Plaintiffs will amend this Complaint to assert claims regarding such additional payments.

98.     This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets.  Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc 1130) at ¶¶ 1-2.   The Court appointed the Committee to represent Stanford investors in the case *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N and in related matters.  Committee Order (Doc. 1149) at ¶ 2.  The Committee, as assignee of The Receiver's claims, seeks the relief described herein in these capacities.

99.     Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."  Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing

Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."  Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c); *see also Alguire*, 2010 WL 5095506, at *16-17 ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims.").

**100.**    One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants").   But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate.  *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

**101.**    The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate and the Stanford Investors jointly with the Receiver.  *See* Committee Order (Doc. 1149) at ¶¶ 2, 7-8. The Receiver has assigned certain claims to The Committee, including those claims hereinafter plead.

### B.      Causes of Action

**COUNT 1:      Disgorgement of CD Proceeds Fraudulently Transferred**

102.     The Plaintiffs are entitled to disgorgement of the CD Proceeds transferred from the Stanford Entities to Defendants because such payments constitute fraudulent transfers under applicable law.  The Stanford Entities made the payments to Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Plaintiffs are entitled to the disgorgement of those payments.  Additionally, the Stanford Parties transferred the funds to Defendants at a time when the Stanford Entities were insolvent, and the Stanford Entities did not receive reasonably equivalent value in exchange for the transfers, and/or any value received was in furtherance of the Ponzi scheme that Defendants knew or should have known about, and was recklessly and willfully blind to.

103.     The Plaintiffs may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007).  The Stanford Entities were running a Ponzi scheme and paid Defendants with funds taken from unwitting SIBL CD investors.  The Plaintiffs are, therefore, entitled to disgorgement of the CD Proceeds the Stanford Entities fraudulently transferred to Defendants.

104.     Consequently, the burden is on Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  The Plaintiffs are, therefore, entitled to recover the full amount of the payments that Defendants received — either directly or indirectly — unless Defendants proves *both* objective good faith *and* reasonably equivalent value.

**105.** There is no evidence that Defendants provided any value — much less reasonably equivalent value — in exchange for the fraudulent transfers it received. Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value. *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'"). Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value." Defendants cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the millions of dollars in CD Proceeds they received from the Stanford Entities. Because Defendants cannot meet their burden to establish that they provided reasonably equivalent value for the payments of CD Proceeds to them, the Plaintiffs are entitled to the disgorgement of those funds.

**106.** Moreover, under applicable fraudulent-transfer law, the Plaintiffs are entitled to attorneys' fees and costs for their claims against Defendants. *See, e.g.,* Tex. Bus. & Com. Code Ann. § 24.013. As a result, the Plaintiffs request reasonable attorneys' fees and costs for prosecuting their fraudulent-transfer claims against Defendants.

**107.** The Receiver was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. Tex. Bus. & Com. Code Ann. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

108.    The Stanford Entities, who orchestrated the Ponzi scheme, transferred the CD Proceeds to Defendants with actual intent to hinder, delay, or defraud their creditors.  The Committee is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to Defendants. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by Defendants were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**COUNT 2:    In the Alternative, the Committee is Entitled to Disgorgement of CD Proceeds from Defendants under the Doctrine of Unjust Enrichment.**

109.    In the alternative, the Committee is entitled to disgorgement of the CD Proceeds paid to Defendants pursuant to the doctrine of unjust enrichment under applicable law.  Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors.  Defendants have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

110.    In order to carry out the duties delegated to it by the Receiver and by this Court, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Defendants.

111.    Defendants have been unjustly enriched by their receipt of CD Proceeds from the Stanford Entities.  The Committee is, therefore, entitled to disgorgement of all CD Proceeds Defendants received.  Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by Defendants unjustly enriched Defendants; (b) CD

Proceeds received directly or indirectly by Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**COUNT 3:** **In the Alternative, the Committee is Entitled to Restitution Under the Theory of Money Had and Received.**

**112.** In the alternative, the Committee is entitled to restitution of the CD Proceeds paid to Defendants pursuant to the doctrine of money had and received, or recoupment. To prove a claim for money had and received, the Committee need only show the following: (1) that Defendants hold/received money and (2) the money, in equity and good conscience belongs to the Plaintiffs. Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors. The Committee is accordingly entitled to all CD Proceeds Defendants received. Further, the recovery of attorney's fees is expressly authorized for this claim. TEX. CIV. PRAC. & REM. CODE § 38.001 et seq.

