## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| The OFFICIAL STANFORD INVESTORS COMMITTEE; and PHILIP A. WILKINSON, and HORACIO MENDEZ, individually and on behalf of a class or classes of all others similarly situated, | § § § § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 3:11-cv-00329-N |
| ADAMS & REESE, LLP; JAMES AUSTIN; BREAZEALE, SACHSE & WILSON, LLP; CLAUDE REYNAUD; J.D. PERRY; REBECCA HAMRIC; MICHAEL CONTORNO; LOUIS FOURNET; JAY COMEAUX; CORDELL HAYMON; THOMAS FRAZER; ZACK PARRISH; DANIEL BOGAR; and JASON GREEN; | § § § § § § § § § § | |
| Defendants. | § § § | |

_____

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT
_____

# TABLE OF CONTENTS

I.      PARTIES ................................................................................................................ 1

II.     PERSONAL JURISDICTION ............................................................................. 5

III.    SUBJECT MATTER JURISDICTION & VENUE ............................................ 6

IV.     FACTUAL BACKGROUND ............................................................................... 7

    A.      The Stanford Financial Group Empire .................................................... 7

    B.      Stanford Financial Group's Operations in the United States .................. 9

    C.      The Anatomy of the Stanford Ponzi Scheme ........................................ 11

        a.      Guardian International Bank and Stanford International Bank Ltd. ......... 12

        b.      Stanford Seizes Control of Antigua's Banking Regulators ..................... 13

        c.      Stanford Sells to Accredited Investors in the United States .................... 15

        d.      Stanford Breeds Loyalty Through Exorbitant Compensation................... 16

        e.      Dissecting the Fraud................................................................................. 17

        f.      Stanford's House of Cards Finally Collapses .......................................... 20

    D.      Defendants' Participation in the Stanford Ponzi Scheme ..................... 21

        a.      BSW and Reynaud Join the Stanford Ponzi Scheme............................... 22

        b.      BSW Discovers STC's Breaches of Fiduciary Duties ............................. 24

        c.      Reynaud Ignores His Own Conflicts of Interest ..................................... 26

        d.      STC's Incestuous Relationship with SIBL and SGC............................... 28

        e.      The Lawyer Defendants Aid the Stanford Ponzi Scheme By Referring
                Clients to Stanford Financial Group ........................................................ 30

        f.      STC's Directors Discover STC's False Statements to Louisiana's OFI... 30

        g.      A&R Issues a False Opinion Letter to Louisiana's OFI .......................... 37

        h.      Whitney Bank Terminates its Banking Relationship with STC ............... 40

        i.      Stanford Financial Group Executes the IRA Plan to Perfection............... 41

        j.      The Stanford Ponzi Scheme Rewards the Lawyer Defendants for
                Referring Clients to Stanford Financial Group ........................................ 42

        k.      J.D. Perry Resigns in a Scandal and Louis Fournet Joins the Stanford
                Ponzi Scheme........................................................................................... 43

        l.      The Beginning of the End ........................................................................ 47

        m.      The Lawyer Defendants: Between a Rock and a Hard Place.................... 56

        n.      Stanford Financial Group Moves the IRA Plan to International Bank
                and Trust .................................................................................................. 58

o.    A&R's Final Act of Betrayal ...................................................... 58

p.    The Defendants' Culpable Knowledge and Participation in the Stanford Ponzi Scheme .............................................................. 59

V.    The COMMITTEE'S CLAIMS .........................................................................61

    A.    The Committee's Authority to Pursue Claims on Behalf of the Receiver and Stanford Financial Group's CD Investors............................................................. 61

    B.    Basis for the Committee's Claims ....................................................... 63

    C.    Discovery Rule/Inquiry Notice .......................................................... 65

    D.    The Committee's Causes of Action ..................................................... 66

VI.    INVESTOR CLASS PLAINTIFFS' CLAIMS ...............................................71

    A.    Basis for Claims....................................................................................... 71

    B.    Class Allegations .................................................................................... 74

    C.    Discovery Rule/Inquiry Notice .......................................................... 75

    D.    Class Causes of Action ......................................................................... 76

VII.    RESPONDEAT SUPERIOR ............................................................................86

VIII.    ACTUAL DAMAGES.........................................................................................86

IX.    PUNITIVE DAMAGES......................................................................................87

X.    JURY DEMAND .................................................................................................87

XI.    PRAYER ...............................................................................................................87

**PLAINTIFFS THE OFFICIAL STANFORD INVESTORS COMMITTEE, PHILIP A. WILKINSON, and HORACIO MENDEZ, individually and on behalf of a class of all others similarly situated**, (collectively, the "Class Plaintiffs") file this their First Amended Class Action Complaint (the "Complaint") against Defendants, **ADAMS & REESE, LLP, JAMES AUSTIN, BREAZEALE, SACHSE & WILSON, LLP, CLAUDE REYNAUD, J.D. PERRY; REBECCA HAMRIC, MICHAEL CONTORNO, LOUIS FOURNET, JAY COMEAUX, CORDELL HAYMON, THOMAS FRAZER, ZACK PARRISH, DANIEL BOGAR, and JASON GREEN,** (collectively, the "Defendants").  The following allegations are based upon information and belief (such information and belief being based, in part, upon the investigation conducted by Plaintiffs' counsel), except those allegations that pertain to the named Plaintiffs, which are based upon the named Plaintiffs' personal knowledge.  The named Plaintiffs and Plaintiffs' counsel expressly reserve the right to supplement or amend this Complaint based upon Plaintiffs' counsel's ongoing investigation of the facts and circumstances concerning the allegations in this Complaint.  In support of this Complaint, the named Plaintiffs show the Court as follows:

## I.    PARTIES

1.    Plaintiff Official Stanford Investors Committee (the "Committee") was formed by this Court on August 10, 2010.  *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order").  As stated in the terms of the Committee Order, the Committee, through this Complaint, is cooperating with the Receiver in the identification and prosecution of actions and proceedings against the Defendants for the benefit of the Receivership Estate and the Stanford Investors.  *See id.* at ¶ 8; *see also id.* at ¶ 7 (authorizing the Receiver and the Committee to bring litigation jointly).  The Committee is the assignee of certain claims owned by the Receiver, as alleged herein.

2.      Plaintiff PHILIP A. WILKINSON is a citizen of the United States of America currently residing in Harris County, Texas.

3.      Plaintiff HORACIO MENDEZ is a citizen of the United States of America currently residing in Travis County, Texas.

4.      Additionally, this case seeks certification of a class of all investors who, as of February 17, 2009, had purchased and still held CDs issued by and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. ("SIBL") through IRA accounts held at Stanford Trust Company (Louisiana)("STC")(hereinafter the "Class").

5.      Defendant Adams and Reese, LLP ("A&R") is a Louisiana limited liability partnership doing business in the State of Texas.  A&R is a law firm that provided legal services to Stanford Financial Group, including Stanford Trust Company (Louisiana) and Stanford Group Company.  A&R has already appeared in this action, and service of this Complaint will be made upon A&R's counsel.

6.      Defendant James Austin ("Austin") is an individual lawyer and citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana.  He is employed by A&R.  Austin provided legal services to Stanford Financial Group, including Stanford Trust Company (Louisiana) and Stanford Group Company.  Austin may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Austin's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

7.      Defendant Breazeale, Sachse & Wilson, LLP ("BSW") is a Louisiana limited liability partnership with its principal place of business in Baton Rouge, Louisiana.  BSW is a law firm that provided legal services to Stanford Financial Group, including Stanford Trust Company (Louisiana)

and Stanford Group Company.  BSW may be served with service of process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

8.      Defendant Claude F. Reynaud, Jr. ("Reynaud") is an individual lawyer and citizen of the United States currently residing in Baton Rouge, Louisiana.  He is employed at BSW.  Reynaud provided legal services to Stanford Financial Group, including Stanford Trust Company (Louisiana) and Stanford Group Company.  Reynaud also served as a Director of Stanford Trust Company (Louisiana) from 2000 until 2009.  Reynaud may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Reynaud's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

9.      Defendant J.D. Perry ("Perry") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana.  Perry served as a Director of Stanford Trust Company (Louisiana) from 1998 until 2006.  Parrish may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Parrish's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

10.     Defendant Rebecca Hamric ("Hamric") is a citizen of the United States of America currently residing in Harris County, Texas.  Since at least 2006, Hamric served as an attorney for Stanford Financial Group, including Stanford Trust Company (Louisiana) and Stanford Group Company.  Hamric may be served with process at her home address.

11.     Defendant Michael Contorno ("Contorno") is a citizen of the United States of America currently residing in Harris County, Texas.  From at least 2000 until September 2008, Contorno served as an attorney for Stanford Financial Group, including Stanford Trust Company

(Louisiana) and Stanford Group Company.  Contorno may be served with process at his home address.

12.     Defendant Louis Fournet ("Fournet") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana.  Fournet served as President and Director of Stanford Trust Company (Louisiana) from 2007 until 2008.  Fournet may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Fournet's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

13.     Defendant Jay Comeaux ("Comeaux") is a citizen of the United States of America currently residing in Harris County, Texas.  Comeaux served as a Director of Stanford Trust Company (Louisiana) from 1998 until 2008.  Comeaux may be served with process at his home address.

14.     Defendant Cordell Haymon ("Haymon") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana.  Haymon served as a Director of Stanford Trust Company (Louisiana) from 2003 until 2008.  Haymon may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Haymon's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

15.     Defendant Thomas Frazer ("Frazer") is a citizen of the United States of America currently residing in the Parish of East Baton Rouge, Louisiana.  Frazer served as a Director of Stanford Trust Company (Louisiana) from 2003 until 2008.  Frazer may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Frazer's

home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

16.     Defendant Zack Parrish ("Parrish") is a citizen of the United States of America currently residing in Harris County, Texas.  Parrish served as a Director of Stanford Trust Company (Louisiana) from 2006 until 2009.  Parrish may be served with process at his home address.

17.     Defendant Daniel Bogar ("Bogar") is a citizen of the United States of America currently residing in Broward County, Florida.  Bogar served as a Director of Stanford Trust Company (Louisiana) from 2004 until 2009.  Bogar may be served with process by the clerk of this Court by mailing a copy of the citation, with this Complaint attached, to Bogar's home address by certified mail, return receipt requested, pursuant to Rules 106 and 108 of the Texas Rules of Civil Procedure.

18.     Defendant Jason Green ("Green") is a citizen of the United States of America currently residing in Harris County, Texas.  Green served as a Director of Stanford Trust Company (Louisiana) from 1998 until 2008.  Green may be served with process at his home address.

## II.     PERSONAL JURISDICTION

19.     This Court has personal jurisdiction over the non-resident Defendants under the Texas Long Arm Statute.  Defendants have conducted continuous and systematic business in the State of Texas for many years and are therefore subject to general jurisdiction.  Furthermore, as described herein, Defendants have engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group ("SFG") headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore Defendants have done business and committed torts, in part, in the State of Texas.

20.     Since at least 1998, Defendants A&R, BSW, Austin and Reynaud served as lawyers for an important segment of SFG headquartered in Houston, Texas.  (A&R, BSW, Reynaud and Austin are sometimes collectively referred to hereinafter as the "Lawyer Defendants".)  Since at least 1998, Defendants Reynaud, Perry, Hamric, Contorno, Fournet, Comeaux, Weller, Haymon, Frazer, Parrish, Bogar, and Green served in various capacities as directors, officers, or employees for an important segment of SFG headquartered in Houston, Texas (these Defendants are sometimes collectively referred to hereinafter as the "Director & Officer Defendants".)  In their capacities as lawyers, directors, officers, and/or employees of Stanford Financial Group, the Lawyer Defendants and Director & Officer Defendants engaged in extensive contacts with Stanford Financial Group personnel based in Houston, Texas, including the General Counsel of Stanford Financial Group, related to their provision of various services to the Texas-based Stanford Financial Group of companies.  In conjunction with their provision of these professional services to Stanford Financial Group, the Lawyer Defendants and Director & Officer Defendants engaged in contacts with the State of Texas that assisted and perpetuated an important segment of the Stanford Ponzi scheme described herein.  Based on their general and specific contacts with the State of Texas, the Lawyer Defendants and Director & Officer Defendants have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

21.     Furthermore, this Court has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

### III.   SUBJECT MATTER JURISDICTION & VENUE

22.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and

under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).  Further, as the Court that appointed the Receiver and the Committee, this Court has jurisdiction over any claim brought by the Receiver (or the Committee as assignee) to execute Receivership duties. Further, within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Receiver filed the original Securities and Exchange Commission Complaint and the Order Appointing Receiver in the United States District Court for the Southern District of Florida and the United States District Courts for the districts in Texas pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

23.     This Court also has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(A) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff Class are citizens and residents of states different from Defendants.

## IV.    FACTUAL BACKGROUND

### A.     The Stanford Financial Group Empire

24.     From the mid 1980s through February 2009, R. Allen Stanford ("Stanford") — a former gym owner from Mexia, Texas — built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself.  The companies operated under the brand name "Stanford Financial" with their worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial Group" or "SFG") included: the Houston, Texas-based registered broker/dealer and investment adviser company Stanford Group Company

("SGC"); the Antiguan-based offshore bank Stanford International Bank Ltd. ("SIBL"); Stanford

Trust Company (Louisiana) ("STC"); Stanford Trust Company (Antigua); and the representative

offices of Stanford Trust Company (Antigua), d/b/a "Stanford Fiduciary Investor Services" ("SFIS"),

that operated in Miami, Houston and San Antonio.  SFG was controlled and managed principally

from Houston, Texas in the United States.

25.    SFG's offshore banking operation began as Guardian International Bank in the mid

1980s.  Over the years, SFG grew into a full-service financial services firm, offering worldwide

clients private banking and U.S.-based broker/dealer and investment adviser services.  SFG gave its

clients all the appearances of a highly successful operation, with lavish offices in some of the world's

premier cities.  Stanford himself made the Forbes' list of the richest people in the world with a

personal fortune estimated at $2.2 billion.

26.    The entire SFG operation was fueled by one primary product:  CDs issued by SIBL,

the Antiguan offshore bank wholly owned and controlled by Stanford himself.  Clients who were

introduced to SFG, whether in Houston, Miami, Caracas, or Mexico City, quickly learned that the

main financial product peddled by the group was the SIBL CD.  The SIBL CDs were sold worldwide

by a web of different SFG "feeder" companies, including SGC, STC and SFIS, whose sole function

was to promote the sale of SIBL CDs.  For example, to access additional investor capital in Latin

America, SFG established representative offices in Colombia (Stanford Group Columbia a/k/a

Stanford Bolsa y Banca), Ecuador (Stanford Group Ecuador a/k/a Stanford Group Casa de Valores,

S.A. and Stanford Trust Company Administradora de Fondos y Fideicomisos, S.A.), Mexico

(Stanford Group Mexico a/k/a Stanford Group Mexico S.A. de C.V. and Stanford Fondos), Panama

(Stanford Group Panama a/k/a Stanford Bank Panama and Stanford Casa de Valores Panama), Peru

(Stanford Group Peru a/k/a Stanford Group Peru S.A. Sociedad Agente de Bolsa), and Venezuela

(Stanford Group Venezuela a/k/a Stanford Group Venezuela C.A., Stanford Bank Venezuela, and Stanford Group Venezuela Asesores de Inversion). These foreign offices were ultimately controlled by SFG's entities and employees in Houston, Texas. By 2009, SIBL's vast network of domestic and foreign "feeder" offices had sold over $7.2 billion in CDs.

**B.      Stanford Financial Group's Operations in the United States**

27.      For the first decade of its CD sales operations, 1985 to 1995, SFG and its offshore bank (whether Guardian International Bank or SIBL) targeted a Latin American clientele. But by the mid 1990s, SFG had begun to establish a foothold in the United States. In 1995, SFG established SGC, a Texas corporation, and in February 1996, SGC was registered as a broker/dealer and investment adviser. Headed by Louisiana brokers Jay Comeaux and Alvaro Trullenque, SGC established offices initially in Houston and Baton Rouge. SFG began the practice of "head hunting" for U.S. brokers, bankers, and other financial advisers, paying enormous signing bonuses to the brokers, bankers and other financial advisers to leave their jobs at other firms and transfer their book of clients over to SGC. Fueled by this influx of veteran bankers, brokers and investment advisers, SGC grew from 6 branch offices in the United States in 2004 to 33 offices across the United States in 2009.

28.      Early on, SFG recognized the huge potential for marketing its offshore CDs to Latin Americans via the "gateway" city of Miami. In 1998, SFG established SFIS, a representative office of SIBL in Miami, and disguised SFIS as the representative office of Stanford Trust Company (Antigua) in order to evade U.S. banking regulations. The Miami office of SFIS generated over $1 billion in SIBL CD sales for SFG, primarily from sales to investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela. SFG also set up SFIS offices in Houston and San

Antonio, Texas to cater to Mexican investors visiting those cities and bring in more investment money to feed the ever expanding Ponzi scheme.

29.    To increase sales of its SIBL CDs, SFG determined that it could convert U.S. investors' IRA funds to the SIBL CDs.  STC was therefore established in Baton Rouge, Louisiana in 1998 to serve as the trustee/custodian for IRA accounts owned by investors referred to STC by SGC — a service that traditional IRA custodians would not provide.  After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some or, in most cases, ***all*** of their funds held in IRA accounts into the SIBL CDs.

30.    For all of the Stanford "feeder" companies — whether SGC, SFIS or STC — the primary product marketed and sold was the SIBL CD, as it sustained SFG's operations and paid the employees' exorbitant salaries and bonuses.  The "feeder" companies were all members of SFG; were ultimately owned by Stanford himself; were interconnected via intercompany marketing and referral fee agreements; and were controlled by SFG in Houston, ***Texas***.