## VI. INVESTOR CLASS PLAINTIFFS' CLAIMS

### A. Basis for Claims

**113.** All of the Class Plaintiffs invested in the Stanford Ponzi scheme by purchasing CDs or placing their money in other depository accounts with SIBL through their IRA accounts at SGC as advised by investment advisers at SGC. Over the years that Plaintiffs purchased and maintained investments in SIBL, Plaintiffs were repeatedly and uniformly told, either directly by SGC FAs (who were uniformly trained to make these statements) or via Stanford Financial promotional materials, that, *inter alia*: (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in a portfolio focused on safe and highly liquid instruments; (2) the assets held in SIBL's

investment portfolio were more than sufficient to cover any and all CD liabilities;  (3) SIBL was fully and adequately regulated by the Antiguan FSRC; and (4) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

114.     During the time that Plaintiffs purchased and maintained investments in SIBL, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) SIBL was not regulated by the U.S. or any other government; (2) Plaintiffs' investments in SIBL were <u>not</u> insured; (3) no one knew where Stanford was investing the money or what assets comprised the SIBL portfolio;  (4) Stanford Financial was operating illegally as an unregistered investment company (whose contracts were thus void under § 47 of the Investment Company Act) soliciting and selling unregistered securities by, from and through Houston, Texas; (5) that SIBL was not invested in safe secure and liquid instruments, but rather was investing its clients' money in speculative Caribbean real estate ventures; and/or (6) that SIBL was not adequately regulated by the FSRC or any other entity and was audited only by a one man "mom and pop" audit shop under the control of Allen Stanford.

115.     Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by SGC FAs and via Stanford Financial promotional materials, Plaintiffs decided to invest money in, and maintain investments in, the SIBL CDs from at least 2007 through 2009.

116.     Horacio and Annalisa Mendez Plaintiffs were investor clients of SGC and STC.  In October 2007 the Mendezs were introduced to an SGC Financial Adviser named Patrick Cruickshank who operated out of the SGC Austin branch office.  Cruickshank made all of the typical uniform representations to the Mendezs about Stanford Financial that were part of the training

instilled in such advisers by Stanford Financial, as described herein.  During that initial meeting, Cruickshank convinced Mendezs to invest their money in CDs issued by SIBL.  Just as he was trained to do, Cruickshank represented to the Mendezs that SIBL was "safer than a U.S. Bank", because it had Lloyds of London Bonded insurance.  He also represented that SIBL had Directors' & Officer's Liability policy; a depository insolvency policy insuring funds held in correspondent financial institutions; and that SIBL was aiming for Basel II status (that most Banks held only Level 1).  He also represented to Mendezs that the Bank did not make loans like a regular bank, but instead invested in a portfolio of highly liquid assets, such that the CDs could be redeemed on just a few days notice. All of these statements were part of the Stanford uniform sales pitch.

117.    During this sales presentation, Cruickshank, like all other Stanford Financial advisers, neglected to inform Mendezs that SIBL was not, in fact, a real bank, but, rather, operated more like a hedge fund.  Based on the representations made to them by Cruickshank, Plaintiffs made the decision to invest their retirement savings in the SIBL CDs.  On October 5, 2007, Plaintiffs invested $100,000 with Stanford Financial, wiring the money to SGC.  With that money, Plaintiffs, following the advice of Cruickshank, purchased one SIBL "Flex CD" in the amount of $50,000  (SIBL Acc # 173185); and also purchased  another SIBL "Fixed CD" also in the amount of $50,000 (SIBL Acc # 173184).