31.    Houston, Texas was the nerve center and principal base for all of SFG's operations, including SIBL, SGC, SFIS, and STC.  STC was wholly owned and controlled by Houston-based SGC, and with the exception of Defendants Reynaud, Frazer, and Haymon, virtually every member of STC's Board of Directors at any time was an employee of SGC.  SGC directed the operations of STC and provided all administrative functions from Houston.  STC's annual budget and financial forecasts were prepared by SGC in Houston, and even reimbursement of expenses for STC employees was handled by SFG's corporate accounting team in Houston.

32.    All the sales and marketing practices for the entire SFG (including SIBL), as well as general operational and administrative functions, were managed under the overall direction, supervision, and control of the Houston offices.  SIBL itself never had a marketing or sales arm in

Antigua.  SFG used entities like SGC, SFIS, and STC to continue selling SIBL CDs and bring in new money to feed the Ponzi beast.

33.     The head of SFG's global sales operation for the marketing and sale of SIBL CDs was located in Houston, Texas.  All the sales practices, directives, techniques, strategies and reward programs for SFG, including SIBL, were developed and crafted in Houston and disseminated to the various SFG "feeder" offices around the world.  All the sales force training manuals, promotional literature, and materials for SIBL, including the Spanish-language promotional materials used by SGC, STC and SFIS, were created, printed, packaged and mailed from Stanford's Houston headquarters to the other SFG sales offices around the world to be utilized by the local sales force in each country.

34.     In addition, mandatory sales training for the SFG sales force for SIBL was conducted principally in Houston (known to the foreign financial advisers as the "Houston experience") by SFG personnel.  In those mandatory training sessions, sometimes twice a year, SFG's financial advisers ("FAs") were trained to sell the image of SFG.  The "script" for why SIBL was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled into their heads again and again.

## C.     The Anatomy of the Stanford Ponzi Scheme

35.     The reality of SFG's empire was that it was nothing but a massive, worldwide Ponzi scheme.  SFG violated the laws of virtually every country it operated in, including the United States, Ecuador, Mexico, Venezuela, and Antigua.  Stanford's repeated commission of regulatory fraud in various countries enabled and fostered the growth of SIBL's CD sales.

36.     The gist of the fraud was actually quite simple: (i) sell the offshore SIBL CDs through a flashy marketing campaign designed to trick investors into believing they were purchasing safe,

secure (even insured) and liquid CDs that were regulated in the United States because SGC was a U.S. licensed broker/dealer, while at the same time (ii) maintaining a "Wizard of Oz" veil of secrecy over the SIBL asset portfolio and what Stanford was doing with the CD investors' money (which ended up being whatever Allen Stanford wanted). Thus Stanford and SFG went to great lengths to keep prying eyes, particularly regulatory eyes, away from SIBL's operations.

37.     SIBL was actually insolvent (i.e., its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the bitter end. Stanford induced investors to buy CDs by offering above-market rates, issuing financial statements and other data that significantly overstated SIBL's earnings and assets, and misrepresenting its business model, investment strategy, financial strength, safety and nature of its investments, and other facts important to investors. In reality, SIBL's earnings and assets were insufficient to meet its CD-payment obligations, so the only way SFG could keep the scheme going was by using proceeds from new CD sales to pay redemptions, interest, and operating expenses. SIBL's assets were inflated to offset CD obligations and its revenues were "reverse-engineered" to arrive at desired levels. Each year or quarterly reporting period, SFG would simply determine what level of fictitious revenue SIBL "needed" to report in order to both look good to investors and regulators and purport to cover its CD obligations and other expenses. SFG would then back into the necessary revenue amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternatives) of a fictitious investment allocation.

### a.     Guardian International Bank and Stanford International Bank Ltd.

38.     Stanford opened his first offshore bank, Guardian International Bank ("Guardian Bank"), in 1985 on the tiny Caribbean island of Montserrat (12,000 residents). The following year, Stanford established Guardian Bank's representative offices in Miami, Florida and Houston, Texas

under the name of Guardian International Investment Services ("Guardian Services"), which was designed to cater to wealthy Latin American clients.  Stanford brought in his old college roommate James Davis to help run operations.  The Guardian Bank and Guardian Services model was an early blueprint for what later became the SFG empire.  Guardian Bank offered CDs with rates typically 2% to 3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

39.     By 1989 the banking system in Montserrat came under investigation by British and U.S. authorities.  Consequently, Guardian Bank itself came under scrutiny for possible drug money laundering, so Stanford looked to move his bank to a new location.  In December 1990, Stanford re-incorporated Guardian Bank in Antigua and transferred all the assets of his Montserrat-licensed bank to the new Antiguan-licensed Guardian Bank.  By May 1991, Stanford's banking license was officially revoked by the Montserrat Government (although in 1994 Stanford later sued the Government of Montserrat to have that order rescinded).  In effect, Stanford simply picked up his banking operations and moved them to Antigua, and continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of his Antiguan bank from Guardian Bank to Stanford International Bank Ltd. in 1994.

### b.     Stanford Seizes Control of Antigua's Banking Regulators

40.     Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship with the local government.  Stanford became the island's largest private-sector employer and even bought the Antiguan newspaper, the Antiguan Sun.  Additionally, in return for political cover, Stanford eventually became a major source of funding for the entire island, eventually loaning hundreds of millions of SIBL CD investors' dollars to the Antiguan government.  By 2004, the

island's government owed SFG over $87 million — nearly half its annual tax revenues — with certain loans secured by the government's tax revenues and medical fund.

41.     In fact, the Antiguan government's relationship with Stanford was so incestuous that Stanford himself actually *rewrote* Antigua's banking laws.  In 1996, Antigua began to suffer from the same suspicions that doomed Stanford's operations in Montserrat, so Stanford approached the Antiguan government about these emerging new threats to SIBL's operations in Antigua.  In June 1997, the Antiguan government formed the Antiguan Offshore Financial Sector Planning Committee, *appointing Stanford as chairman*, to advise the government and recommend changes to its banking laws.  Stanford then leveraged his new committee to *fund*, *organize*, and *appoint himself and his agents* to a banking task force that was charged with amending Antigua's banking laws and supervising Antigua's banks.  In January 1998, Stanford's new task force (the "Stanford Task Force") recommended sweeping changes to Antigua's banking laws and regulatory institutions.  The Antiguan government later adopted these recommendations, which included highly suspicious amendments to the nation's Money Laundering (Prevention) Act.  Stanford also used his new Task Force, a precursor to Antigua's Financial Services Regulatory Commission ("FSRC"), to wrest control of Antigua's entire offshore banking industry, even stooping to the level of physically seizing bank records from the previous Antiguan banking regulators.

42.     Antigua's corruption and lax banking regulations are borne out by the Plea Agreement entered by Stanford CFO Jim Davis (the "Davis Plea"), as well as by the June 18, 2009 federal grand jury indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and former head of Antigua's FSRC (the "Indictment").  The Davis Plea and Indictment allege that for years, King — while acting as the CEO of the Antiguan FSRC — accepted bribes from Stanford and/or his associates in return for his assurance that the FSRC "looked the other

way" and would not properly perform its regulatory functions or supervise SIBL. In 2003, King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford. As part of this blood-brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of SFG and SIBL from 2005 all the way until 2009. All this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIBL's activities at every turn and in every country.

### c.    Stanford Sells SIBL CDs to "Accredited" Investors in the United States

43.    In November 1998, SFG needed new capital to feed its Ponzi scheme, so SIBL filed a Regulation D exemption with the United States Securities and Exchange Commission ("SEC"). SFG used this exemption to sell SIBL CDs to U.S. "accredited investors" in the United States without registering them as securities. SIBL's initial Reg. D filing listed CD offerings totaling only $50 million.

44.    After the initial Reg. D filing in 1998, SFG began to exploit U.S. investors and its empire grew exponentially. SIBL filed an amended Reg. D in November 2001 to increase the CD offering amount to $150 million. SIBL filed two additional amendments in 2004 (March and then November) increasing the size of SIBL's offering to $200 million and then to $1 *billion*, clearly evidencing the mass sales of SIBL CDs taking place in the United States. Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the size of the offering to *$2 billion*. During those years, SFG sold CDs under the Reg. D offering to well in excess of 1,000 investors.

45.    By 2003, SFG had printed and distributed to its FAs some 30,000 offering brochures for SIBL CDs. In 2005, SFG began an intensive television advertising campaign in the United States

designed to promote the sale of SIBL CDs.  By March 2006, SFG had distributed 4,424 SIBL CD

"Accredited Investor" subscription agreements to U.S. investors under the Reg. D offering.

### d.    Stanford Breeds Loyalty Through Exorbitant Compensation

46.    From 2004 to 2008, SFG grew into a high-powered sales and marketing juggernaut.

The different SFG sales offices competed with each other for SIBL CD sales, and developed team

names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to

market and sell the SIBL CDs, SFG established a commission structure that provided huge

incentives for the SFG FAs, including those at SGC, to sell as many SIBL CDs as possible.  The FAs

became addicted to these outrageous commissions — which they referred to as "bank crack" — and

the FAs became more and more aggressive in pushing SIBL CDs on innocent investors, despite the

high-risk nature of the investments.  Specifically, SGC received a 3% commission upon each sale of

a SIBL CD, with 1% going to the SGC broker that made the sale, and the FAs were eligible to

receive an additional 1% trailing commission throughout the term of the CD.   SFG used this

generous commission structure to recruit established financial advisers, and to reward those advisers

for aggressively selling SIBL CDs to investors.  To make matters worse for Plaintiffs and the

members of both Classes, STC also earned referral fees when it invested its clients' IRA funds in

SIBL CDs.  This incentive effectively undermined STC's fiduciary obligations to invest its clients'

IRA funds in a "prudent" manner.   Of course, commission and bonus structures like this are

emblematic of Ponzi schemes because they create perverse conflicts of interest and cannot be

sustained economically.  This was particularly true for STC because its referral fees proved to be the

life blood of STC's operations.  This commission structure, its inherent conflicts of interest, and

STC's substantial dependence on referral fees for SIBL CD investments were fully known to the

Lawyer Defendants and Director & Officer Defendants.

e.    **Dissecting the Fraud**

47.    The ultimate reality of SFG is that it was, *at all times*, a Ponzi scheme based out of Houston, Texas.  In essence, SFG, acting through its international network of "feeder" companies, lured money from investors like Plaintiffs; sold them fictitious "Certificates of Deposit;" and then pooled all the investors' money together to fund Allen Stanford's lavish lifestyle and invest in various illiquid and high-risk assets worldwide, including personal loans to Allen Stanford and speculative investments in Antiguan real estate.  None of the investors' money was segregated. Instead, all investor money was commingled and then sprinkled as private equity investments throughout the various companies that comprised SFG.  As such, SFG was violating the Investment Company Act by operating as an unregistered outlaw hedge fund and selling its internal securities product to Plaintiffs and others from Houston, Texas.  Section 47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.  15 U.S.C. § 80a-46.

48.    SFG was never registered nor authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or members of the Class, who were consistently and uniformly told verbally and via the SFG promotional materials that, e.g., the SFG based in Houston, Texas was compliant, authorized, and regulated by the Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority (FINRA), and backed by insurance coverage from the Securities Investor Protection Corporation (SIPC) and Lloyd's of London. Plaintiffs and other investors were never told the material fact that the acts of SFG and its

unregistered investment company were *void as a matter of law* under Section 47 of the Investment Company Act.

49.     As part of the fraud committed on Plaintiffs and members of the Class, SFG also uniformly touted the high liquidity of SIBL's investment portfolio.  For example, in its marketing materials distributed to Plaintiffs and members of the Class from at least 1995 through 2009, SFG emphasized the importance of the SIBL CD's liquidity, stating (under the heading "Depositor Security") that the bank focuses on "maintaining the highest degree of liquidity as a protective factor for our depositors."  *None of that was true.*  Likewise, SFG trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that the "liquidity/marketability of SIBL's invested assets" was the "most important factor to provide security to SIBL clients . . . ."  To ensure investors would buy SIBL CDs, SFG, through its FAs, assured the investor clients that SIBL's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly all of SIBL's investments were concentrated in high-risk, illiquid ventures: (i) unsecured personal loans to Allen Stanford in the amount of $1.8 billion; (ii) private equity investments in non-public companies; and (iii) private investments in SFG companies with real estate holdings, including extensive real estate holdings in Antigua and elsewhere in the Caribbean.

50.     Contrary to SFG's representations (both verbal and via the promotional materials) to Plaintiffs and members of both Classes regarding the liquidity of its portfolio from 1995 through 2009, significant portions of SIBL's portfolio were misappropriated by SIBL's sole shareholder, Allen Stanford, to fund his lavish lifestyle and invest heavily in Caribbean real estate development ventures.  In fact, by 2008, SFG was essentially a real estate development fund, a crucial fact that was never disclosed to Plaintiffs or members of the Class.

51.     At the end of 2008, Stanford could account for only a fraction of the SIBL CD obligations.  The largest segments of SIBL's portfolio consisted of "loans" to Stanford and over-valued real estate, primarily in the Caribbean.  By February 2009, SFG had misappropriated at least $1.8 billion of investor money through bogus personal loans to Stanford and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses, including massive investments in real estate and other private business ventures in Antigua.  The rest of the CD investors' money was spent by SFG on creating and perpetuating the charade of SFG's image, with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the SFG image of wealth, power, and prestige.  None of this was disclosed to Plaintiffs or members of the Class.

52.     As alleged in the Davis Plea and in the criminal indictment of Allen Stanford and his associates, Stanford and his CFO Jim Davis fabricated the performance of SIBL's investment portfolio and lied to investors about the nature and performance of that portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for SFG companies, fabricated the financial statements.  Using a pre-determined return on investment, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that SIBL did not actually earn.  Information in SIBL's financial statements and annual reports to investors about the bank's investment portfolio bore *no* relationship to the actual performance of the bank's investments.  SIBL's financial statements and annual reports to investors were prepared, drafted, and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis then signed these falsified financial statements.

53.     By the end of 2008, SFG had sold approximately $7.2 billion worth of SIBL CDs to Plaintiffs and other CD investors by touting: (i) the bank's safety and security, including that invested funds were insured; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that exceeded those offered by commercial banks in the United States.  It was at this time in 2008, in the midst of the worldwide financial meltdown, that SFG began to crumble.

### f.     Stanford's House of Cards Finally Collapses

54.     As alleged by the SEC and the United States Department of Justice, Stanford and Davis — attempting to cover a hole in SIBL's balance sheet that would cause it to fall below minimum capital requirements — concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of Antiguan property he purchased for $63 million, transferred it to some entities who "booked" it at $3.2 billion, and then transferred shares in those entities back to SIBL.

55.     In October 2008, SFG began suffering liquidity problems caused by a depositor "run" on SIBL that prevented SIBL from complying with client requests for funds transfers.  SIBL's CD transaction records indicate that approximately $2 billion in CDs were redeemed from January 1, 2008 through February 17, 2009.  These redemptions and volatile financial markets had a huge impact on the ability of SFG's FAs to keep clients pacified, and on SFG's ability to keep the Ponzi scheme afloat.  As a result, the FAs were ordered to continue selling the CDs to bring in new money and to discourage redemptions.

56.     In the wake of the Madoff scandal in January 2009, Venezuelan financial analyst Alex Dalmady, as a favor for a friend, performed an analysis of SIBL's returns over the years, taken from SIBL's publicly available Annual Reports, and then published his findings in a Venezuelan magazine

under the title "Duck Tales." His findings were then re-published in various blog postings. Dalmady concluded that SFG was nothing but another Ponzi scheme — a Ponzi "duck". The duck (or rather the cat) was out of the bag.

57.     In the background stood an increasingly skeptical SEC, which had been investigating SFG for four years. The Madoff scandal renewed the intensity of the SEC's expanding investigation. On February 4, 2009, in advance of a deposition before the SEC, SFG officials met with outside counsel in Miami. Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Stanford an email, copying head of Stanford Mexico David Nanes, that illuminated SFG's crumbling empire:

> [T]hings are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means. There are real bullets out there with my name on [sic], David's name and many others and they are very real…[w]e are all in this together.

58.     On February 17, 2009, the SEC filed a Complaint against SGC, SIBL, and other entities, as well as against Allen Stanford and Jim Davis, in the U.S. District Court for the Northern District of Texas. The SEC obtained an injunction to freeze the assets of SFG and Ralph S. Janvey was appointed to serve as Receiver to liquidate the SFG of companies. On June 18, 2009, Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts, including wire and mail fraud, obstruction of an SEC investigation, and money laundering. In August 2009, former SFG CFO Jim Davis pleaded guilty to, *inter alia*, securities fraud.

## D.     Defendants' Participation in the Stanford Ponzi Scheme

59.     In 1998, SFG set about establishing the IRA component of the Ponzi scheme by acquiring the Southern Trust Company, an existing Louisiana trust company based in Baton Rouge, Louisiana. The acquisition was spearheaded by Jay Comeaux and Alvaro Trullenque, who used

SFG's broker/dealer and investment adviser, SGC, to purchase Southern Trust Company's outstanding common stock and change its name to "Stanford Trust Company (Louisiana)." J.D. Perry was named as STC's new President, and the company's initial Directors included Jay Comeaux, J.D. Perry, Jay Zager, and Jason Green. STC's final Director was Yolanda Suarez, who served as SFG's General Counsel and eventual Chief of Staff. Suarez was one of Allen Stanford's most trusted confidants and a critical cog in Stanford's Ponzi machine.