118.    Then in February 2008, when Plaintiff Horacio Mendez changed employers, Cruickshank convinced the Mendezs to "roll over" Mr. Mendez's IRA savings account into a new IRA account at STC.  Thus on February 5, 2008, Plaintiffs wired $300,000 to an STC account at Hancock Bank of Louisiana for further credit to a bank account controlled by SIBL for further credit to the Mendez's new SIBL Account #300822.

119.    Later in 2008, after being reassured by another SGC adviser in the Austin office that their investments in Stanford Financial continued to be safe and secure, Mendezs made another

investment in SIBL – this time using money that Mrs. Mendez was holding for the benefit of her nieces. On September 17, 2008, Mendezs wired $24,137.32 to their SGC account to purchase the CD in that amount. All that money is now lost.

120. Phillip Wilkinson invested his retirement savings with SGC and STC in early June, 2007. In early June 2007, Wilkinson met with an SGC investment adviser at the Houston office of SGC, who advised him of the safety and security of an investment in the SIBL CDs. The same uniform and standardized representations made to Wilkinson by the SGC adviser included that SIBL was "safer than a U.S. Bank", because it had Lloyds of London Bonded insurance and that the Bank was safe because it did not make loans like a regular bank, but instead invested in a portfolio of highly liquid assets, such that the CDs could be redeemed on just a few days notice. Based on those and other standard and uniform sales misrepresentations and omissions of material facts, Wilkinson decided to open an IRA account with STC (Account # STSGC40958) and, following the advice of the SGC investment adviser, to invest all of his retirement savings, some $500,000, into the SIBL CDs. Wilkinson mailed the check for the $500,000 directly to STC's bank, Hancock Bank on June 13, 2007.

B.   Class Allegations

121. Class Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Over 1,200 owners of IRA accounts at STC still had money invested in the SIBL CDs and other depository accounts at SIBL as of February 17, 2009. The numbers of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims. The Named Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Plaintiffs will fairly and

adequately protect the class' interests.  The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

122.    Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses: a class of all investors who, as of February 17,2009, had purchased and still held CDs and/or otherwise maintained deposit accounts with SIBL through IRA accounts established at STC.

AND such other classes or sub-classes as the Court may determine.

Excluded from the class are:

a.    Defendants, and their employees and agents; and

b.    Any officer, director, employee, or promoter of Stanford Financial, including SIBL, SGC, SFIS, or STC as those entities have been defined herein

123.    The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors into believing that their investments in SIBL were backed up by a liquid portfolio of assets.  The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

### C.       Discovery Rule/Inquiry Notice

**124.**      The SEC filed an action against Allen Stanford and SIBL *et al.* on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIBL, SGC, STC, or Defendants until after that date.  Moreover, the wrongful acts and conspiracy by Defendants was inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud until now.

### D.       Class Causes of Action

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF THE CLASS PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

### COUNT 1:      Participation in/Aiding and Abetting Breach of Fiduciary Duty

**125.**      As a registered investment adviser, SGC owed a fiduciary duty to the Plaintiffs and the Class as a matter of law.  As a fiduciary trust company holding IRA accounts, STC owed fiduciary duties to the Plaintiffs and Class of STC investors.   SGC and STC breached their respective fiduciary duties to Plaintiffs and the Class by advising them to invest their money in the SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor and because SGC and STC were financially incentivized to recommend the related party SIBL CDs above other investment products.  SGC and STC did not have the basic financial information regarding the SIBL investment necessary to make such investment recommendations to Plaintiffs and the Class, but instead made the recommendation to purchase the SIBL CDs based on the huge, above-market commissions SGC and STC were paid by SIBL to promote the CDs.   Defendants knew that SGC and STC owed fiduciary duties to Plaintiffs and the Class and knew or were willfully blind to the fact that SGC and STC were breaching said fiduciary duties, as described herein.  With

full knowledge that SGC and STC were breaching their fiduciary duties to Plaintiffs and the Class, Defendants conspired with and aided and abetted and otherwise participated in SGC's and STC's breaches of those duties by the conduct alleged herein.  Defendant's participation in breaches of fiduciary duties are a proximate cause of actual damages to Plaintiffs and the Class.  Defendants knew or should have known that their aiding, abetting and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to the Plaintiffs and the Class. Accordingly, Plaintiffs are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