### a.     BSW and Reynaud Join the STC/IRA Scheme

60.     In order to close its acquisition of the Southern Trust Company, SFG needed the approval of Louisiana's Office of Financial Institutions ("OFI"), which supervises financial services companies operating in the state. During the OFI's examination of the proposed transaction, OFI Chief Examiner Sidney Seymour sent a letter dated April 13, 1998 to SFG's outside counsel requesting more detailed information about SGC and its affiliated companies. As part of this request, Chief Examiner Seymour stated that OFI wanted more information about Allen Stanford's involvement with Guardian Bank in Montserrat (the predecessor to SIBL), which had been the subject of a troubling Banking Circular (denominated "OCC-171") published in 1989 by the United States Department of the Treasury's Office of the Comptroller of Currency. The Banking Circular concerned Guardian Bank's unauthorized banking activities in the United States and various investigations by banking regulators in Texas, Florida, and California regarding Guardian Bank's potentially illegal, unlicensed bank offices in those states.

61.     After reviewing these requests, SFG's General Counsel Yolanda Suarez concluded that SGC needed "connected" counsel in Louisiana. In early May 1998, Suarez found her man. She hired Defendant Claude Reynaud and his Baton Rouge law firm, BSW, to sweeten SFG's relationship with Louisiana's OFI to gain approval for the proposed acquisition. From the very

beginning, the circumstances surrounding Reynaud's engagement put Reynaud and BSW on notice of Allen Stanford's suspicious past in Montserrat, and his ongoing quest to operate unregulated U.S. sales offices for his offshore Ponzi banks.

62.     Reynaud determined that under Louisiana law, STC would be regulated as a bank holding company and subject to the OFI's annual examinations just like the trust department of a commercial bank.  But Reynaud also recognized that STC was a unique entity because it would be affiliated with SGC, which was not a bank but rather an investment advisor and broker/dealer licensed with the SEC.  In May or early June 1998, however, Reynaud and BSW discovered that SGC's sole shareholder, Allen Stanford, was also the sole shareholder of SFG's offshore bank in Antigua.  In other words, Reynaud and BSW learned that SIBL was affiliated with STC's proposed parent company, SGC, which meant that STC was also affiliated with an offshore bank.  At this point, both Reynaud and BSW knew about the incestuous business relationship between STC, SGC, and SIBL, all operating under the direction and control of SFG in Houston, Texas.  Reynaud and BSW also learned about SFG's business plan to promote STC as a trustee and custodian for the IRA accounts of SGC's investor clients (the "IRA Plan").

63.     On June 4, 1998, Reynaud met with Suarez at SFG's offices in Houston, Texas. During this meeting, Reynaud received information from Suarez about OCC-171 and various regulatory investigations concerning Guardian Bank's unlicensed and illegal banking offices in the United States.  On June 5, 1998, Reynaud and BSW responded to the OFI's letter request concerning Guardian Bank and provided documentation to the OFI relating to the surrender of Guardian Bank's license in Montserrat and an investigation by the Texas Department of Banking regarding Guardian Bank's operation of an unregistered office in Texas.

64.     On June 9, 1998, Reynaud and BSW also delivered a letter from Antigua's Minister of Finance to Louisiana's OFI.  The Antiguan Minister's glowing letter personally attested to the "integrity" and "professional competence" of SIBL's operations.  In reality, *this letter was actually written by SFG* — most likely Suarez or one of her staff — and Reynaud *knew* this letter was actually written by SFG because Suarez provided him with a draft copy of the letter when Reynaud met with Suarez on June 4, 1998, *before* it was purportedly signed by Antigua's Minister of Finance.

65.     Apparently, the fictitious letter finally tipped the scales in Allen Stanford's favor.  On June 23, 1998, Louisiana's OFI conditionally approved SGC's proposed acquisition of the Southern Trust Company.  Its conditional approval required the company to maintain minimum equity capital levels of $500,000, and more importantly, required the company's new Board of Directors to "insure [sic] compliance with all applicable laws and regulations."  BSW subsequently closed the transaction on July 13, 1998, with SGC purchasing approximately 99% of the Southern Trust Company's outstanding common stock.  The company's name was promptly changed to Stanford Trust Company (Louisiana)("STC").

### b.     BSW Discovers STC's Breaches of Fiduciary Duties

66.     In late September 1998, STC opened its doors in Baton Rouge as SFG's new trust company, and SFG began to slowly implement its fraudulent IRA Plan by promoting STC as a trustee and custodian for Stanford's broker/dealer, SGC's, IRA investor clients.  STC and its parent company, SGC, executed referral agreements between themselves that incentivized both companies to recklessly promote STC's investments of its clients' IRA funds into SIBL CDs.  For example, in a Referral Agreement dated September 14, 1999, signed by Jay Comeaux for SGC and J.D. Perry for STC, SGC agreed to refer clients to STC "*who have an interest in the types of investment products that are available*" through STC.  In return for these referrals, STC agreed to pay referral fees to

SGC equal to 50% of the fees that STC earned from each referred client. Additionally, a separate agreement allowed STC to receive referral fees *directly from SIBL* when STC invested its clients' IRA funds in SIBL CDs. Thus, all three of these related companies — STC, SGC, and SIBL — would share in the fees earned when STC invested its clients' IRA funds in SIBL CDs. Critically, however, STC also retained the right to "*determine the suitability of the client for the purchase of any security or other investment product.*" This provision gave STC the discretion to select investments for its IRA accountholders, and with this discretion, came heightened fiduciary obligations to those accountholders.

67.     SFG's IRA Plan was revealed to BSW in October 1998 when STC's President, J.D. Perry, asked BSW to provide a legal opinion concerning any applicable laws or regulations that would prohibit STC from investing client funds in SIBL CDs. On October 12, 1998, BSW opined that: (i) SIBL CDs did not qualify as securities under applicable securities laws so long as SIBL was sufficiently well capitalized and there was "*virtually no risk that [SIBL's] insolvency [would] prevent it from repaying the holder of the certificate in full;*" and (ii) because STC was affiliated with SIBL, STC would need to obtain security for its investments in SIBL CDs (e.g., marketable bonds or other instruments from SIBL) in order to satisfy STC's "prudent" investor obligations as a *fiduciary*, unless such security was specifically exempted by STC's trust agreements with clients.

68.     Despite BSW's advice, STC *never* obtained the necessary security for its fictitious investments, and because of this, *STC never fulfilled its fiduciary obligations* to its IRA accountholders. Reynaud and BSW knew about these fiduciary failures. In Reynaud's capacity as a Director of STC and an attorney for SFG, he knew about BSW's October 12, 1998 opinion, and over the years he reviewed numerous financial reports and other documents showing that STC never obtained the requisite collateral for its holdings of SIBL CDs. But BSW's and Reynaud's knowledge

of STC's breaches of fiduciary duties to its IRA accountholders never deterred BSW and Reynaud from helping SFG execute its IRA Plan.  In fact, in December 1998 — just two months after BSW recognized STC's duty to collateralize its SIBL CDs — BSW was advising SFG on how to open representative "trust production offices" for STC in Florida and Texas.

**c.     Reynaud Ignores His Own Conflicts of Interest**

69.     Reynaud suffered debilitating conflicts of interest because he wore too many hats in his relationship with SFG.  Under one hat, Reynaud was a partial owner of STC who served as a member of STC's Board of Directors from 2000 until SFG's collapse in 2009.  In that capacity, he had a *personal* interest in STC's success, and he also owed fiduciary duties to STC and its accountholders just like every other Director of the company.  Under another hat, Reynaud was the relationship partner for his firm's attorney-client relationship with SFG (and STC) from 1999 until SFG's collapse in 2009.  In that capacity, Reynaud leveraged his membership on the Board to generate lucrative legal fees for himself and BSW.  Moreover, both Reynaud and BSW suffered conflicts of interest within this attorney-client relationship because they knew that their ultimate "client" was not really STC, but SFG and SGC, and their executives in Houston, Texas.  And under yet another hat, Reynaud was an attorney at BSW who recommended to his other law firm clients that they invest in SIBL CDs, despite his knowledge of SFG's improprieties and STC's and SGC's breaches of fiduciary duties to their clients' IRA accounts.  As discussed further below, Reynaud held his own interests above those of his clients because he recommended the SIBL CDs to his clients' detriment while SFG rewarded his referrals by sending additional legal work to Reynaud and BSW.

70.     In April 1999, STC President J.D. Perry invited Reynaud to serve on STC's Board of Directors.  Reynaud accepted his offer in a September 21, 1999 letter to SFG's Yolanda Suarez, in

Houston, Texas.  Reynaud's service as a Director entitled him to receive directors' fees, and he informed Perry that under BSW policy, all such fees should be made to Reynaud personally.  In addition to receiving directors' fees, Reynaud received approximately 2,000 shares of common stock in STC, which gave him a partial ownership interest in STC.

71.     Reynaud served as a member of STC's Board of Directors for nearly ten years, and he served without interruption until STC's receivership in February 2009.  In this capacity, Reynaud was involved in deliberating all of STC's major decisions about its business operations, including STC's business model, the IRA Plan, and investments in SIBL CDs for its IRA accountholders.  With full awareness of STC's conflicts of interest in generating referral fees when making investments in SIBL CDs, from 2003 to 2008 Reynaud oversaw the rapid, disproportionate growth of STC's investments in SIBL CDs relative to other investments.  In short, Reynaud was acutely aware of STC's improprieties through his extensive service on STC's Board of Directors, including his appointment to STC's Policy, Procedures and Administrative Committee (the "Policy Committee") in 2006, which was responsible for overseeing all of STC's policies, procedures, and legal matters.  Specifically, through his service as a Director and member of the Policy Committee, Reynaud was aware that STC's primary business purpose was to enable SFG to sell as many SIBL CDs as possible to SGC's IRA accountholders.

72.     All the while, Reynaud leveraged his position on STC's Board of Directors to generate additional legal fees for himself and BSW.  In February 2000, Reynaud wrote to SFG's newly appointed General Counsel, Mauricio Alvarado, to inform Alvarado about BSW's services and its relationship with SFG that, in Reynaud's words, "*is growing daily.*"  In addition to BSW's regulatory advice for STC, Reynaud pointed out that BSW at that time was also representing STC's parent company, SGC, in defending various broker/dealer matters.  Reynaud invited Alvarado to

contact him whenever SGC had any broker litigation, and he described BSW's extensive experience in corporate, securities, banking, and bond matters.   Reynaud invited Alvarado to meet with him personally, and he closed the letter by noting his service on STC's Board of Directors and his wishes for a "*long working relationship with you and the Stanford Financial Group.*"

### d.   STC's Incestuous Relationship with SIBL and SGC

73.   By 2000, SFG was ready to implement the IRA Plan.   In September 2000, a staff attorney for SFG named Michael Contorno drafted a memo addressing whether CD products issued by an offshore bank (SIBL) were acceptable, qualified investments for IRA accounts under United States tax laws.   Contorno's memo, which he addressed to Jason Green, Oreste Tonarelli, and SFG's General Counsel, Mauricio Alvarado, concluded that there were no tax-based restrictions on selling offshore CDs to IRA accounts.   But Contorno raised concerns about the related-party transactions between STC, SGC, and SIBL, and he recommended that SFG obtain an independent legal opinion from Louisiana counsel to determine if there were any other legal restrictions for these transactions under Louisiana law.

74.   On September 15, 2000, Alvarado retained Louisiana law firm Jones Walker to provide this legal opinion.   On September 19, 2000, a Jones Walker partner, Ted Martin, delivered his opinion that IRS regulations would not prevent SIBL from selling its CDs to STC's IRA accountholders, notwithstanding the fact that Allen Stanford was the ultimate owner of both entities.   However, Martin questioned whether the transactions would run afoul of the Louisiana Trust Code's prohibition on self-dealing, which *barred* STC from purchasing an affiliate's securities.   And taking a page from BSW's earlier opinion in October 1998, Martin raised the question whether STC's investments in SIBL CDs would comport with its fiduciary obligations to invest the IRA accounts in a prudent manner.   "***In view of the close relationship between [STC and SIBL]***," Martin reasoned,

"*if something goes wrong STC will have a very high burden of proving that it was not imprudent*." In light of the self-dealing prohibitions under Louisiana law, and STC's receipt of referral fees from SIBL, Martin recommended that SFG disclose to each IRA accountholder that "STC will in some cases receive payments from third parties *(including [SIBL])* in connection with investments made with those third parties."

75.     Alvarado simply ignored the unfavorable portions of Martin's opinion, and on September 21, 2000, Alvarado wrote to Green and Tonarelli that he was "happy to confirm" SIBL CDs could be utilized as qualified investments in STC's IRA accounts, as long as clients were advised that STC received fees directly from SIBL.  Some of SFG's executives continued to have concerns about the fee structure, however, so Ted Martin of Jones Walker was asked to provide another analysis addressing the propriety of STC receiving fees directly from SIBL for its investments in SIBL CDs.  On October 27, 2000, Martin issued a separate opinion letter stating that STC's proposed fee structure did not change his earlier opinion on September 19, 2000, but he *withdrew* his initial recommendation that SFG disclose the fee arrangements among its various companies.

76.     Based on these two legal opinions from Jones Walker, SFG's staff attorney Contorno advised STC's business group that it was legally permissible for STC to invest its clients' IRA accounts *exclusively* in SIBL CDs.  In a memo dated October 30, 2000 and addressed to Jason Green and J.D. Perry, Contorno opined that "*[u]nless the recommendation of such an investment can be shown to be imprudent, there is no reason why an IRA need contain any other investment [beyond SIBL CDs]*."  Armed with Contorno's blessing, STC and SGC embarked on a joint campaign to aggressively market the sale of SIBL CDs for their clients' IRA accounts.  STC soon began

purchasing SIBL CDs "for the benefit of" its IRA accountholders, and STC retained discretionary authority to move the assets held in those IRA accounts.

### e.     The Lawyer Defendants Aid the Stanford Ponzi Scheme By Referring Clients to Stanford Financial Group

77.     During this same period, BSW and A&R embarked on their own campaign to enrich themselves at their other clients' expense.  Both firms were already providing legal services to SFG, and both firms quickly started referring their *own law firm clients* to SFG.  Many of these clients purchased SIBL CDs.  Through these referrals, the two firms curried favor with their powerful new client, SFG, while enjoying the lucrative legal work that SFG sent the firms to reward them for adding to SFG's bottom line.  Of course, the law firms' efforts to help SFG sell more SIBL CDs did not go unnoticed at SFG.

78.     In the fall of 2000, SFG's executives exchanged emails on the subject of "Attorney Referrals."  On September 19, 2000, SGC Senior Vice President Jason Green suggested to Michael Contorno that SFG send more legal work to both BSW and A&R because the firms had been *referring their clients* to SFG.  Specifically, the memo noted that A&R had been "very good about referring business to [SFG]," and Reynaud was "beginning to refer business back to [SFG]."  As Green put it, "*[w]hy wouldn't we use these opportunities to deepen our existing relationships, and reward those who . . . have been adding to our bottom line via referrals[?]*"  Alvarado added that SFG should also meet with Ted Martin to see if he or his partners at Jones Walker wanted to become SFG's clients, although he cautioned that "it would be best to wait some time before approaching him for this purpose, so that we have time to consolidate our client-attorney relationship . . . ."

### f.     STC's Directors Discover STC's False Statements to Louisiana's OFI

79.     In April 2001, a proposed change in Louisiana law threatened to derail SFG's IRA Plan.  STC President J.D. Perry advised STC's Board of Directors, including Reynaud, that a

Louisiana politician had submitted a bill in the state legislature to overhaul Louisiana's trust company laws, including a provision that minimum capital requirements be quadrupled to $2 million. Perry believed the bill was supported by OFI's Commissioner, John Travis. Perry informed STC's Board of Directors that he had retained a powerful lobbying firm that would give STC a "*good shot at quietly killing the entire bill*" while "*maintaining our current relationship with the OFI.*"

80.     Later in May 2001, Perry informed STC's Board of Directors, including Reynaud, that Louisiana's OFI had taken the position that SFG had already promised to capitalize STC with $2 million back in 1998. Perry also reported that STC's lobbyist had successfully "stalled" the proposed legislation, but STC no longer needed to "kill" the bill because Perry had compromised with the OFI by negotiating a lesser capitalization requirement of $1 million. More importantly, as part of this compromise, STC and the OFI had also agreed to jointly submit an amendment to the proposed legislation that would *exempt* STC from its provisions.

81.     These developments were not news to Reynaud. He had been actively involved in STC's lobbying efforts to forestall the proposed legislation. Reynaud also knew there were other critical reasons for these lobbying efforts aside from the new capitalization requirements. The regulatory reforms reflected in the proposed legislation meant that STC would no longer be regulated as a limited purpose bank. SFG's Yolanda Suarez had informed Reynaud that STC preferred to keep its status as a limited purpose bank under Louisiana law because it provided more "flexibility" for operations. In a June 11, 2001 email to STC President J.D. Perry, Reynaud discussed his plans to get closer to OFI Commissioner John Travis so Reynaud could get Travis "in our camp."

82.     But on July 26, 2001, STC's carefully courted relationship with Commissioner Travis soured when the OFI's 2001 examination report for STC raised concerns about the conflicts of

interest and self-dealing problems caused by STC's investments in SIBL CDs.  Specifically, the

OFI's report to STC's Board of Directors (the "2001 Report"), stated that approximately $4.3 million

in trust account funds, primarily IRAs, were currently invested in SIBL CDs, and that STC, as trustee

for these accounts, had full discretionary authority over these investments.  The 2001 Report noted

that STC's own lawyers at Jones Walker believed STC would have difficulty proving its investments

in SIBL CDs were prudent because STC was affiliated with SIBL.  The OFI informed STC's Board

of Directors that it shared Jones Walker's concerns about the prudence of these investments,

particularly given that SIBL CDs were not insured nor otherwise collateralized.