### COUNT 2:    Aiding and Abetting Violations of the Texas Securities Act

#### A. SALES OF UNREGISTERED SECURITIES

**126.**    Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.  In particular, by their actions described herein, Defendants provided substantial assistance to SGC, STC and SIBL and made it possible for SGC, STC and SIBL to effectuate the sale of the CDs to Plaintiffs and others and materially aided SGC, STC and SIBL to sell unregistered securities to Plaintiffs from and through Texas.  As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIBL, with Defendants' participation, constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the CDs were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime.  By agreeing to assist SGC, STC and SIBL to effectuate the sales of these securities products, Defendants acted recklessly and knew or should have known, and were willfully blind to the fact that said sales were illegal.   But for Defendants' participation, SGC, STC and SIBL could not have sold unregistered securities to Plaintiffs and the Class from and through Texas.

**127.**    Defendants had general awareness that they were assisting in the sale of unregistered

securities from and through Texas.  Defendants knew that SGC was based in Texas and that SGC controlled and made all the decisions for STC and that the primary purpose behind STC was its use by SGC as a vehicle to get IRA accounts invested in the SIBL CDs.  Defendants also knew that SIBL did not function as a regular bank making loans but, rather, invested the CD proceeds in a private investment portfolio.  Defendant knew that the CDs being peddled directly from Houston, Texas had not been registered as securities with the SEC or TSSB, because Defendants reviewed the SIBL offering and disclosure statements and knew that SIBL had filed for a limited Reg. D exemption for certain "accredited" U.S. investors only.   Based on their knowledge of SIBL, and the size of the CD offerings made by SGC to STC IRA account customers, and what SIBL was allegedly doing with the money, Defendants also knew that the Reg. D exemption did not apply and that Stanford Financial was operating as an unregistered mutual or hedge fund in violation of the Investment Company Act, selling unregistered investment company securities.

128.   In assisting a Houston-based enterprise in the sale of unregistered securities, Defendants were at the very least subjectively conscious of and willfully blind to a risk of illegality. None of the CDs sold to Plaintiffs were ever registered with the Texas State Securities Board and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act.  In assisting SGC, STC and SIBL effectuate the sale of the unregistered securities from and through Texas, Defendants acted intentionally or with reckless disregard for the truth and the law. As a result of Defendant's conduct in materially aiding SGC, STC and SIBL to sell unregistered securities from and through Texas, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership

distribution.

129.    Moreover, and despite SGC's and SIBL's scheme to evade compliance with the Texas

Act by claiming a Reg D exemption, the global offering of CDs by Houston-based Stanford Financial

to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article

581 of the Texas Act.  It was an integrated offering under Texas securities laws, and, on information

and belief, involved each of the following factors that made it a public offering and not a private

offering exempt from registration:

a.  The integrated offering involved general solicitation. This general solicitation by
    Stanford Financial through SGC, STC, SFIS and its U.S. affiliates, agents and brokers, as
    well by the foreign financial advisors, included general public advertisements, publicly
    distributed magazine articles, television and other communications and media published
    in print in Houston, Texas and distributed broadly for general distribution in the United
    States and abroad to offerees and purchasers of the CDs.

b.  The integrated offering involved general solicitation through television advertisements,
    including advertisements broadcast in Texas, Louisiana and Florida, of Stanford
    Financial's products, including the CDs.

c.  The integrated offering involved seminars and meetings conducted in the United States
    (including Texas, Louisiana, and Florida), Mexico and Venezuela and elsewhere in Latin
    America.  The integrated offering was conducted through the use of sales seminars, "road
    shows," and meetings directed at potential offerees and purchasers.

d.  The integrated offering involved offers to tens of thousands of offerees and purchases by
    thousands of offerees involving sums of money, in the billions of dollars, far in excess of
    that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering

involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas. Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial and/or SFIS.

e.   The aggregate size of the sales of CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States from this period was in excess of $1.5 billion.  The number of investors purchasing the CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and Defendants knew this because it wire transferred money from 1,200 different SGC accounts to buy the SIBL CDs.

f.   The offering was made to investors with whom Stanford Financial/SGC had no pre-existing relationship, through brokers or affiliates of Stanford Financial who were paid substantial and excessive undisclosed commissions in connection with the CDs.

g.   The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors".