83.     The 2001 Report also indicated that STC President J.D. Perry had informed the OFI

during its 2001 examination that "*clients interested in **more riskier international instruments** are

introduced to these CDs because of the strong returns and strength of [SIBL].*"  Of course, J.D.

Perry's statement to the OFI — now fully disclosed to Reynaud and the other members of STC's

Board of Directors — utterly contradicted SFG's entire marketing campaign for SIBL CDs as safe,

low-risk investments.  This marketing campaign was fully known by the Director & Officer

Defendants, who were serving in such capacity as of that time, including Reynaud.

84.     The 2001 Report also noted the OFI's disagreement with many of the conclusions in

Jones Walker's opinion, and the OFI suggested that STC obtain a Private Letter Ruling from the

Internal Revenue Service (IRS) to determine: (i) whether STC was a fiduciary; (ii) whether SIBL was

an affiliate of STC; and (iii) whether SIBL CDs were the same as CDs issued by banks in the United

States.  The OFI's report to the Board of Directors closed by stating that "*Management and the

Board should reevaluate this program and ensure that the risk being assumed by recommending and*

*facilitating the purchase of these CDs is justified by the potential return to the accountholders.*"[1] Notably, at the same time that Louisiana's OFI issued this report, OFI Commissioner John Travis also sent a letter to STC's Board of Directors and advised them of his decision to increase STC's minimum capital requirement to $2 million.

85.     The OFI's 2001 Report was a potential game changer for SFG's IRA Plan. Reynaud urged SFG's Suarez to give his "solid political connections" time to influence OFI Commissioner John Travis, and he noted BSW's access to the Governor of Louisiana, but Suarez rejected his pleas and promptly flew down to Baton Rouge with *Allen Stanford himself* to meet with Travis on July 30, 2001. Allen Stanford's desperation was evident in the parties' discussions that day, as SFG not only agreed to increase STC's capitalization to $2 million, but Allen Stanford personally promised Commissioner Travis that STC would maintain $5 million in capital as long as the OFI allowed STC to stay in business. At the time, of course, Stanford's $5 million pledge was more than sufficient to secure the approximately $4.3 million in SIBL CDs held by STC in its clients' IRA accounts.

86.     On August 6, 2001, SFG's General Counsel, Mauricio Alvarado, wrote to Ted Martin at Jones Walker and asked Martin to respond to the issues raised in the OFI's 2001 Report. According to Alvarado, SFG needed Martin's response because "*STC did indeed rely on your analysis and offered SIBL CDs to STC's IRA clients.*" Alvarado closed the letter by stating that an IRS Letter Ruling was *not* desirable.

87.     On August 13, 2001, Martin responded to Alvarado's letter by opining, in effect, that STC's affiliated relationship with SIBL was *irrelevant*. Alvarado promptly forwarded Martin's opinion to J.D. Perry, Jason Green, and SFG's Chief of Staff, Yolanda Suarez, and recommended

---

[1] All OFI examination reports provide that each member of STC's Board of Directors has a duty, in keeping with his or her responsibilities to both depositors and shareholders, to read the examination reports in detail.

that Martin respond directly to the OFI because "Jones Walker is the largest law firm in Louisiana." Alvarado shared this decision with Reynaud.  On August 15, 2001, Suarez directed Perry to instruct Jones Walker to handle the OFI so it would not include the CD program in its official audit.

88.      On August 16, 2001, Martin sent a letter to the OFI and provided his legal opinion that there was nothing wrong with STC acquiring SIBL CDs for its clients' IRA accounts — despite the fact that STC was a fiduciary for these IRA accounts — as long as STC's clients were informed about the relationship between STC and SIBL.  Martin followed up with a second letter dated September 26, 2001, in which he informed the OFI of his opinion that it was proper for SIBL to pay referral fees directly to STC for STC's investments in SIBL CDs because STC was *not* a fiduciary.  This second opinion, which completely contradicted Martin's earlier opinion that STC, as a trustee, was a fiduciary, was apparently based on the assumption that STC did *not* exercise any discretion over the investments its clients' IRA accounts.

89.      Reynaud reviewed all of Jones Walker's opinions at the time they were prepared and issued to Louisiana's OFI, and Reynaud became concerned during STC's ongoing debate with the OFI.  Ironically, however, Reynaud was not concerned about the propriety of SFG's IRA Plan, which had been squarely criticized by the OFI, nor was he concerned about the role of STC's Board of Directors in helping STC execute that plan.  *Rather, Reynaud was concerned about the lucrative legal fees that SFG was paying to Jones Walker instead of Reynaud and his firm, BSW.*  Reynaud wanted BSW to handle all of STC's regulatory needs in Louisiana, including the company's ongoing feud with the OFI, so Reynaud and his firm could reap the valuable fees produced by this work.  On August 17, 2001, Reynaud sent a letter to Suarez in Houston in which he voiced his concern about the "*degree of disconnection*" between himself and SFG about BSW's ability to offer a full array of

legal services.  Reynaud's letter then proceeded to compare his law firm's ability to that of Jones Walker.  *"On the political level,"* Reynaud boasted, *"we have as much or more political influence or contacts  than any firm in the state."*  Reynaud closed his letter by offering to visit Mauricio Alvarado and Suarez in Houston, Texas in order to "*firm up relationships between our firm, Stanford Trust and Stanford Group*."

90.     Reynaud's pleas to Suarez and Alvarado highlight an important point: BSW's true client was not really STC, but SFG in Houston, Texas.  Throughout Reynaud's and his firm's entire relationship with STC, BSW knew that its true client was Houston-based SFG and SGC, and the firm, including Reynaud, directed its activities, counsel, and opinions to SFG's and SGC's headquarters in Houston, Texas.  Furthermore, Reynaud and BSW knew that SGC directed and controlled STC's operations from its offices in Houston, Texas.  For example, in early 1999, STC advised Louisiana's OFI that all of STC's accounting functions would be handled by SGC in Houston, Texas.  In a letter response dated May 14, 1999, the OFI informed STC that it did not object to SGC handling all of STC's accounting functions in Houston, Texas.

91.     Additionally, both Reynaud and BSW knew or should have known that they suffered a conflict of interest by simultaneously representing SFG, SGC and STC.  For example, as the broker/dealer and investment adviser for STC's IRA clients, SGC was incentivized to aggressively sell SIBL's fictitious CDs to those clients.  But STC had a fiduciary obligation to invest its clients' IRA accounts in a safe, secure, and "prudent" manner.  And if SFG, SGC, STC, and SIBL had not been related parties, and if STC had not been beholden to the same ultimate owner for all four entities, then STC surely would have scrutinized SGC's recommendations and SIBL's CDs much closer.  In truth, STC did *nothing* to scrutinize SGC's investment recommendations or SIBL's CDs, and Reynaud and his law firm placed themselves squarely in the middle of these conflicts of interest

by representing SFG, SGC, and STC simultaneously.  This is particularly true given that STC was dominated and controlled by both SFG and SGC, whose overarching goal was to sell as many SIBL CDs as possible to STC's IRA clients.

92.     The same was true of A&R:  its real client was not STC, but SFG and SGC in Houston, Texas.  Moreover, by representing all three affiliates simultaneously, A&R placed itself squarely in the middle of the conflicts of interest suffered by SFG, SGC, and STC.  A&R opinion letters demonstrate that A&R's clients included both SFG and STC, and A&R knew that SGC directed and controlled STC's operations from its offices in Houston, Texas.  Because of this knowledge, A&R and its partners directed their activities, counsel, and opinions to SFG's and SGC's headquarters in Houston, Texas.

93.     STC's Board of Directors held a meeting on August 28, 2001.  Suarez personally attended this meeting, as well as two representatives from Louisiana's OFI, Sidney Seymour and Deidre Moore, who discussed the OFI's findings in its 2001 Report.  Reynaud attended the meeting by telephone.  When the Board's discussion turned to SIBL CDs, Ms. Moore indicated that in addition to the other issues raised by the 2001 Report, she was concerned about SFG's promotion of "excess FDIC" insurance in its marketing program for SIBL CDs.  In her opinion, this promotion could mislead STC's clients into thinking SIBL CDs were insured by the FDIC.

94.     After this discussion, the OFI representatives left the meeting, and Suarez addressed STC's Board of Directors on behalf of Allen Stanford.  Suarez told the Board that Stanford was "displeased and dismayed" by this latest turn of events, and Stanford *forbid* any further communication with the OFI unless he was "in the loop." At this point, Reynaud defended STC's strategy but expressed his desire to be more informed about SFG as a whole so the Board could make more informed decisions.  Suarez invited Reynaud to join her in Houston, Texas to tour SFG's

headquarters and discuss the rest of SFG in more detail.  Suarez also requested that STC's Board of Directors hold more of its meetings in Houston, Texas so she could attend them in person.  At her request, STC's Board of Directors did hold more of its meetings in Houston, Texas, and Reynaud (and the other Directors) regularly travelled to Houston thereafter to attend those Board meetings and to so that Reynaud could meet with Suarez and Alvarado regarding BSW's legal services for SFG.

### g.  A&R Issues a False Opinion Letter to Louisiana's OFI

95.     On October 8, 2001, STC's Board of Directors received a letter from Louisiana's OFI enclosing the 2001 Report.  The letter once again highlighted STC's potential self-dealing and conflicts of interest, and informed the Board that the OFI believed STC was acting as a fiduciary for its IRA accountholders, despite Ted Martin's opinion to the contrary.  The OFI further directed the Board to its comments in the 2001 Report that questioned the prudence of STC's investments in SIBL CDs.  Finally, the OFI discussed its concerns about the Board's own failure to satisfy its fiduciary obligations.

> "[W]e are concerned about the apparent lack of oversight on the part of [STC's] Board of Directors as demonstrated by the infrequency of board meetings, irregular attendance, brevity of board minutes, and failure to review and approve all policies on an annual basis.  Directors have a fiduciary obligation under [Louisiana] law to discharge their duties and responsibilities in an appropriate manner.  Directors are expected to be actively involved in the company's affairs and are directly responsible for establishing policies under which it will operate.  Active participation at regular board meetings helps to ensure that directors are fully informed and adequately prepared to meet their obligations."

96.     SFG recognized the threat posed by the 2001 Report and the OFI's October 8, 2001 letter.  SFG tried to shift momentum by retaining more compliant legal counsel for its negotiations with the OFI.  Mauricio Alvarado, SFG's General Counsel, rebuffed Reynaud's pleas for additional work and turned to Louisiana law firm A&R.  On October 26, 2001, Alvarado sent a letter to Bob Schmidt, a partner in A&R's Baton Rouge office, and outlined the scope of SFG's request:

"The broad issue is whether STC, as trustee of an IRA, is permitted under all applicable state and federal law to place client IRA funds into CDs issued by [SIBL]. If so, can STC earn fees as [a] result of such placement?"

97.    Over the next several weeks, Schmidt drafted and redrafted his legal opinion, and both his legal conclusions and the factual assumptions underlying those conclusions continued to evolve until his letter response crystallized in late November 2001. In the early drafts of Schmidt's opinion, he struggled with the legalities of SFG's business structure, including whether or not STC and SGC would be considered joint fiduciaries to the IRA accounts, thereby making the CD investments "prohibited transactions." But SFG's employees, including Alvarado, J.D. Perry, and Jason Green, *carefully revised Schmidt's preliminary memos by deleting large portions of Schmidt's early drafts*, and in the final draft of Schmidt's opinion, his early doubts had mysteriously vanished. The final version of Schmidt's letter did not find *any* problems with STC's business structure, and Schmidt concluded that STC could receive referral fees if they were fully disclosed because STC was *not* a fiduciary. On November 29, 2001, STC President J.D. Perry forwarded A&R's legal opinion to Reynaud and stated that STC's Board of Directors needed to "bless" STC's response to the OFI. Reynaud promptly approved the legal positions in STC's response, and A&R's legal opinion was appended to STC's official response letter to the OFI dated December 12, 2001.

98.    By allowing SFG to effectively rewrite his opinion, A&R's Schmidt issued a false opinion letter that essentially approved of STC's incestuous and deeply conflicted relationship with SIBL and SGC. In doing so, Schmidt consciously ignored facts known to him, including the facts that: (i) SGC, as an investment adviser, would be advising its clients to invest up to 100% of their IRA accounts in uninsured CDs held in custody at SGC's subsidiary, STC; (ii) the uninsured CDs were issued by an offshore bank that was affiliated with both SGC and STC; and (iii) the offshore bank paid referral fees directly to STC and SGC for investing their clients' IRA funds in those

uninsured CDs.  A&R's false legal opinion provided STC with the ammunition it needed to hold

Louisiana's OFI at bay, and as a direct result of that false legal opinion, A&R empowered SFG to

execute a fraudulent scheme that would eventually cost innocent IRA accountholders $300 million.

Clearly, if Schmidt had submitted a truthful opinion based on the facts known to him, and concluded

that STC could *not* invest its clients' IRA funds in SIBL CDs while receiving fees for those

investments, then SFG's IRA Plan would have been dead in the water from the OFI's perspective

and the STC portion of the Stanford Ponzi scheme would have quickly unraveled.

99.     On February 26, 2002, OFI Commissioner John Travis sent a letter to STC's Board of

Directors acknowledging the OFI's receipt of STC's December 12, 2001 response letter, which

included Schmidt's false opinion letter.  The OFI noted STC's decision that an IRS ruling on the

SIBL CDs was unnecessary, and while the OFI "continued to have concerns" about STC's

investments in SIBL CDs, the OFI accepted this decision of STC's Board of Directors.  In essence,

Commissioner Travis informed STC that the OFI was closing its 2001 examination and would no

longer pursue the issues raised in its 2001 Report, including the OFI's concerns about STC's

potential self-dealing, conflicts of interest, and fiduciary obligations.  The "independent" legal advice

provided in Schmidt's false opinion letter, which summarily dismissed the OFI's concerns, was

surely an important factor in the OFI's decision to stand down and allow SFG's IRA Plan to proceed.

 Commissioner Travis reiterated, however, that STC's decision not to seek an IRS ruling "*does not*

*relieve the Board of its fiduciary responsibility to avoid self-dealing and act prudently in the best*

*interest of the accountholders.*"

100.    Importantly, Travis also reminded STC's Board of Directors that STC could ***not***

receive a fee for investing IRA funds in SIBL CDs.

### h.   Whitney Bank Terminates its Banking Relationship with STC

101.   SFG and its team of complicit professionals had successfully dodged the bullet.  In fact, their efforts to pacify Louisiana's OFI were so successful that the agency seemed to completely lose interest in STC.  The OFI's annual examinations of STC from 2002 through 2006 resulted in few, if any, reported issues.  Indeed, despite the glaring issues raised in its 2001 Report, the OFI did not even *mention* STC's investments in SIBL CDs for years.

102.   But other entities began to sound the alarm.  On January 7, 2004, Whitney Bank informed J.D. Perry by letter that its banking relationship with STC had been terminated.  This development was a potentially significant blow to STC's IRA Plan because STC used Whitney Bank's accounts to purchase SIBL CDs.  According to Whitney Bank's account termination letter, certain affiliates of STC — most likely SGC and SIBL — had approached Whitney Bank to establish a banking relationship.  As a result of its due diligence, Whitney Bank had discovered the size and scope of SFG and its affiliated web of companies, including SIBL, which Whitney Bank specifically named.  Armed with this knowledge, Whitney Bank then reviewed its relationship with STC and noted its relationship with SFG, and based upon its review of fund flows through STC's accounts at the bank, Whitney Bank decided to terminate their banking relationship.  Under the terms of Whitney Bank's letter, STC had 30 days to move its banking elsewhere, and the bank warned STC that it reserved the right to close any or all of STC's accounts immediately — without any further notice to STC — if "other information" came to the bank's attention.  Unfortunately for STC's innocent IRA accountholders, SFG managed to find a new banking partner and the Stanford Ponzi Scheme continued its march.

103.   Upon information and belief, the Director and Officer Defendants knew of Whitney Bank's termination of its banking relationship with STC in January 2004.

### i.      Stanford Financial Group Executes the IRA Plan to Perfection

104.     Unfettered by any real regulatory oversight from 2002 through 2007, SGC's brokers and investment advisers convinced hundreds of clients to transfer their IRA accounts to STC and recommended that they invest those funds in SIBL CDs.  In many cases, STC's clients relied on the advice of their SGC investment advisers and invested 100% of their IRA accounts — ***their entire life's savings*** — in SIBL CDs.  These aggressive and ***patently imprudent*** business practices led to the exponential growth of STC's investments in SIBL CDs over the next several years.  For example, the OFI's 2003 examination report noted that STC held almost $35 million in SIBL CDs for its IRA accountholders.  In the 2004 examination report, the OFI noted that STC's holdings of SIBL CDs had grown to over $52 million.  And by 2006, STC's holdings of SIBL CDS had more than tripled to $166 million.  During this period, nearly all the Director & Officer Defendants supervised and monitored STC's operations, and authorized STC to invest its clients' IRA accounts in SIBL CDs so STC and SGC could earn lucrative referral fees from these transactions.

105.     For example, from 2003 through 2006, Defendants Reynaud, Perry, Comeaux, Frazer, Haymon, and Green all served continuously on STC's Board of Directors, supervising and monitoring STC's operations, such as reviewing financial reports, capital investments, governing documents, and OFI examination reports.  During this period, these Defendants allowed STC's investments in SIBL CDs to increase nearly five-fold, from $35 million to $166 million, despite their knowledge that STC's affiliation with SGC and SIBL, and STC's perverse incentives to purchase SIBL CDs, conflicted with STC's own fiduciary duties.  Defendant Bogar joined STC's Board of Directors in 2004 and served continuously through 2006, reviewing the same financial reports, capital investments, governing documents, and OFI examination reports during this period.  On his watch, Defendant Bogar allowed STC's investments in SIBL CDs to more than triple, from $52

million to $166 million, all while knowing that STC's affiliation with SGC and SIBL, and STC's perverse incentives to purchase SIBL CDs, conflicted with STC's own fiduciary duties.