B.  SALES OF SECURITIES BY UNREGISTERED DEALERS

**130.**   Defendants aided and abetted SIBL, SGC, STC and Stanford Financial generally in the sale of securities to Plaintiffs from and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act. Specifically, and as alleged herein, Defendants knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial" was acting as a hedge or mutual fund without being registered as such under the Investment Company Act, and that the hedge

or mutual fund was disguising itself as a bank (SIBL) and issuing hedge/mutual fund shares, disguised as CDs, to the general public from, by and through Texas and then pooling its customers' money together to make illiquid, speculative investments. The Stanford Financial "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

131. Defendants intentionally and actively aided and abetted the Stanford Financial "fund" to sell securities from and through Texas, by means of the conduct described herein. With full knowledge or willfully blind to the fact that Stanford Financial was, directly or through its web of companies, including SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from and through Texas, and that Stanford Financial/SIBL were being operated and "run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial, SGC and SIBL's violations of the Texas Securities Act by continuing to provide the services described herein to help effectuate the sale of the worthless CDs and fund the Ponzi scheme.

132. Defendants had general awareness and were willfully blind to the fact that they were assisting the sales by an unregistered "fund" of unregistered "fund" securities from and through Texas. In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality. In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law. As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission. In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the

difference between their investments in SIBL as stated in their last account statement and the amount

Plaintiffs may receive from the receivership distribution.

### C. UNTRUTH OR OMISSION

**133.** Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial, SGC, STC and SIBL and their principals in the sale of uncovered securities (the CDs) through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the TSA. In particular, and as set forth in the Davis Plea, Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs. Stanford Financial led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments including real estate development projects in Antigua and elsewhere in the Caribbean. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act.

**134.** Defendants had general awareness and were willfully blind to the fact that they were involved in improper activity and that they were assisting the sale of unregistered securities from and through Texas. With knowledge that SGC and STC were misleading investors about the nature and

risk of investments in related party bank SIBL, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIBL and Stanford Financial in the effectuation of over $300 million worth of CD purchase transactions as described herein, and thereby materially aided SGC and STC's sales of securities through the use of untruths and materially misleading omissions. Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.   In assisting the sale of unregistered securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  In short, Defendants' actions as described herein allowed SGC and STC (and SIBL) to continue to sell securities to Plaintiffs from and through Texas using untruths and materially misleading omissions.

135.    As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### D. CO-CONSPIRATOR LIABILITY

136.    Defendants are jointly and severally liable as co-conspirators for Stanford Financial, SGC, STC and SIBL's primary violations of the Texas Securities Act.  In particular, Defendants knowingly combined together and with others at Stanford Financial to assist Stanford Financial to sell unregistered securities to the IRA accounts of the customers of STC from the State of Texas using untrue representations or materially misleading omissions, as described herein. Defendants took various overt acts designed to assist Stanford Financial to accomplish the goal of selling CDs from and through the State of Texas and operate as an unregistered securities dealer selling

unregistered securities from Texas.   Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### COUNT 3:   AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME

137.   By their conduct described herein, Defendants aided and abetted and participated with SGC and STC in a fraudulent scheme, making Defendants directly liable for fraud.  In particular, Defendants all assisted and made possible SGC's sales of SIBL CDs to the IRA accounts of Plaintiffs and the Class held at STC.  Said actions by Defendants in combination with Stanford Financial are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### COUNT 4:   CIVIL CONSPIRACY

138.   Defendants conspired with each other and with other employees and agents of SGC and STC to commit the wrongful conduct described herein, including fraud, theft of fiduciary property, breach of fiduciary duty, and violations of the Texas Securities Act.  Defendants are each responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, Juan Rodriguez Tolentino, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise.