> **j.      Stanford Rewards the Lawyer Defendants for Referring Clients to Stanford Financial Group**

106.    Reynaud personally benefitted from STC's growing investments in SIBL CDs.  First, as a partial owner of STC, his ownership interest benefitted from the substantial referral fees that STC earned when making these investments.  Second, as an attorney for SFG, Reynaud personally benefitted because STC shared its referral fees with Reynaud in the form of legal fees.  Reynaud had finally convinced SFG to retain BSW so his law firm could represent STC in its legal and regulatory matters, including matters concerning the SIBL CDs.  For example, in May 2004, STC President J.D. Perry asked Reynaud and BSW to investigate whether STC could establish a "common trust fund" as another mechanism to invest client funds in SIBL CDs.  On June 8, 2004, J.D. Perry met with BSW and provided the firm with information regarding SIBL, its CDs, and the proposed fund.  Attorney notes from that meeting, likely written by BSW partner Van Mayhall, describe STC's proposed fund as an "upside down mutual fund."  Despite Mayhall's clear description of the common trust fund as a "mutual fund," however, BSW opined in a June 17, 2004 memo that STC's fund should be *exempt* from regulation under the Investment Company Act of 1940 because STC was regulated as a bank. Furthermore, BSW concluded, STC should not have *any* legal problems when selling units in its fund to accredited investors.

107.    A&R also benefitted from STC's swelling investments in SIBL CDs by providing legal advice to SFG, including STC and SGC, and assisting SFG's efforts to access other retirement plans to fuel the expanding Ponzi scheme.  For example, in approximately February 2007, SFG retained A&R to determine whether STC could act as custodian for ERISA plans and whether such

plans could purchase SIBL CDs.  As part of its analysis, A&R's lawyers, including Bob Schmidt and fellow partner Jim Austin, reviewed offering materials and disclosures for the SIBL CDs.  Through this review, A&R was aware that SIBL CDs were *not* insured, had *not* been registered as securities in the United States, and were *not* otherwise subject to regulation in the United States.  A&R was also aware that SIBL's offering materials did *not* disclose the fact that STC received referral fees from SIBL.  Incredibly, however, A&R furnished its opinion to SFG on February 19, 2007 that STC, as a fiduciary to an ERISA plan, could in fact purchase and hold SIBL CDs for that plan.

### k.   J.D. Perry Resigns in a Scandal and Louis Fournet Joins the Stanford Ponzi Scheme

108.    In September 2006, J.D. Perry resigned as President of STC amidst allegations of theft and embezzlement.  On September 7, 2006, Reynaud notified Louisiana's OFI that Perry had resigned, and that Zack Parrish, an officer of SGC, would serve as STC's interim President.  On October 12, 2006, STC's Board of Directors held a meeting to discuss STC's "overall [t]rust strategy" and the company's plan for replacing former President J.D. Perry.  The Board also discussed the formation of three new committees, the Policy Committee, the Investment Policy Committee, and the Financial/Audit Committee.  Over the next two years, STC's Board of Directors discovered even more information about STC's suspicious operations, and STC's burgeoning investments in SIBL CDs, through the work of these new committees.  In particular, Directors Reynaud, Haymon, and Frazer, who each chaired one of these new committees, gained more knowledge about STC's illicit operations.

109.    Later in October 2006, interim STC President Parrish asked Reynaud to serve as Chairman for STC's Policy Committee.  In a letter to Parrish dated November 3, 2006, Reynaud accepted the position but expressed his broader concerns about his responsibility to Louisiana's OFI

relative to STC and its corporate actions.  Reynaud acknowledged that ultimate authority for STC's

actions rested with Allen Stanford, as STC was a wholly owned subsidiary of SFG, but Reynaud

insisted that communication and consultation with STC's other Directors was important "*given the*

*unique hybrid nature of this relationship.*"

110.     The three new committees of STC's Board of Directors met on January 18, 2007.

During the Investment Policy Committee meeting, members Haymon, Green, and Parrish discussed

STC's client allocations, investment objectives, capital account holdings, and asset classes.  The

committee suggested that STC's investment allocations and objectives be modified as *target*

allocations.  Later that day, the Board held a meeting and the chairman of each committee reported to

the Board.  In attendance were Directors Frazer, Haymon, Reynaud, Bogar, Comeaux, Green, and

Parrish.  Reynaud, as Chairman of the Policy Committee, reported that his committee would review

STC's policies and make recommendations to the Board.  As part of this discussion, STC's Joe

Klingen discussed STC's fee schedules with the Board.  Haymon, as Chairman of the Investment

Policy Committee, discussed STC's investment policy report.  And Frazer, as Chairman of the

Financial/Audit Committee, reported that no major adjustments to STC's financial statements were

anticipated, and that his committee had approved STC's budget.  Finally, interim President Parrish

reported on STC's operations, including *missing documentation* in STC's client files, and STC's

progress in identifying a new President to replace J.D. Perry.

111.     In April 2007, SFG found its new man and tapped Louis Fournet to serve as STC's

new President.  Fournet joined STC from Hancock Bank — the successor to STC's prior banking

relationship with Whitney Bank — where Fournet had been Hancock Bank's Senior Vice President

and Manager of Trust Administration.  STC's Board of Directors met on April 12, 2007 and

approved of Fournet's appointment as President.  In attendance were Frazer, Reynaud, Bogar,

Comeaux, and Parrish.  Haymon did not attend.  Frazer reported on behalf of the Financial/Audit Committee, noting that his committee "did not have a lot of time to review" STC's financial statements for the first quarter of 2007.  Reynaud reported on behalf of STC's Policy Committee, and Parrish reported on behalf of STC's Investment Policy Committee, noting that an investment policy had been developed to address STC's investment objectives for its capital account.

112.    Reynaud's Policy Committee met again on July 3, 2007.  In attendance were members Reynaud and Comeaux, as well as STC President Fournet.  The Policy Committee noted that SIBL CD investments had generated $16.3 million in March 2007 alone, and that April 2007 had also generated "a large influx of [SIBL] CDs."  President Fournet stated his belief that "*the Board would be interested in where production comes from*."  He then reported that STC was currently developing a report that will show STC's "leading producers in [SIBL] CDs" for its IRA or trust accounts, by FA and office.  Comeaux then reported that Green had already developed a progress report "for the entire network of [Stanford Financial Group] companies that cross sell [SIBL CDs]."  Finally, Fournet discussed additional new business from SIBL CDs, including "33 new CDs booked just this week," and reported that STC was still receiving *incomplete* documentation for its CD investments.

113.    On July 13, 2007, STC's Investment Policy Committee held a meeting to discuss STC's capital account investment policy statement and capital account proposed asset allocation.  In attendance were Chairman Haymon and STC President Fournet.  Green was absent and Parrish voted on the committee's motions by email.  The committee was given an investment presentation that included STC's current investment holdings and proposed investment strategies, as well as STC's June 30, 2007 capital account asset listings.  Finally, the committee discussed the need to appoint Fournet as a member during its next meeting.

114.     It did not take long for Fournet to appreciate SFG's aggressive IRA Plan and STC's role in executing that plan.  Similarly, however, it did not take long for Fournet to appreciate the breadth of STC's fiduciary obligations to its IRA clients, and the significant legal risks posed by SFG's outright contempt for those fiduciary obligations.  On July 18, 2007, only three months after Fournet's appointment as STC's new President, STC's Senior Vice President Joe Klingen sent an email to A&R's Bob Schmidt and asked him how STC could achieve its goal of acting as trustee of an IRA "without taking on the 'fiduciary' liability."

115.     The next day, July 19, 2007, STC's Board of Directors held a meeting and the chairman of each committee reported to the Board.  Among other items, Financial/Audit Committee Chairman Frazer reported on a "Revenue Stream Memo" for STC, and Policy Committee Chairman Reynaud reported on STC's legal issues.  Finally, Investment Policy Committee Chairman Haymon reported on STC's capital account investment policy statement, capital account summary, capital account asset allocation, and client allocations and investment objectives.

116.     STC's Board of Directors met again on September 20, 2007.  In attendance were Haymon, Parrish, Reynaud, and Comeaux.  Frazer, Green, and Bogar did not attend.  The Board's first order of business concerned STC's financial statements.  President Fournet summarized the financial statements by stating that "***STC revenue is driven by [SIBL CD] accounts***."  Reynaud then reported to the Board that he and Fournet had recently met with Louisiana's OFI and the OFI "is fine" with STC's reserves, but the OFI is concerned about STC's capital account because the OFI considers this account "*as insurance on all the [SIBL CD] accounts*."  Fournet then reported on STC's strategic plan, including its recently opened offices in other states.  Finally, Reynaud updated the Board on behalf of the Policy Committee, and Haymon, reporting for the Investment Policy

Committee, noted that STC's investment manager was expected to achieve STC's target allocation by the end of the month.

### l.     The Beginning of the End

117.     The tables finally turned on STC in September 2007 when Louisiana's OFI began its 2007 examination.  At the time, STC was holding $263 million in IRA accounts, and the vast majority of the funds in these accounts (72%) were invested in SIBL CDs.  During the examination, OFI discovered that STC's IRA account files did not contain *any* financial information or documentation supporting the appropriateness of STC's investments in SIBL CDs*, a violation of STC's own internal policies*.  The OFI was also alarmed when it discovered that STC was *still* receiving referral fees for its investments in SIBL CDs, and that such fees accounted for the vast majority of STC's income.  The Director & Officer Defendants, particularly Reynaud, Fournet, Frazer, and Haymon, knew that STC was still receiving referral fees for its investments in SIBL CDs.  In fact, in addition to the various financial reports that STC's Board of Directors reviewed and discussed each year, STC's Controller Kerry Jackson had specifically informed Frazer on July 4, 2007 that STC's greatest source of revenue was the referral fees that SGC paid to STC for its investments in SIBL CDs.  Jackson described these fees as a "*related party revenue stream wherein STC uses brokers from [SGC] to sell [SIBL CDs]*."  Additionally, in STC's Board of Directors meeting on September 20, 2007, Fournet summarized STC's financial statements by stating that "*STC revenue is driven by [SIBL CD] accounts*."

118.     The OFI was clearly troubled by its preliminary findings and the examiners expressed their concerns to STC.  SFG promptly turned to its old friends at A&R and requested a new legal opinion on the propriety of STC's investments in SIBL CDs.  A&R's Bob Schmidt issued his new legal opinion on October 8, 2007, and with full knowledge that SFG would be using his opinion to

placate the OFI, Schmidt opined that: (i) STC was *not* prohibited from purchasing SIBL CDs for its clients' IRA accounts; and (ii) neither SGC nor its FAs were prohibited from receiving fees in these transactions. *Notably, Schmidt's new opinion did not even mention nor address the fact that STC received fees for its investments in SIBL CDs.* STC forwarded Schmidt's new legal opinion to Louisiana's OFI and adopted Schmidt's position that STC's substantial investments in SIBL CDs were permissible. This time, however, the OFI would not be swayed by Schmidt's legal conclusions.

119.    STC's Financial/Audit Committee met again on November 19, 2007 to discuss STC's October 2007 financial statements. In attendance were Frazer and Fournet. Bogar was absent. Fournet summarized STC's October operating results, noting that "*[SIBL CD] revenue is the main component.*"

120.    STC's Board of Directors met again on December 4, 2007. In attendance were Directors Haymon, Parrish, Reynaud, Comeaux, Fournet, Green, Bogar, and Frazer. Reporting for the Board's Financial/Audit Committee, Frazer reported on STC's financial results in September and October 2007. Reynaud, reporting for the Policy Committee, noted that many new accounts were generating fees for STC. At the request of Louisiana's OFI, the Policy Committee also reviewed STC's intercompany agreement with SGC, which governed SGC's provision of administrative services for STC. Haymon then reported to the Board on behalf of the Investment Policy Committee. Following Haymon's presentation, the Board discussed the OFI's ongoing examination of STC, and several OFI representatives joined the meeting, including Sidney Seymour and Didrea Moore. The OFI discussed various issues raised during its examination, including STC's client accounts and the need for STC to resolve any exceptions noted in those accounts.

121.    The OFI's 2007 examination of STC continued into the following year, and after additional meetings with STC's Board of Directors, the OFI sent a letter request to STC President

Louis Fournet on January 30, 2008.  The OFI's letter requested information from STC to "verify the validity" of SIBL CDs, including a summary of STC's analyses and efforts to validate the CDs and SIBL's portfolio of assets.  The letter also requested STC's authorization to contact SIBL's auditor in Antigua, C. A. S. Hewlett & Co. ("Hewlett & Co."), to confirm SIBL's asset portfolio.

122.    Instead of getting a response directly from STC, however, the OFI received a response from SGC's Director of Compliance, Bernie Young, on February 14, 2008.  Young claimed that Antiguan privacy laws prohibited SGC from producing any documents to satisfy the OFI's request to examine SIBL's portfolio.  Young also informed the OFI that SGC could not facilitate its requested contact with SIBL's auditor because SGC "does not have a contractual relationship" with Hewlett & Co.  Instead, Young offered to "facilitate an introduction" with SIBL's management. In short, STC could offer nothing to the OFI to validate its investments of client IRA accounts in the SIBL CDs.

123.    In that same month, the Financial/Audit Committee of STC's Board of Directors met to discuss STC's December 2007 financial results.  In attendance were Bogar and Fournet.  Frazer did not attend.  Fournet reviewed STC's results and noted that "affiliated company product revenue [i.e., referral fees from SIBL CDs] was *40%* greater than the previous year."  (emphasis added).  On February 19, 2008, STC's Board of Directors also held a meeting to discuss STC's recent financial results and receive reports from its respective committees.  In attendance were Haymon, Parrish, Comeaux, Fournet, Green, and Frazer.  Reynaud and Bogar did not attend.  Frazier reported to the Board on behalf of the Financial/Audit Committee.  Fournet discussed STC's new accounts on behalf of the Policy Committee, and Investment Committee Chairman Haymon reported on STC's investment performance.

124.    On February 22, 2008, Reynaud sent a letter on BSW letterhead to STC President Louis Fournet and fellow STC Director Zack Parrish.  In that letter, in which Reynaud described

Bernie Young's letter as "our initial response" to the OFI's inquiries, Reynaud reported on two tasks

that had been assigned to him by STC's Board of Directors: (i) gather intelligence on OFI's current

Commissioner, John Ducrest, who was in charge of the OFI's examination; and (ii) determine the

best strategy to "approach" Ducrest.   Reynaud reported that Ducrest was a "lifer," in that he was a

career regulator, and Ducrest had a reputation of being very professional and no-nonsense.  Then, in

a surprising moment of candor, Reynaud stated that

> "[a]ll of this would likely be good news if we were wanting good
> government professional appointees running our State, and I do for
> reasons obviously independent of this situation.  It is, however, not
> necessarily good news from a political standpoint, because, unlike
> past commissioners, we have no political history with him.   In
> addition, Mr. Ducrest's history as a fraud examiner probably makes
> him look at the offshore business of Stanford International Bank with
> an initial bit of curiosity, if not concern."

125.    Reynaud then expressed his concerns about Bernie Young's misleading and

obstructive responses to the OFI.

> "I think we need to consider supplementing our letter of February 14,
> 2008.  I am concerned about its overall tone, and I am very concerned
> about answers to Question Nos. 4, 5, and 8.  . . . In particular, our
> response to Question No. 4 is basically to say we are not going to give
> you any information, because it is 'protected by Antiguan privacy
> laws.'   If you are a regulator, what does that tell you?  . . . The
> response to Question No. 5 is similar.  We are telling [the] OFI that
> we do not have the authority to release this kind of information.  Once
> again, we should at least look like we are willing to cooperate.  If we
> have nothing to hide, and I believe we do not since I have been to the
> bank in Antigua, let's help [the] OFI do its job. . . . Lastly, I still am
> of the opinion that this is a significant enough issue that the Board
> needs to be told and relatively soon."[2]

(emphasis added).

---

[2]  The OFI's Question No. 4 requested a copy of SIBL's latest examination by the FSRC.  Question No. 5
requested authority to contact SIBL's auditor, Hewlett & Co., to obtain information regarding the auditor's
confirmation process for SIBL's investments and CDs, peer reports, deposit confirmation process, and CD
review workpapers.  Question No. 8 requested a copy of the SIBL CD brochure that STC provided to its IRA
clients.

126.     On February 22, 2008, STC's Board of Directors met to discuss the recent questions raised by Louisiana's OFI.  In attendance were Frazer, Haymon, Reynaud, Green, and Parrish. Comeaux and Bogar did not attend.  Fournet reported that the OFI had raised additional questions in its examination and that Bernie Young, SGC's Chief Compliance Officer, had responded to these inquiries on behalf of STC.  Fournet noted that the OFI had not yet responded to Bernie Young's letter.  Reynaud reported to the Board that he had recently discussed the OFI's examination with Sidney Seymour, who expressed concerns about STC's investments in SIBL CDs.  Reynaud also reported that the OFI was "holding up" STC's Florida office because of these concerns.  The Board discussed a possible meeting between the OFI and STC to discuss this situation further.