139.   Together with other employees and agents of SGC and STC, the Defendants joined in a conspiracy (which began in 2001 and continued to February 2009) to assist SGC to use STC as a vehicle to sell SIBL CDs to the IRA accounts of Plaintiffs and the Class, and to help shield SGC and STC's activities from regulatory scrutiny.  The object of the ongoing conspiracy was to use STC as a

vehicle to help SGC sell the SIBL CDs to the IRA accounts of Plaintiffs and the Class. There was a meeting of the minds at various times described herein as the various members of the conspiracy joined the conspiracy, as to the central objective of using STC as a vehicle to sell SIBL CDs to IRA accounts, and to keep STC in business despite regulatory examinations by the OFI, and a meeting of the minds between Defendants and others as to the means for carrying out the scheme.

140.     During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting SGC and STC employees and agents, in furtherance of the common enterprise, engaged in specific overt acts as described herein. Defendants' conduct was part of continuing activity that was essential to and therefore in furtherance of the survival of the STC/IRA portion of the Stanford Financial Ponzi scheme, which was an ongoing operation when Defendants joined the conspiracy. Frustration of investigatory efforts by the OFI and/or other agencies in a highly regulated environment such as securities was central to the success and longevity of the overall Stanford Ponzi scheme conspiracy. Stanford's Ponzi scheme proximately caused Plaintiffs to lose their investments, and Defendants, by joining in conduct designed to assist and facilitate Stanford Financial's illicit conduct, are jointly and severally liable with SGC and STC and SIBL for all of Plaintiffs' losses.

## VII.     <u>RESPONDEAT SUPERIOR</u>

141.     Defendant BSW is liable for the tortious and negligent acts of its employees, including without limitation, Claude Reynaud. Reynaud was acting within the course and scope of his employment with BSW, and in furtherance of BSW's business, when he engaged in the wrongful conduct described herein.

## VIII.     <u>ACTUAL DAMAGES</u>

142.     Plaintiffs and the Class have suffered the loss of at least $300 million that was proximately caused by the wrongful conduct of Defendants as described herein, in addition to the

approximately $2 million that Defendants took from Stanford over the years.  Defendants are jointly and severally liable for the injury caused by SGC and STC and SIBL under Texas common law of joint and several liability as well as under the Texas Securities Act.

## IX.  PUNITIVE DAMAGES

**143.**   The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendant and to deter similar conduct of others in the future.

**144.**   All conditions precedent to filing this Complaint have been met.

## X.  JURY DEMAND

**145.**   Plaintiffs demand a trial by jury.

## XI.  PRAYER

**146.**   WHEREFORE, Class Plaintiffs pray the Defendant be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Class Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

| | |
|---|---|
| **CASTILLO SNYDER, P.C.** | **MORGENSTERN & BLUE, LLC** |

By:  /s/ Edward C. Snyder

       Edward C. Snyder
       esnyder@casnlaw.com
       Jesse R. Castillo
       jcastillo@casnlaw.com
       300 Convent Street, Suite 1020
       San Antonio, Texas  78205
       (210) 630-4200
       (210) 630-4210 (Facsimile)

By:  /s/ Peter D. Morgenstern

       Peter D. Morgenstern (*admitted pro hac vice*)
       pmorgenstern@mfbnyc.com
       885 Third Avenue
       New York, New York 10022
       (212) 750-6776
       (212) 750-3128 (Facsimile)

**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE
FOR PLAINTIFFS
AND THE PUTATIVE CLASS**

**NELIGAN FOLEY, LLP**

By:  /s/ Nicholas A. Foley

       Nicholas A. Foley
       nfoley@neliganlaw.com
       Douglas J. Buncher
       dbuncher@neliganlaw.com
       Republic Center
       325 N. St. Paul, Suite 3600
       Dallas, Texas  75201
       (214) 840-5320
       (214) 840-5301 (Facsimile)

## CERTIFICATE OF SERVICE

On February 17, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

       /s/ Edward C. Snyder
         Edward C. Snyder