127.     What happened next is nothing short of shocking.  In order to provide some "cover" for SIBL with the OFI, STC and SGC decided that SIBL's Antiguan regulator should send the OFI a letter attesting to SIBL's legitimacy.  On April 8, 2008, a staff attorney at SFG named Rebecca Hamric prepared a letter that was purportedly from Antigua's FSRC to Louisiana's OFI.  Hamric drafted the letter for Leroy King's signature, the FSRC Director and "blood brother" to Allen Stanford, who was to print the letter on FSRC letterhead and sign it and send it to the OFI from Antigua.  SFG lawyer Hamric drafted all the language in the fake letter, including the statement that "*we found the bank to be in compliance with all regulatory guidelines and all applicable rules and regulations*."  Hamric even inserted a space at the top of the page to indicate that the letter needed to be printed on Leroy King's letterhead.  Hamric then emailed the draft letter to SIBL's President, Juan Rodriguez-Tentino, who passed it along to King.

128.     The exact same letter that Hamric prepared for King's signature was then duly signed by King the very next day, April 9, 2008, and faxed back to SGC by Rodriguez-Tentino.  SGC then promptly forwarded the fraudulent letter to Louisiana's OFI that same day.  Hamric did the same

thing for SIBL's auditor, Hewlett & Co. She drafted a fake letter that stated exactly what she and

SFG's other employees wanted it to state, and the auditor was supposed to sign and deliver the letter

to the OFI. Hewlett & Co. signed the fraudulent letter that Hamric prepared and sent it to the OFI on

April 10, 2008.

129.    To crown the deception of these fake letters, SFG also answered Reynaud's pleas to

"*look* like [STC is] willing to cooperate" by supplementing Bernie Young's initial response to the

OFI. On April 11, 2008, SFG's Director of Global Compliance, Lena Stinson, sent a letter to Sidney

Seymour thanking him for their meeting in the prior week and providing additional information

responsive to the OFI's requests. The enclosed materials included: (i) reports from other SFG

companies, including SIBL due diligence files produced by Stanford Group Holdings, Inc.; (ii)

Antiguan banking laws and guidelines; (iii) the FSRC's pre-examination package for SIBL; and (iv)

information regarding SIBL's auditor, Hewlett & Co. Stinson then added that SFG had requested the

FSRC and Hewlett & Co. to provide additional information directly to the OFI, which "[the OFI]

should receive under separate cover." Of course, SFG and STC knew that SFG had drafted these

fake letters, and that the OFI would not be receiving these letters in the *future* because they had

already been provided by SFG's minions.

130.    On May 29, 2008, the Financial/Audit Committee of STC's Board of Directors met to

discuss STC's annual audited financial statements. In attendance were Frazer, Fournet, Jackson, and

Bogar. Fournet reported to the committee that STC's revenues had increased in 2007, including a

*40% increase* in revenue from STC's investments in SIBL CDs. On July 10, 2008, STC's Board of

Directors met again to hear reports from its committees and discuss the OFI's continuing

examination of STC. In attendance were Haymon, Fournet, Frazer, Bogar, and Jim Weller. Reynaud

and Parrish did not attend. Fournet reported that the OFI had yet to respond to STC regarding a final

report for its 2007 examination, nor had the OFI requested any additional information. At this point, Haymon expressed his concern for STC's future business strategy. Bogar indicated that STC's overall strategy was an agenda item for discussion but STC's "clean up" process had taken time. Bogar added that Weller would be instrumental in developing STC's nationwide trust strategy.

131.    Despite SFG's best efforts to sway the OFI, including its outright fabrication of third-party documents, OFI Commissioner John Ducrest stood firm. On July 21, 2008, the OFI finally issued its examination report (the "2007 Report"), in which the OFI concluded that *STC was violating numerous laws*. In particular, the 2007 Report noted that "*a great majority of STC's growth and income since 2001 is directly related to the proliferation of [SIBL] CDs in self-directed IRA accounts,*" and that "*much of STC's income derived from referral fees from its affiliate SGC and is directly connected with the SIBL CDs.*" The OFI also noted that all the investment advisors for STC's IRA accounts were employed by its affiliate SGC. The 2007 Report emphasized the OFI's growing "concern[] with the lack of diversification and apparent risk associated with this growing concentration," which "without proper due diligence and ongoing reviews of SIBL is exposing STC to an undue level of risk."

132.    In light of these factors, the OFI once again questioned the adequacy of STC's capitalization, and the OFI informed STC that it was "no longer willing" to allow STC to continue investing its clients' IRA funds in SIBL CDs without an independent valuation of the CDs. The OFI recommended that STC immediately obtain an independent valuation of the SIBL CDs brokered through SGC, and to obtain an independent validation of the methodology being used by SGC to determine whether clients truly qualified as "accredited investors" under Regulation D.

133.    During this hour of crisis, SFG turned once again to A&R. On July 29, 2008, SGC's Lena Stinson informed Alvarado that she had spoken with A&R partner Jim Austin, who said he had

personally known OFI Commissioner John Ducrest since they were five years old, and according to

Austin, he was "well known" by Sidney Seymour and the OFI generally.  At an August 5, 2008

meeting of STC's Board of Directors, which was attended by Alvarado and Stinson, STC's Directors

discussed the OFI's 2007 Report and a process for handling the requested CD valuation.  Alvarado

voiced his objection to the OFI's perceived attempt to exert jurisdiction over SIBL, but STC's

Directors interjected that the OFI had jurisdiction because the CDs were being held in Louisiana IRA

accounts.  On the issue of referral fees, Alvarado pointed to STC's legal opinions from A&R and

stated that STC should just ignore the OFI's concerns about fees.

134.    STC's Board of Directors held a special session meeting on August 5, 2008 to discuss

the OFI's 2007 Report.  In attendance were Haymon, Frazer, Bogar, Parrish, Weller, and Fournet.

Reynaud did not attend.  The OFI had given STC's Board of Directors 45 days to submit a plan of

action to address the OFI's concerns, including STC's need to secure a third-party valuation of the

SIBL CDs.  SFG General Counsel Mauricio Alvarado pressed the Board to authorize STC to engage

someone to perform the valuation.  After further discussions regarding possible valuation candidates,

"*Haymon then questioned whether the [SIBL CDs] had even been valued and it was confirmed that

[they] had not.*" (emphasis added).  Of course, as a director of a trust company whose primary source

of revenue derived from its' clients' purchase of the SIBL CDs, this is something that Haymon

should have already known, and was reckless in not knowing.

135.    Frazer then noted that the OFI's focus was on STC's documentation supporting the

valuation of the SIBL CD, as opposed to questioning the SIBL CD itself.  Haymon agreed with

Frazer.  Alvarado stated that SIBL CDs were not domestic securities and that SIBL's portfolio was

outside the scope of U.S. law.  He cautioned against U.S. regulation of foreign entities, and he

believed the OFI's concern had expanded beyond the scope of SIBL's portfolio.  Frazer expressed

his concern that the OFI may be requesting something that STC could not provide.  Bogar agreed with Frazer, and said STC had already given the OFI everything that it could provide.

136.    Haymon disagreed with Alvarado, noting his belief that the OFI was not attempting to regulate SIBL, but that because the SIBL CDs were being held in Louisiana IRA accounts, the OFI was seeking an analysis of the CDs fair market value to evaluate SIBL's creditworthiness (something STC's Directors and Officer were duty bound to have done previously but had failed to do).  Bogar interjected that SIBL was strong financially and the OFI should consider SIBL's "strong track record."

137.    Haymon then expressed his concerns that STC was being asked to stop selling SIBL CDs until the third-party valuation was complete.  Mauricio Alvarado asked the Board to interpret the OFI's 2007 Report and determine the appropriate course of action.  Haymon responded that the 2007 Report was clear that the OFI wanted STC to stop selling SIBL CDs at this time, and Frazer suggested ceasing SIBL CD sales as of July 31, 2008.

138.    Frazer then expressed his concerns regarding the OFI's request that STC obtain a Private Letter Ruling from the IRS regarding the referral fees associated with STC's investments in SIBL CDs.  Mauricio Alvarado responded that STC already had two legal opinions supporting the propriety of these fees, and that STC should rely on these opinions without a ruling by the IRS. Finally, Frazer asked if STC's fees for SIBL CDs were a referral fee or a custodial fee, "*and the latter was confirmed*."

139.    STC's Board of Directors met again on August 11, 2008, continuing its discussions about the OFI's 2007 Report and approving STC's retention of A&R's Jim Austin.  Following that meeting, STC and SGC executives supplied Austin with copies of SIBL's audited financial statements, the OFI's prior examination reports, and A&R's prior legal opinions.  On August 15,

2008, in response to the OFI's 2007 Report, STC officially stopped investing its clients' IRA funds in SIBL CDs. Louis Fournet resigned as STC's President shortly thereafter in late August 2008.

### m.    The Lawyer Defendants: Between a Rock and a Hard Place

140.    On August 27, 2008, A&R's Austin met with the OFI's Sidney Seymour in an attempt to help STC get its IRA Plan back on track. During these discussions, Seymour informed Austin that the OFI had serious concerns that SIBL was violating its registration exception under Reg. D. The OFI also had serious concerns about the competency and *independence* of Antigua's banking regulators and SIBL's auditor. In fact, Seymour informed Austin that the OFI could not get Antigua's banking regulators to even speak with them. Seymour also informed A&R's Austin that the OFI could not get comfortable with Antigua's regulatory scheme because "***Antigua owes $ to Allen Stanford***" (underline in Austin's original notes). The next day, August 28, 2008, STC advised Austin that it was currently holding ***$337,270,133*** in SIBL CDs in more than ***1,200*** of its clients' IRA accounts.

141.    This was a pivotal moment in A&R's relationship with SFG, as Jim Austin had just received information from a state regulator that raised grave concerns about the propriety of SIBL's operations, as well as those of STC and SGC. Just as importantly, however, it was a pivotal moment in A&R's relationship with the many clients and friends that A&R had referred to SFG. A&R was stuck between the proverbial rock and a hard place: should A&R inform all these clients and friends about the OFI's disturbing revelations and the many other red flags that A&R had uncovered in its relationship with SFG? To do so, however, would mean breaching A&R's fiduciary duties to SFG, including STC and SGC. Reynaud and his law firm, BSW, also shared this same dilemma. As Chairman of STC's Policy Committee, which oversaw all of STC's policies, procedures, and legal

affairs, Reynaud knew or should have known about the OFI's revelations and the red flags uncovered by *both* law firms.  Reynaud and BSW had also referred BSW clients to SFG to buy SIBL CDs.

142.    On August 29, 2008, STC's Board of Directors held another special session meeting to discuss Fournet's departure and Jim Weller's appointment as STC's new President.  In attendance were Haymon, Frazer, Reynaud, Parrish, and Weller.  Bogar did not attend.  Weller reported that A&R's Jim Austin had met with the OFI to update STC on any additional items requested by the OFI.  Weller also reported that he had met with an accounting firm that he believed could give the OFI comfort regarding Antigua's regulatory and audit standards.

143.    In response to Jim Austin's meeting with Sidney Seymour, A&R frantically researched STC's files and the Antiguan FSRC to examine the issues raised by the OFI.  Instead of resolving these issues, however, A&R's investigation raised even more red flags.  For example, A&R reviewed a random selection of STC's IRA account files and discovered that *none* of those files contained the necessary disclosure statements required under STC's internal procedures.  Additionally, A&R's legal research showed that the Antiguan FSRC was violating its *own directives* by refusing to cooperate with Louisiana's OFI.

144.    On September 22, 2008, the Financial/Audit Committee of STC's Board of Directors met to discuss STC's financial results.  In attendance were Frazer, Jackson, and Weller.  Bogar did not attend.  Weller updated the committee regarding STC's response to the OFI's 2007 Report and stated that a valuation report for the SIBL CDs should be available in October 2008.  Weller also confirmed that STC's investments in SIBL CDs had ceased on August 15, 2008.  At this point, Frazer questioned how this action would impact STC's 2008 revenue with no additional revenue generated by SIBL CDs.  He added, "*STC could end with a substantial loss for the year.*"

n.    **Stanford Financial Group Moves the IRA Plan to International Bank and Trust**

145.    Frazer was right.  When STC was forced by the OFI to stop investing its clients' money in SIBL CDs, the company's revenues collapsed because it was no longer earning SIBL referral fees.    To respond to this crisis, SFG moved its IRA business away from STC to a third-party trustee, International Bank and Trust ("International Trust"), to which entity SFG intended to transfer STC's 1,264 IRA accounts that held SIBL CDs.  Many innocent IRA accountholders who entrusted their money with SFG after January 2009 had their IRA funds transferred to International Trust and invested in SIBL CDs.  But SGC could not complete its transfer of existing IRA accounts to International Trust before the SEC seized SFG's operations in February 2009.   When the government's seizure finally occurred, STC's clients' IRA accounts held over *$300 million* in SIBL CDs.

o.    **A&R's Final Act of Betrayal**

146.    A&R continued to show its true colors in the final days of the Stanford Ponzi Scheme.  On January 13, 2009, SFG's General Counsel – North America, Larry Fontana, wrote to A&R's Bob Schmidt and requested that he communicate with SFG's auditors concerning significant STC matters to which A&R had devoted substantive attention in 2008.  Despite the considerable amount of time that A&R spent representing STC in 2008 related to the OFI's examination, A&R did *not* disclose this matter in its audit response letter dated February 6, 2009.  Nor did A&R list the numerous claims against STC that A&R had defended in 2008, which stood in stark contrast to the disclosures in A&R's audit response letter for the prior year, dated March 24, 2008.  Rather, A&R's February 6, 2009 letter simply stated that "some or all of [STC's] matters . . . have been settled or otherwise resolved."   Ironically, A&R's false response to BDO Seidman was issued just days before the

Stanford Ponzi Scheme collapsed.   This final act of betrayal against STC's innocent IRA accountholders provides further proof of A&R's complicity in the Stanford Ponzi Scheme.

> **p.      The Defendants' Culpable Knowledge and Participation in the STC/IRA Portion of the Stanford Ponzi Scheme**

147.    Incredibly, the red flags were everywhere and yet the Defendants continued to provide services in furtherance of the STC/IRA portion of the Stanford Ponzi Scheme.  While the deceptive machinations of Allen Stanford and his co-conspirators certainly dictated the course of this fraudulent scheme, the Defendants' purportedly "independent" legal and fiduciary services fueled the engine for that scheme.  Without the Defendants' complicity and participation, the STC/IRA portion of the Stanford Ponzi Scheme would not have survived, and hundreds of innocent IRA account holders would not have lost over $300 million.

148.    Through their years of faithful service for SFG, including STC and SGC, the Lawyer Defendants[3] acquired extensive knowledge of SFG's fraudulent operations and STC's illicit business relationship with SIBL and SGC.  Despite this knowledge, the Lawyer Defendants ignored numerous red flags and continued to faithfully serve SFG without question, and in doing so, played a pivotal role in furthering the STC/IRA portion of the Stanford Ponzi Scheme.

149.    The Lawyer Defendants' knowledge and conduct demonstrates that each of them assisted SFG in the face of a perceived risk that their assistance would facilitate SFG's violations of the Texas Securities Act.  The Lawyer Defendants' knowing or reckless participation in SFG's violations of the Texas Securities Act enabled SFG to sell SIBL's fictitious CDs to the STC Class of investors through deceptive acts that emanated from, and operated under the direction and control of, SFG in Houston, Texas.

---

[3]  The "Lawyer Defendants" have been previously defined as Defendants A&R, Austin, BSW, and Reynaud.

150.   Similarly, the Lawyer Defendants' knowledge and conduct demonstrates that each of them was aware that SFG, including STC and SGC, was continuously breaching fiduciary duties to Plaintiffs and the Class.  Additionally, the Lawyer Defendants' knowledge and conduct demonstrates that each of them was aware of their participation in these breaches of fiduciary duties.  The Lawyer Defendants' awareness of their participation in these breaches of fiduciary duties enabled SFG, including STC and SGC, to sell SIBL's fictitious CDs to the STC Class because the Lawyer Defendants' participation in the breaches of fiduciary duties enabled such illegal investments.

151.   The Director & Officer Defendants,[4] through their loyal service as directors, officers, or employees of one or more SFG companies, ignored the same red flags and continued to provide services in furtherance of the Stanford Ponzi Scheme.  The Director & Officer Defendants owed fiduciary duties to STC to use reasonable care in operating and managing STC and to operate STC's business in a reasonably prudent manner.  The Director & Officer Defendants also owed fiduciary duties to STC to operate STC in compliance with all applicable laws and regulations.  The Director & Officer Defendants breached their fiduciary duties by failing to use reasonable care in operating and managing STC, failing to operate STC's business in a reasonably prudent manner, and failing to operate STC in compliance with all applicable laws and regulations.  Specifically, the Director & Officer Defendants breached their fiduciary duties to STC by ignoring the numerous red flags discussed in this Complaint and continuing to provide services in furtherance of the Stanford Ponzi Scheme, despite the Director & Officer Defendants' extensive knowledge of SFG's fraudulent operations and STC's illicit business relationship with SIBL and SGC.  In doing so, the Director &

---

[4] The "Director & Officer Defendants" have been previously defined as Defendants Reynaud, Perry, Hamric, Contorno, Fournet, Comeaux, Weller, Haymon, Frazer, Parrish, Bogar, and Green.

Officer Defendants' faithful service of SFG, including STC and SGC, played a pivotal role in furthering the STC/IRA portion of the Stanford Ponzi Scheme.

152.    The Director & Officer Defendants' knowledge and conduct demonstrates that each of them assisted SFG, including STC and SGC, in the face of a perceived risk that their assistance would facilitate SFG's violations of the Texas Securities Act.  The Director & Officer Defendants' knowing or reckless participation in the violations of the Texas Securities Act committed by SFG, including STC and SGC, enabled SFG to sell SIBL's fictitious CDs to the STC Class of investors through deceptive acts that emanated from, and operated under the direction and control of, SFG in Houston, Texas.

153.    Similarly, the Director & Officer Defendants' knowledge and conduct demonstrates that each of them was aware that SFG, including STC and SGC, was continuously breaching its fiduciary duties to Plaintiffs and the Class.  Additionally, the Director & Officer Defendants' knowledge and conduct demonstrates that each of them was aware of their participation in these breaches of fiduciary duties.  The Director & Officer Defendants' awareness of their participation in these breaches of fiduciary duties enabled SFG, including STC and SGC, to sell SIBL's fictitious CDs to the STC Class of investors because Director & Officer Defendants' participation in the breaches of fiduciary duties enabled such illegal investments.

## V.    THE COMMITTEE'S CLAIMS

### A.    The Committee's Authority to Pursue Claims on Behalf of the Receiver and Stanford Financial Group's CD Investors

154.    This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc 1130) at ¶¶ 1-2.  The Court appointed the Committee to represent Stanford investors in the case *SEC v. Stanford International Bank, Ltd., et*

*al.,* Case No. 3:09-CV-0298-N and in related matters.  Committee Order (Doc. 1149) at ¶ 2.  The Committee, as assignee of the Receiver's claims, seeks the relief described herein in these capacities.

155.    Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."  Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."  Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c); *see also Janvey v. Alguire,* 628 F.3d 164, 183-84 (5th Cir. 2010) ("[R]eceivers are legal hybrids, imbued with rights and obligations analogous to the various actors required to effectively manage an estate in the absence of the 'true' owner. . . . [R]eceivers have long held the power to assert creditor claims.").

156.    One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  See Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants").  But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate.  See Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

157.    The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate and the Stanford Investors jointly with the Receiver.  See Committee Order (Doc. 1149) at ¶¶ 2, 7-8. The Receiver has assigned certain claims to the Committee, including those claims hereinafter plead.

**B.    Basis for the Committee's Claims**

158.    This Court has already found that the Stanford fraud was a Ponzi scheme.  *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

159.    In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme.  *See Alguire,* 628 F.3d at 164, 185 (upholding this Court's Order).  In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> *            *            *
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme.  . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme ab initio.
>
> *            *            *

> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . . .
>
>          \*        \*        \*
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at 176-80.

160.    SIBL CD Proceeds from the Ponzi scheme described above were transferred at various times by or at the direction of SFG to Defendants.  Defendants did not provide reasonably equivalent value for the transfers of CD Proceeds and cannot establish that they are good-faith transferees.

161.    The Receiver has identified payments of CD Proceeds totaling millions of dollars from SFG to Defendants from January 2006 through February 16, 2009.  *See* Schedule of Payments, attached as Exhibit "A" to this Complaint.  Based on this information, the Committee has identified numerous fraudulent transfers to Defendants as summarized below.

162.    The transfers of CD Proceeds to A&R from SFG consisted of at least the following: $111,247.68 in legal fees between April 17, 2007 and December 4, 2008.

163.    The transfers of CD Proceeds to BSW from SFG consisted of at least the following: $283,270.59 in legal fees between December 13, 2006 and February 6, 2009, which includes a flat payment of $250,000 on May 27, 2008 for unknown work.

164.    The transfers of CD Proceeds to Reynaud from SFG consisted of at least the following: $38,000 in STC director's fees at $1,000 a month between at least January 19, 2006 and February 12, 2009.

165.    The transfers of CD Proceeds to Contorno from SFG consisted of at least the following: $652,756.45 in salary and bonuses between March 22, 2006 and October 22, 2008, including $165,000 in severance payments transferred to Contorno in September 2008.

166.    The transfers of CD Proceeds to J.D. Perry from SFG consisted of at least the following: $117,794.84 in salary and bonuses between at least March 17, 2006 and October 21, 2006, including $100,000 in severance payments transferred to Perry on October 13, 2006.

167.    The transfers of CD Proceeds to Hamric from SFG consisted of at least the following: $470,604.23 in salary and bonuses between at least April 6, 2006 and March 31, 2009.

168.    The transfers of CD Proceeds to Fournet from SFG consisted of at least the following: $374,740.53 in salary and bonuses between May 15, 2007 and September 17, 2008, including $125,000 in severance payments transferred to Fournet on September 15, 2008.

169.    The Receiver's investigation is continuing, and if more payments of SIBL CD Proceeds to any of the Defendants are discovered, Plaintiffs will amend this Complaint to assert claims regarding such additional payments.

## C.    Discovery Rule/Inquiry Notice

170.    Plaintiffs were able to discover the fraudulent nature of the transfers only after Allen Stanford and his accomplices were removed from control of SFG, and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to SFG. The Court has recognized the necessarily complex nature of this investigation. *See, e.g.*, Doc. 1315 at 11, 14 ("This Court has charged the Receiver with the responsibility of tracking down and collecting ill-gotten funds that properly belong to the Receivership Estate and, ultimately, defrauded investors.  That task has been complicated by the Ponzi scheme's complexity. . . . The Stanford Defendants' Ponzi scheme collected and dissipated billions of dollars over its long existence.

Coupled with the scheme's Byzantine structure, the process of recouping any fraudulently obtained funds necessarily includes weeding through a massive number of individual transactions and any documents and information related to those transactions.").

171.    In light of these circumstances, Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by SFG, SIBL, SGC, STC, or Defendants until after the SEC filed an action against Allen Stanford and SIBL *et al.*, and the Court appointed the Receiver, which occurred on or about February 17, 2009. Moreover, the Committee could not have discovered the improper transactions involving CD Proceeds until after the Committee was formed on August 10, 2010, at the earliest. The wrongful acts by Defendants were inherently undiscoverable, and Plaintiffs, including the Committee, were not aware of facts that would have put them on inquiry notice as to Defendants' role in SFG's fraud until now. Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See, e.g.*, *Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

## D.    The Committee's Causes of Action

### COUNT 1:    Disgorgement of CD Proceeds Fraudulently Transferred

172.    The Plaintiffs are entitled to disgorgement of the CD Proceeds transferred from SFG to Defendants because such payments constitute fraudulent transfers under applicable law. SFG made the payments to Defendants with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, Plaintiffs are entitled to the disgorgement of those payments. Additionally, SFG

transferred the funds to Defendants at a time when the SFG companies were insolvent, and SFG did not receive reasonably equivalent value in exchange for the transfers, and/or any value received was in furtherance of the Ponzi scheme that Defendants knew or should have known about, and was recklessly and willfully blind to.

173.    Plaintiffs may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007).  SFG was running a Ponzi scheme and paid Defendants with funds taken from unwitting SIBL CD investors.  Plaintiffs are, therefore, entitled to disgorgement of the CD Proceeds that SFG transferred to Defendants.

174.    Consequently, the burden is on Defendants to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  Therefore, Plaintiffs are entitled to recover the full amount of any payments that Defendants received from SFG — either directly or indirectly — unless Defendants prove *both* objective good faith *and* reasonably equivalent value.

175.    There is no evidence that Defendants provided any value — much less reasonably equivalent value — in exchange for the fraudulent transfers they received.  Moreover, both this Court and the Fifth Circuit have held that providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value.  *Warfield*, 436 F.3d at 555, 560; Case No. 3:09-CV-0724-N, Doc. 456 at 13-14 ("[A]s a matter of law, services provided in the context of a Ponzi scheme do not constitute 'reasonably equivalent value.'").  Furthermore, consideration which has no utility from the creditor's perspective does not satisfy the statutory definition of "value."  Defendants cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the millions of dollars in CD Proceeds they received from SFG.  Because Defendants cannot

meet their burden to establish that they provided reasonably equivalent value for the payments of CD Proceeds to them, Plaintiffs are entitled to the disgorgement of those funds.

176.    Moreover, under applicable fraudulent-transfer law, Plaintiffs are entitled to attorneys' fees and costs for their claims against Defendants.  *See, e.g.,* Tex. Bus. & Com. Code Ann. § 24.013.  As a result, Plaintiffs request reasonable attorneys' fees and costs for prosecuting their fraudulent-transfer claims against Defendants.

177.    SFG, which orchestrated the Ponzi scheme, transferred the CD Proceeds to Defendants with actual intent to hinder, delay, or defraud their creditors.  The Committee is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to Defendants. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by Defendants were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**COUNT 2:    In the Alternative, the Committee is Entitled to Disgorgement of CD Proceeds from Defendants under the Doctrine of Unjust Enrichment.**

178.    In the alternative, the Committee is entitled to disgorgement of the SIBL CD Proceeds paid to Defendants pursuant to the doctrine of unjust enrichment under applicable law.  Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors.  Defendants have been unjustly enriched by such funds, and it would be unconscionable for them to retain the funds.

179.     In order to carry out the duties delegated to it by the Receiver and by this Court, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by Defendants.

180.     Defendants have been unjustly enriched by their receipt of CD Proceeds from SFG. The Committee is, therefore, entitled to disgorgement of all CD Proceeds Defendants received. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by Defendants unjustly enriched Defendants; (b) CD Proceeds received directly or indirectly by Defendants are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Defendants are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**COUNT 3:     In the Alternative, the Committee is Entitled to Restitution Under the Theory of Money Had and Received.**

181.     In the alternative, the Committee is entitled to restitution of the SIBL CD Proceeds paid to Defendants pursuant to the doctrine of money had and received, or recoupment.  To prove a claim for money had and received, the Committee need only show the following:  (1) that Defendants hold/received money and (2) the money, in equity and good conscience belongs to Plaintiffs.  Defendants received funds that in equity and good conscience belong to the Receivership Estate for ultimate distribution to the defrauded investors.  The Committee is accordingly entitled to all CD Proceeds Defendants received.   Further, the recovery of attorney's fees is expressly authorized for this claim.  Tex. Civ. Prac. & Rem. Code § 38.001 et seq.

**COUNT 4:     Breach of Fiduciary Duty (Against the Director and Officer Defendants)**

182.   Plaintiffs reassert and incorporate by reference the foregoing paragraphs as if specifically set forth herein.

183.   The Directors and Officers breached their fiduciary duties owing to STC, and, upon said company entering the zone of insolvency, their fiduciary duties to the creditors of STC.   As the Receiver for STC, Ralph Janvey has the authority to pursue said claim of behalf of STC and STC's creditors.   The Receiver in turn has assigned said claim to the Investors' Committee to prosecute.

184.   The Directors and Officers owed fiduciary duties to STC as Directors and Officers of said entity.   Among the fiduciary duties owed were the duties of care and good faith.   In dereliction and breach of their statutory and common law duties, the Directors and Officers stood idly by while STC was used as an instrumentality of SFG to illicitly sell CDs to the IRA accounts of STC's customers, all to the detriment of STC and its creditors.

185.   The Directors and Officers materially and repeatedly failed to undertake any of the duties typically performed by directors and officers of a corporation.   The Directors and Officers failed to exercise due care by actively monitoring or addressing the clear threat that the SIBL CD sales program, and the illicit nature of the related party SIBL-SGC-STC referral fee situation, presented to the ability of STC to conduct a viable and lawful business.   Such conduct constituted a sustained failure by the Directors and Officers to be informed about the business and affairs of STC, and constituted a material failure to discharge their oversight functions.

186.   The Directors and Officers' breaches of their fiduciary duties proximately caused over $300 million dollars of damages to STC and to STC's creditors, the IRA investors.

## VI.   INVESTOR CLASS PLAINTIFFS' CLAIMS

**A.     Basis for Claims**

187.     All of the Class Plaintiffs invested in the Stanford Ponzi Scheme by purchasing SIBL CDs or placing their money in other depository accounts with SIBL through their IRA accounts at STC, as recommended by investment advisers at SGC.  Over the years that Plaintiffs and members of the Class purchased and maintained investments in SIBL, Plaintiffs and the Class were repeatedly and uniformly told, either directly by SGC FAs (who were uniformly trained to make these statements) or via SFG promotional materials, that, *inter alia*:  (i) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in a portfolio focused on safe and highly liquid instruments; (ii) the assets held in SIBL's investment portfolio were more than sufficient to cover any and all CD liabilities; (iii) SIBL was fully and adequately regulated by the Antiguan FSRC; and (iv) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's of London, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All these representations were false, and STC and Defendants did nothing to protect Plaintiffs from these falsehoods.

188.     During the time that Plaintiffs and members of the Class purchased and maintained investments in SIBL, SFG sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs and the Class that, *inter alia*: (i) SIBL was not regulated by the U.S. or any other government; (ii) Plaintiffs' and the Classes' investments in SIBL were *not* insured; (iii) no one knew where SFG was investing investors' CDs or deposits or what assets comprised SIBL's portfolio; (iv) SFG was operating illegally as an unregistered investment company (whose contracts were thus void under § 47 of the Investment Company Act) that was soliciting and selling unregistered securities by, from and through Houston, Texas; (v) SIBL was not invested in safe, secure, and liquid instruments, but was either

stealing its clients' money outright or investing it in speculative Caribbean real estate ventures; (vi) SIBL was not adequately regulated by the FSRC or any other entity and was audited by a one man "mom and pop" audit shop under the control of Allen Stanford; and (vii) SFG issued personal loans to Allen Stanford using the funds from Plaintiffs' and the members of both Classes' investments in SIBL CDs. STC should have protected Plaintiffs' from SFG's lies and manipulations, but STC and Defendants did nothing to protect Plaintiffs.

189.    Based on the representations and omissions of material fact made to Plaintiffs and members of the Class repeatedly and uniformly over the years — both in person by SGC FAs, employees, or agents, and via the promotional materials created by SFG — Plaintiffs and the Class decided to invest money in, and maintain investments in, SIBL CDs, through their STC IRA accounts.

190.    Plaintiffs Horacio and Annalisa Mendez were investor clients of SGC and STC.  In October 2007, they were introduced to an SGC FA named Patrick Cruickshank who operated out of the SGC Austin, Texas branch office.  Cruickshank made all the typical uniform representations to the Mendezs about SFG that were part of the training instilled in such advisers by SFG, as described herein.  During that initial meeting, Cruickshank convinced the Mendezs to invest their money in SIBL CDs.  Just as he was trained to do, Cruickshank represented to the Mendezs that SIBL was "safer than a U.S. bank" because it had Lloyds of London bonded insurance.  He also represented that SIBL had Directors' & Officer's insurance, a depository insolvency policy insuring funds held in correspondent financial institutions, and that SIBL was aiming for Basel II status (in contrast to most other banks, which held only Basel I status).  He also represented to the Mendezs that SIBL did not make loans like a regular bank, but instead invested in a portfolio of highly liquid assets, such that the CDs could be redeemed on just a few days notice. All of these statements were part of SFG's uniform sales pitch.

191.    During this sales presentation, Cruickshank, like all other SFG FAs, failed to inform the Mendezs that SIBL was not a real bank, but rather operated more like a hedge fund.  Based on the representations made to them by Cruickshank, Plaintiffs Horacio and Annalisa Mendez decided to invest their retirement savings in SIBL CDs.  On October 5, 2007, the Mendezs invested $100,000 with SFG, wiring the funds to SGC.  With that money, the Mendezs, following the advice of Cruickshank, purchased one SIBL "Flex CD" in the amount of $50,000 (SIBL Account No. 173185), and purchased another SIBL "Fixed CD" in the amount of $50,000 (SIBL Account No. 173184).

192.    Then in February 2008, when Plaintiff Horacio Mendez changed employers, Cruickshank convinced the Mendezs to "roll over" Mr. Mendez's IRA savings account into a new IRA account at STC.  On February 5, 2008, Plaintiff Horacio Mendez wired $300,000 to an STC account at Hancock Bank of Louisiana for further credit to a bank account controlled by SIBL for further credit to the Mendez's new SIBL Account #300822.

193.    Later in 2008, after being reassured by another SGC adviser in the Austin office that their investments in SFG continued to be safe and secure, the Mendezs made another investment in SIBL CDs using money that Annalisa Mendez was holding for the benefit of her nieces.  On September 17, 2008, the Mendezs wired $24,137.32 to their SGC account to purchase a SIBL CD in that amount.  All the Mendezs' money is now lost.

194.    Philip Wilkinson invested a substantial portion of his retirement savings with SGC and STC in early June 2007.  At that time, Wilkinson met with an SGC investment adviser at the Houston office of SGC, who advised him of the safety and security of investing in SIBL CDs.  Following SFG's indoctrinated script, the SGC advisor made several uniform and standardized misrepresentations to Wilkinson, including that: (i) SIBL was "safer than a U.S. bank" because it had Lloyds of London bonded insurance; (ii) SIBL was safe because it did not make loans like a regular

bank, but instead (iii) invested in a portfolio of highly liquid assets, such that the CDs could be redeemed on just a few days notice. Based on those and SGC's other uniform and standardized sales misrepresentations and omissions of material facts, Wilkinson decided to open an IRA account with STC (Account No. STSGC40958) and, following the advice of his SGC investment adviser, Wilkinson decided to invest a substantial portion of his retirement savings, $500,000, into SIBL CDs. Wilkinson mailed his $500,000 check directly to STC's bank, Hancock Bank, on June 13, 2007.

**B.     Class Allegations**

195.    Class Plaintiffs and the Class request this case be certified as a class action pursuant to FED. R. CIV. P. 23. The numbers of affected investors are so numerous that joinder of all members is impracticable. Over 1,200 owners of IRA accounts at STC still had money invested in SIBL CDs and other depository accounts at SIBL as of February 17, 2009. There are common questions of law and fact that are common to the Class and these common questions predominate over individual issues. The named Plaintiffs' claims are also typical of the Class' claims. The named Plaintiffs have no interest adverse to the interests of other members of the Class, and they will fairly and adequately protect the Class' interests. The named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

196.    Pursuant to FED. R. CIV. P. 23(a) and (b)(3), the Court should certify the following Class:

a.    all investors who, as of February 17, 2009, had purchased and still held SIBL CDs and/or otherwise maintained deposit accounts with SIBL through IRA accounts established at STC, excluding: (i) Defendants, and their employees and agents;

and (ii) any officer, director, employee, or promoter of SFG, including SIBL,

SGC, SFIS, or STC, as those entities have been defined in this Complaint.

197.    The court should certify the Class pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only the individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because SFG's fraud could not have existed or flourished were it not for the fraud that SFG committed on regulators around the world and the fraud SFG committed by misleading investors into believing that their investments in SIBL were safe and backed up by a liquid portfolio of assets.  Plaintiffs and both Classes relied on the integrity of the market in deciding to invest in SIBL CD's.  Many of the investors who are members of either Class have amounts invested that are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## C.    Discovery Rule/Inquiry Notice

198.    The SEC filed an action against Allen Stanford and SIBL *et al.* on February 17, 2009, and on or about that same day the Court appointed the Receiver.  Class Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by SFG, SIBL, SGC, STC until after that date.  Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in SFG's fraud until now.

### D.    Class Causes of Action

(THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF
the CLASS PLAINTIFFS INDIVIDUALLY, AND ON BEHALF OF THE CLASS)

### COUNT 1:    Participation in/Aiding and Abetting Breach of Fiduciary Duty

199.    Through their years of faithful service for SFG, including STC and SGC, the Defendants acquired extensive knowledge of SFG's fraudulent operations and STC's illegal business relationship with SIBL and SGC.  Despite this knowledge, the Defendants ignored numerous red flags and participated in the Stanford Ponzi Scheme, including STC's and SGC's breaches of fiduciary duties to Plaintiffs and the Class.  As a registered investment adviser, SGC owed a fiduciary duty to Plaintiffs and the Class as a matter of law.  As a fiduciary trust company holding IRA accounts, STC also owed fiduciary duties to Plaintiffs and the Class.  SGC and STC breached their respective fiduciary duties to Plaintiffs and the Class by advising them to invest their money in SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor and because SGC and STC were financially incentivized to recommend the related-party SIBL CDs above other investment products. SGC and STC did not have the basic financial information regarding SIBL, including its investment portfolio and what SIBL was doing with investors' money, necessary to make such investment recommendations to Plaintiffs and the Class, but instead recommended the purchase of SIBL CDs based on the huge, above-market commissions that SGC and STC were paid by SIBL to promote the CDs.

200.    Defendants knew that SGC and STC owed fiduciary duties to Plaintiffs and the Class, and Defendants were aware that SGC and STC were continuously breaching these fiduciary duties, as described herein.  Defendants were also aware that they were aiding, abetting, and otherwise participating in SGC's and STC's breaches of those duties by the conduct alleged herein. The breaches of fiduciary duties by SGC and STC, and Defendants' awareness of their participation

in such breaches, were a proximate cause of actual damages to Plaintiffs and the Class.  Defendants knew or should have known that their aiding, abetting, and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Plaintiffs and the Class. Accordingly, Plaintiffs and the Class are entitled to recover damages, including exemplary damages, in excess of the minimum jurisdictional limits of this court.

### COUNT 2:    Aiding and Abetting Violations of the Texas Securities Act

**A. Sales of Unregistered Securities**

201.    Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs and the Class.  In particular, by their actions described herein, Defendants provided substantial assistance to SFG (including SGC, STC and SIBL) and made it possible for SFG to sell SIBL CDs to Plaintiffs and the Class and materially aided SFG (including SGC, STC and SIBL) to sell unregistered securities to Plaintiffs and the Class from and through the State of Texas.  The CDs offered and sold by SFG and SIBL, with Defendants' participation, constitute "securities" under the relevant securities laws, primarily the *Reves* test, precisely because the SIBL CDs were not insured by the FDIC, nor guaranteed by any similar government regulatory insurance regime.  By assisting SFG's sales of these securities products, Defendants acted recklessly and knew or should have known, and were willfully blind to the fact, that said sales were illegal.  But for Defendants' participation, SFG (including SGC, STC and SIBL) could not have sold unregistered securities to Plaintiffs and the Class from and through Texas.

202.    Defendants were generally aware that they were assisting in the sale of unregistered securities from and through Texas.  Defendants knew that SFG (including SGC) was based in Texas, that SGC's primary purpose was to sell SIBL CDs, and that the primary purpose of STC, which was controlled by SGC in Texas, was its utilization by SGC as a vehicle to get IRA accounts invested in

SIBL CDs.  Defendants also knew that SIBL did not function as a regular bank making loans, but rather invested SIBL CD proceeds in a private investment portfolio.  Defendants also knew the CDs had not been registered as securities with the SEC or Texas State Securities Board, because Defendants reviewed SIBL's offering and disclosure statements and knew that SIBL had filed for a limited Reg. D exemption for certain "accredited investors" only.  Based on their knowledge of SIBL, the size of CD offerings made by SGC to STC's IRA clients, and what SIBL was allegedly doing with the investors' money, Defendants also knew that the Reg. D exemption did not apply and that SFG was operating as an unregistered hedge fund in violation of the Investment Company Act of 1940, selling unregistered investment company securities.

203.    In assisting a Houston-based enterprise in the sale of unregistered securities, Defendants were subjectively conscious of and willfully blind to a risk of illegality, and Defendants assisted SFG (including SGC, STC, and SIBL) in the face of a perceived risk that their assistance would facilitate SFG's violations of the Texas Securities Act.  None of the SIBL CDs sold to Plaintiffs and the Class were ever registered with the Texas State Securities Board and therefore they were sold to Plaintiffs and the Class as unregistered securities in violation of the Texas Securities Act.  In assisting SFG (including SGC, STC and SIBL) to sell unregistered securities from and through Texas, Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding SFG (including SGC, STC, and SIBL)  to sell unregistered securities from and through Texas, Plaintiffs and the Class have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and the Class, measured as the difference between their investments as stated in their last account statements and the amounts that Plaintiffs and the Class members may receive from the receivership distribution.

204.    Moreover, and despite SGC's and SIBL's scheme to evade compliance with the Texas Securities Act by claiming a Reg. D exemption, the global offering of CDs by Houston-based SFG to "accredited investors" in the United States was in fact an unregistered public offering made in violation of Article 581 of the Texas Securities Act.  It was an integrated offering under Texas securities laws, and involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.      The integrated offering involved general solicitation. This general solicitation by SFG through SGC, STC, SFIS and its U.S. affiliates, agents and brokers, as well by the foreign FAs, included general public advertisements, publicly distributed magazine articles, television and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of SIBL CDs.

b.      The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana, and Florida, of SFG's products, including SIBL CDs.

c.      The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d.      The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions

of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas. Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of SFG and/or SFIS.

e.   The aggregate size of the sales of SIBL CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States from this period was in excess of $1.5 billion.  The number of investors purchasing SIBL CDs in the United States under the Reg. D filing was far in excess of 1,000, and Defendants knew that over a 1,000 IRA accounts at STC were invested in SIBL CDs.

f.   The offering was made to investors with whom SFG, including SGC, had no pre-existing relationship, through brokers or affiliates of SFG who were paid substantial and excessive undisclosed commissions in connection with the SIBL CDs.

g.   The offering was made to persons who did not qualify as "accredited investors"; and far more than 35 persons who did not qualify as "accredited investors" purchased the CDs; indeed the vast majority, at least $5 billion of the SIBL CDs, were sold to foreign citizens that did not qualify as "accredited investors," and many of these foreign citizens purchased SIBL CDs from registered representatives of a broker/dealer who effected the transactions

through the offices of SFG and SFIS in Miami, Florida, Houston, Texas, and

San Antonio, Texas.

**B.  Sales of Securities by Unregistered Dealers**

205.    Defendants aided and abetted SIBL, SGC, STC, and SFG generally in the sale of

securities to Plaintiffs and the Class from and through the State of Texas without being registered as

a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.

Specifically, and as alleged herein, Defendants knew or should have known that the global

conglomeration of entities known collectively as SFG was acting as a hedge fund without being

registered as such under the Investment Company Act of 1940, and that the hedge fund was

disguising itself as a bank (SIBL) and issuing hedge fund shares, disguised as CDs, to the general

public from, by and through Texas and then SFG pooled its customers' money together to make

illiquid, speculative investments.  The SFG "fund" made these sales without registering with the

Texas State Securities Board as a dealer under Section 12(A).

206.    Defendants intentionally and actively aided and abetted SFG's "fund" to sell

securities from and through Texas, by means of the conduct described herein.  With full knowledge

or willful blindness to the fact that SFG was, directly or through its web of companies, including

SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from

and through Texas, and that SFG, including SIBL, was being operated and "run" from Texas,

Defendants aided and abetted, materially and substantially assisted, and perpetuated SFG's, SGC's

and SIBL's violations of the Texas Securities Act by continuing to provide the services described

herein to help effectuate sales of worthless SIBL CDs to Plaintiffs and the Class.

207.    Defendants were generally aware and willfully blind to the fact that they were

assisting the sales by an unregistered "fund" of unregistered "fund" securities from and through

Texas.  In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, Defendants were subjectively conscious of a risk of illegality, and Defendants assisted SFG in the face of a perceived risk that their assistance would facilitate SFG's violations of the Texas Securities Act.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs and the Class have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and the Class, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and the Class members may receive from the receivership distribution.

## C. Untruth or Omission

208.    Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided SFG (including SGC, STC and SIBL) and their principals in the sale of uncovered securities (the CDs) through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the Texas Securities Act.  In particular, and as set forth in the Jim Davis Plea, SFG was a massive Ponzi scheme that was perpetuated by the continued sales of SIBL CDs to unsuspecting investors like Plaintiffs and both Classes.  SFG led Plaintiffs and the Class, verbally and through written marketing materials prepared and disseminated via SFG's Houston office to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured

investments, but instead was pooled together with other investors' money and used to finance SFG's principals' lavish lifestyles and to invest in long-term, illiquid, and high-risk investments including real estate development projects in Antigua and elsewhere in the Caribbean.  Moreover, SFG omitted to inform Plaintiffs and both Classes that it was selling them unregistered securities and that it was operating as an unregistered, uninsured, illegal investment company "fund" in violation of the Investment Company Act of 1940 and the Texas Securities Act.

209.    Defendants were generally aware and willfully blind to the fact that they were involved in improper activities and that they were assisting the sale of unregistered securities from and through Texas.  With knowledge that SFG (including SGC and STC) were misleading investors about the nature and risk of investments in related-party bank SIBL, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SFG (including SGC, STC and SIBL) in effecting the sale of over $300 million worth of SIBL CD sales transactions as described herein, and thereby materially aided SGC's and STC's sales of securities through the use of untruths and materially misleading omissions.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.  In assisting the sale of unregistered offshore securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality, and Defendants assisted SFG (including SGC, STC, and SIBL) in the face of a perceived risk that their assistance would facilitate SFG's violations of the Texas Securities Act.  In short, Defendants' actions as described herein allowed SGC, STC, and SIBL to continue selling securities to Plaintiffs and both Classes from and through Texas using untruths and materially misleading omissions.

210.    As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs and the Class

have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs and the Class, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and the Class members may receive from the receivership distribution.

**D.  Conspiracy Liability**

211.    Defendants are jointly and severally liable as co-conspirators for SFG's, including SGC's, STC's, and SIBL's, primary violations of the Texas Securities Act.  In particular, Defendants knowingly combined together and with others at SFG to assist SFG to sell unregistered securities to the IRA accounts of STC's customers from the State of Texas using untrue representations or materially misleading omissions, as described herein.  Defendants took various overt acts designed to assist SFG to accomplish the goal of selling CDs from and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas.  Defendants' conspiracy with SFG to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs and both Classes, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and the Class members may receive from the Receivership distribution.

**COUNT 3:**    **AIDING AND ABETTING/PARTICIPATION IN A FRAUDULENT SCHEME**

212.    By their conduct described herein, Defendants aided and abetted and participated with SFG, including SGC, STC, and SIBL, in a fraudulent scheme, making Defendants directly liable for fraud.  In particular, Defendants all assisted and made it possible for SFG (through SGC) to sell SIBL CDs to the IRA accounts held at STC for Plaintiffs and the Class.  These actions by Defendants, in combination with SFG, are a proximate cause of actual damages to Plaintiffs and the

Class, measured as the difference between their investments in SIBL as stated in their last account statements and the amounts that Plaintiffs and the Class members may receive from the Receivership distribution.

**COUNT 4:    CIVIL CONSPIRACY**

213.    Defendants conspired with each other and with other employees and agents of SFG, including SGC, STC, and SIBL, to commit the wrongful conduct described herein, including fraud, theft of fiduciary property, breach of fiduciary duty, and violations of the Texas Securities Act. Defendants are each responsible for all wrongdoing done by each and every other member of the conspiracy, including Allen Stanford, Jim Davis, Mauricio Alvarado, SIBL's president Juan Rodriguez Tolentino, SGC's president Danny Bogar, Leroy King, and others, in furtherance of the unlawful conspiracy and enterprise.

214.    Together with other employees and agents of SFG (including SGC, STC, and SIBL) the Defendants joined in a conspiracy (which began in 1998 and continued to February 2009) to assist SFG (through SGC and SIBL) in using STC as a vehicle to sell SIBL CDs to the IRA accounts held at STC for the benefit of Plaintiffs and the Class, and to help shield SFG's, SIBL's, SGC's, and STC's activities from regulatory scrutiny.  The central object of the ongoing conspiracy was to enable SFG (through SGC and SIBL) to use STC as a vehicle to help SGC sell SIBL CDs to the IRA accounts held at STC for the benefit of Plaintiffs and the Class.  There was a meeting of the minds at various times described herein as the various members of the conspiracy joined the conspiracy, as to the central objectives described above, and a meeting of the minds between Defendants and others as to the means for carrying out the scheme.

215.    During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting the employees and agents of SFG, including SGC, STC, and SIBL, in furtherance of the

common enterprise, engaged in specific overt acts as described herein.  Defendants' conduct was part of a continuing activity that was essential to and therefore in furtherance of the survival of the STC portion of the Stanford Ponzi scheme, which was an ongoing operation when Defendants joined the conspiracy.  The conspirators' frustration of investigatory efforts by the OFI and/or other agencies in a highly regulated environment such as securities was central to the success and longevity of the overall STC portion of the Stanford Ponzi scheme conspiracy.  The STC portion of the Stanford Ponzi scheme proximately caused Plaintiffs and the Class to lose their investments, and Defendants, by joining in conduct designed to assist and facilitate SFG's illicit conduct through SGC and STC, are jointly and severally liable with SFG, SGC, STC, and SIBL for all of Plaintiffs' and the Class members' losses.

## VII.   RESPONDEAT SUPERIOR

216.    Defendant BSW is liable for the tortious and negligent acts of its employees, including without limitation, Claude Reynaud.  Reynaud was acting within the course and scope of his employment with BSW, and in furtherance of BSW's business, when he engaged in the wrongful conduct described herein, and all of Reynaud's knowledge is attributed to BSW.

217.    Defendant A&R is liable for the tortious and negligent acts of its employees, including without limitation, Bob Schmidt and James Austin.  Both Schmidt and Austin were acting within the course and scope of their employment with A&R, and in furtherance of A&R's business, when they engaged in the wrongful conduct described herein, and all of said individuals' knowledge is attributed to A&R.

## VIII.   ACTUAL DAMAGES

218.    The Investors' Committee, Class Plaintiffs and the Class have suffered the loss of at least $300 million that was proximately caused by the wrongful conduct of Defendants as described

herein.  Additionally, the Committee sues to recover approximately $2 million that Defendants took from SFG over the years in fraudulent transfer payments.  Defendants are jointly and severally liable to Class Plaintiffs and the Class for the injuries caused by SFG, including SGC, STC, and SIBL, under Texas common law of joint and several liability, as well as under the Texas Securities Act.

## IX.   PUNITIVE DAMAGES

219.   The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs and the Class are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

220.   All conditions precedent to filing this Complaint have been met.

## X.   JURY DEMAND

221.   Plaintiffs demand a trial by jury.

## XI.   PRAYER

119.   Plaintiffs request that Defendants be summoned to answer this Complaint, that this action be certified as a class action for the Class claims, that the case be tried before a jury, and that upon final judgment, Plaintiffs and the Class recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs and the Class pray for such other and further relief to which they may be justly entitled.

Dated:  July 7, 2011

Respectfully submitted,

**CASTILLO SNYDER, P.C.**

By:   /s/ Edward C. Snyder
     Edward C. Snyder
     esnyder@casnlaw.com
     Jesse R. Castillo
     jcastillo@casnlaw.com
     300 Convent Street, Suite 1020
     San Antonio, Texas  78205
     (210) 630-4200
(210) 630-4210 (Facsimile)

**MORGENSTERN & BLUE, LLC**

By:   /s/ Peter D. Morgenstern
     Peter D. Morgenstern (*admitted pro hac vice*)
     pmorgenstern@mfbnyc.com
     885 Third Avenue
     New York, New York 10022
     (212) 750-6776
     (212) 750-3128 (Facsimile)

**NELIGAN FOLEY, LLP**

By:   /s/ Nicholas A. Foley
     Nicholas A. Foley
     nfoley@neliganlaw.com
     Douglas J. Buncher
     dbuncher@neliganlaw.com
     Republic Center
     325 N. St. Paul, Suite 3600
     Dallas, Texas  75201
     (214) 840-5320
     (214) 840-5301 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2011, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of records, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.

_____/s/ Edward C. Snyder_____